## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

...............................................................
                                       :
**UNITED STATES OF AMERICA**,          :
                                       :        Case Number:
        Plaintiff,                     :        8:21-cr-00286-JSM-NHA-1
                                       :
v.                                     :        Tampa, Florida
                                       :        April 23, 2025
                                       :        9:30 AM - 11:45 AM
**JUAN GABRIEL RIOS-SILVA**,           :
                                       :
        Defendant.                     :
                                       :
.......................................:.......................

### TRANSCRIPT OF JURY TRIAL (DAY 3 - AM)
### BEFORE THE HONORABLE JAMES S. MOODY JR.
### UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Michael Leath, Esquire |
| | Daniel M. Baeza, Esquire |
| | U.S. ATTORNEY'S OFFICE |
| | 400 North Tampa Street |
| | Suite 3200 |
| | Tampa, Florida 33602 |
| For the Defendant: | Rebecca Castaneda, Esquire |
| | THE CASTANEDA LAW FIRM, PLLC |
| | 506 North Armenia Avenue |
| | Tampa, Florida 33609 |
| Spanish Interpreter: | Gabriela Loncar |
| | Beatriz Velasquez |

Proceedings recorded by real-time mechanical stenography.
Transcript produced by computer-aided transcription.

Stenographically reported before:
Heather Suarez, RDR, CRR, FCRR, FPR-C, CA CSR
(407) 801-8921 | heather@stenosuarez.com
StenoSuarez, LLC; PO Box 3574; Orlando, Florida 32802

2

# T A B L E   O F   C O N T E N T S

## April 23, 2025

PAGE

WITNESSES CALLED BY GOVERNMENT (CONT'D):

MILTON ORLANDO RIOS-SILVA
Voir Dire Examination By Mr. Leath .....................5
Direct Examination By Mr. Leath ........................6
Cross-Examination By Ms. Castaneda ....................13
Redirect Examination By Mr. Leath ....................18

KEGAN NELSON
Direct Examination By Mr. Leath .......................19
Cross-Examination By Ms. Castaneda ....................27

STEVEN PAUL MAURIZIO
Direct Examination By Mr. Leath .......................34
Cross-Examination By Ms. Castaneda ....................37
Redirect Examination By Mr. Leath ....................40

McKENNA WYCHOCKI
Direct Examination By Mr. Leath .......................41
Cross-Examination By Ms. Castaneda ....................49
Redirect Examination By Mr. Leath ....................54

CARLOS IRIZARRY
Direct Examination By Mr. Leath .......................55
Cross-Examination By Ms. Castaneda ....................58

JUAN CAICEDO-VALENCIA
Direct Examination By Mr. Leath .......................61
Cross-Examination By Ms. Castaneda ....................67

CHARGE CONFERENCE ........................................72

CERTIFICATE OF REPORTER ..................................74

**E X H I B I T S**

| GOVERNMENT | | PAGE ADMITTED |
|---|---|---|
| Number 10(a) | Photograph | 8 |
| Number 11(a) | Photograph | 8 |
| Number 12(a) | Photograph | 23 |
| Number 12(b) | Photograph | 23 |
| Number 12(c) | Photograph | 23 |
| Number 12(d) | Photograph | 23 |
| Number 12(e) | Photograph | 23 |
| Number 17(a) | Photograph | 45 |
| Number 17(b) | Photograph | 45 |
| Number 17(c) | Photograph | 45 |
| Number 17(d) | Photograph | 45 |
| Number 17(e) | Photograph | 45 |
| Number 17(f) | Photograph | 45 |
| Number 17(g) | Photograph | 45 |
| Number 17(h) | Photograph | 45 |
| Number 17(i) | Photograph | 45 |
| Number 17(j) | Photograph | 45 |
| Number 17(k) | Photograph | 45 |
| Number 17(l) | Photograph | 45 |
| Number 17(m) | Photograph | 45 |
| Number 17(n) | Photograph | 45 |
| Number 17(o) | Photograph | 45 |
| Number 17(p) | Photograph | 45 |

| DEFENDANT | PAGE ADMITTED |
|---|---|
| (None identified.) | |

**P R O C E E D I N G S**

(Proceedings commenced at 9:30 AM.)

THE COURT:  What did you decide about jury instructions?

MR. BAEZA:  Your Honor, we conferred last night. There are just a few distinctions here between the United States and defense.

THE COURT:  We have all the jurors; so we'll take this up later.

MR. BAEZA:  Yes, Your Honor.  And before the jury comes out, though, our next witness is the defendant's brother. And, you know, he might -- our understanding is he's good to go; but sometimes he comes out, reality sets in, and they don't want to testify.  So if that's done in the presence of the jury, that can be a little prejudicial.  We're wondering if he can just be brought out before the jury comes out, and then we can proceed.

THE COURT:  All right.  Let's bring in the witness. Give the marshal his name.

Unless you know the name.  Do you know who they're talking about?

Mr. Baeza, do you want to ask some questions to see if we're good to go?

MR. BAEZA:  Mr. Leath is going to lead the direct of this witness; so it'll be his show.

THE COURT:  All right.

MR. LEATH:  Thank you, Your Honor.  Just briefly.

THE COURT:  I'll swear him when the jury's brought in, but ask him questions and make sure he's ready to go.

**VOIR DIRE EXAMINATION**

BY MR. LEATH:

Q.  Mr. Milton Rios-Silva, good morning.

A.  Good morning.

Q.  Sir, are you prepared to testify today at trial?

A.  Yes, sir.

Q.  Here to testify honestly?

A.  Yes, sir.

THE COURT:  All right.  Bring in the jury, please.

(Jury in at 9:34 AM.)

THE COURT:  Good morning.

THE JURY:  Good morning.

THE COURT:  Swear the witness, please.

THE COURTROOM DEPUTY:  Yes, Your Honor.

Would you please rise and raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in these proceedings shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I swear.

(Milton Orlando Rios-Silva sworn.)

THE COURTROOM DEPUTY:  Can you please state your name

and spell your last name for the record.

**THE WITNESS:**  Milton Orlando Rios, R-i-o-s.

**THE COURT:**  Thank you.  You can proceed.

**MR. LEATH:**  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. LEATH:

**Q.**  Good morning, Mr. Rios-Silva.

**A.**  Good morning.

**Q.**  Are you currently in jail?

**A.**  Yes, sir.

**Q.**  Did you plead guilty to conspiracy?

**A.**  Yes, sir.

**Q.**  In your own words, please tell the jury what you did.

**A.**  Could you clarify that question for me, Counselor.  I'm so sorry.

**Q.**  For the conspiracy that you pled guilty to.

**A.**  I pled guilty of conspiracy of -- while selling engines to people that -- well, that worked in narco trafficking and with knowledge and that those engines were possibly going to be used for such purposes.

**Q.**  And did you plead guilty because you are guilty of that?

**A.**  Yes, sir.

**Q.**  Sir, where are you from?

**A.**  I'm from Colombia.

**Q.**  And how did you get started in the engine business?

**A.**   Well, approximately over 20 years ago.  It's a business that -- basically, in our family.  I was the last one to join in to that business of the outboard engines and parts.  There was a business in Buenaventura and while I went to work there, and so we went to open a business in Tumaco in Nariño.

**Q.**   And for your business, what were indicators that someone was a narco trafficker when they were buying engines?

**A.**   Well, in that area it's not common to sell an amount of over four to six engines of the same spec to one single person.  So that gives you the idea, then, well, that's going to be used for that.  But at the end of the day, what we only wanted to do was to make a sale.

**Q.**   And for that being trafficking with cocaine because those engines are trafficking cocaine?

**A.**   Possibly, it would be for trafficking.

        **MR. LEATH:**  Your Honor, may I approach the witness?

        **THE COURT:**  You may.

**BY MR. LEATH:**

**Q.**   Sir, I placed two folders in front of you that are labeled as Government's Exhibits 10(a) and 11(a) for identification.  Would you please look at those briefly and then look up to me once you're done.

     Sir, do you recognize those?

**A.**   Well, they're lists of accessories and items for -- used for the installation of engines.

**Q.**   And would you sell those accessories at your store?

**A.**   Yes, of course.

**Q.**   And would you have the lists?

**A.**   Well, yes.  All of the items that appear here are items that are sold normally at the store.

        **MR. LEATH:**  Your Honor, the Government moves to admit Government's Exhibits 10(a) and 11(a) into evidence.

        **THE COURT:**  They'll be admitted.

        (Government's Exhibit Numbers 10(a) and 11(a) were admitted into evidence.)

**BY MR. LEATH:**

**Q.**   So would you sell accessories at your store?

**A.**   Yes, we sold accessories.  We sold outboard engines.  We sold parts.  We sold lubricants.  We sold electric generators, everything.

**Q.**   And, sir, I'm going to go ahead and play a phone call for you, previously admitted Government's Exhibit 32(a) -- or I'm sorry -- 35(a).  35(a).  And, sir, if you could just listen.

        (Government's Exhibit Number 32(a) published.)

**BY MR. LEATH:**

**Q.**   And do you recognize that call, sir?  Do you recognize who was on that call?

**A.**   Yes, sir.

**Q.**   And who were the individuals?

**A.**   It's me and my brother Juan.

**Q.**    And what were you talking about on that phone call?

**A.**    Well, if I recall correctly, that call was after the pandemic.  As we all know, after the pandemic, I believe there was a scarcity as far as machinery throughout the whole world.  And I am a Suzuki distributor -- or, rather, was a distributor for the Suzuki brand in Cali and in Tumaco.  And due to the scarcity of engines at the Pereira plant -- there weren't engines at that time, and the opportunity arose of importing them from Panama.  And that's why I was asking my brother there as to when the engines would possibly be arriving.  There was a client who would possibly be buying them from me.

          **MR. LEATH:**  And, Your Honor, I'm going to go ahead and show what's previously been admitted as Government's Exhibit 35(b), the translation of that transcript, just briefly.  And scrolling down to the second part.

**BY MR. LEATH:**

**Q.**    And for those engines, where were they coming from?

**A.**    The importation was done from Panama.

**Q.**    I'm going to play another call for you, Exhibit 33(a).

          (Government's Exhibit Number 33(a) published.)

**BY MR. LEATH:**

**Q.**    And, sir, do you recognize that phone call?

**A.**    Yes, sir.

**Q.**    And who is on that phone call?

**A.**    On that call, once again, it's me and my brother Juan.

**Q.**    And what were you discussing?

**A.**    Likewise, that was also another import that was done. This one was related to some Suzuki 250 engines.  And as I mentioned earlier, after the pandemic, there was a scarcity of engines, and there were none on site at Pereira.  They weren't assigning that spec of engine to me, and so we did the importing from people that -- it says "Trepito."  Trepito -- that's my brother Herson (phonetic) who is in Buenaventura. And they were asking him quotes for those engines, and that's why he called me, because he knew that I was a Suzuki distributor.  And at the end of the day, it all boiled down to making the sale and making some commission.

          **MR. LEATH:**  And I'm going to publish, Your Honor, Exhibit 33(b), which has been previously admitted into evidence.

**BY MR. LEATH:**

**Q.**    And how many engines were you discussing in that phone call?

**A.**    In that call we spoke about that six were arriving but that eight were needed, and so logically -- and I remember at that time my brother wasn't even able to make the sale because we were talking about there that the engines would be arriving after 20 days.

**Q.**    And who buys eight engines?  Is that an indication of a narco trafficker?

**A.**   Well, possibly.  If they're buying the same spec, it's possible they're a narco trafficker.  But many times it happens, and it would happen to me over there in Tumaco.  The majority of people also send other people, and then people trying to make a commission start getting quotes here, there, at some other store.

**Q.**   And would -- was it typical -- would narco traffickers always pick up themselves or with other people -- pick up engines for other people?

**A.**   Excuse me?

**Q.**   Would a narco trafficker always pick up the engines themself, or would other people pick up engines?

**A.**   No.  They'd send other people.  Sometimes they weren't even the same people that would pay one for the engines.

         **MR. LEATH:**  Your Honor, one moment --

         **THE WITNESS:**  They would send different ones.

         **MR. LEATH:**  Sorry.

         One moment to confer with counsel.

         **THE COURT:**  All right.

**BY MR. LEATH:**

**Q.**   So in the call -- I'm going to go ahead and just scroll to the transcription.

         **MR. BAEZA:**  Your Honor, would you direct the witness not to talk to the defendant.

         **THE COURT:**  I'm sorry?

**MR. BAEZA:** Would you direct the witness not to talk to the defendant, please.

**THE COURT:** All right. Yes.

Don't speak to anyone here in the courtroom. Just answer the questions that you're asked.

**THE WITNESS:** I'm so sorry. He was asking me about the swelling in my eye.

**BY MR. LEATH:**

**Q.** So for those engines, what type of customers would pick up those engines in terms of the large volumes? Would that be an indication of a fisherman or a narco trafficker?

**A.** No. Logically, a fisherman is not going to use a 250 engine unless it's, like, for larger vessels.

**Q.** Now, did you take part in a deposition with prior defense counsel a few years ago regarding your brother?

**A.** Yes, sir. I did an interview for my brother's defense in 2023, and it was March, if I remember correctly.

**Q.** And did you testify falsely in that interview -- that deposition?

**A.** Well, possibly I did lie when I was asked about if I had knowledge as to who the engines were being sold to.

**Q.** And why -- why did you lie? What was the reasoning?

**A.** Well, due to fear. Due to fear of me being associated beyond what perhaps my role in all of this was, which at the end of the day, it's sales. It's the sale of a legal product

at a store that was legitimately established.

Q.   And why were you scared and why -- why were you afraid to tell the truth at the deposition?

A.   Well, if I remember correctly, at that deposition I also said that -- that I had the store in a conflict area that was for drug trafficking.  So what was missing was for me to finish in completing the answer as such.

            MR. LEATH:  Thank you, sir.

            One moment, Your Honor.

            THE COURT:  All right.

            MR. LEATH:  Thank you, Your Honor.  Pass the witness.

            THE COURT:  You may proceed with cross.

                    **CROSS-EXAMINATION**

BY MS. CASTANEDA:

Q.   Good morning.

A.   Good morning.

Q.   Your brother's younger than you; correct?

A.   No.  I'm the younger.

Q.   You have one older brother or two?

A.   I have four older siblings.

Q.   Okay.  And you have an engine store; correct?

A.   Yes, of course.

Q.   And so did Mr. Rios, the defendant here in this case; correct?

A.   Yes, ma'am, he did as well.

Q.   And you split ways in business in 2013; right?

A.   2013, we split our partnership, yes, ma'am.

Q.   So you operated your own business independently; right?

A.   Yes, ma'am.

Q.   And he had his own business; right?

A.   He stayed with the business in Cali, and I stayed with the one in Tumaco and, logically, with different names.

Q.   And -- I'm sorry.  Go ahead.

A.   Back then Juan remained at Agronautica S.A.S., and I stayed with Agronautica N.R. back then so that we wouldn't lose that name in Tumaco.

Q.   So your store's name was also Agronautica?

A.   It was also Agronautica.

Q.   And it was your store that sold the engines to narco traffickers, wasn't it?

A.   Yes.  I worked independently.

Q.   And after Mr. Rios was indicted by the Government, you tried to prove his innocence, didn't you?

A.   Yes.  I did the interview to cooperate.

Q.   And you previously stated under oath that your brother was not guilty of assisting drug traffickers; right?

A.   Well, yes.

Q.   And you were part of a formal court proceeding where you were deposed by the United States government in Colombia; right?

**A.** Yes, ma'am.

**Q.** And a United States federal prosecutor on this case was there?

**A.** Well, the interview was done with my brother's then defense attorney, and by video call I believe there was a prosecutor and I believe a female translator. There were about four people.

**Q.** And after you answered all the Government's questions about your brother's conduct to which you said he did not knowingly sell engines to narco traffickers, you were indicted; right?

**A.** Yes, ma'am. I believe I gave my statement on the 9th of March, and by the 15th/16th, they initiated a process with me.

**Q.** And that was a surprise to you; correct?

**A.** Well, yes. No one expects to have a case open on them.

**Q.** So you were federally charged in this case after your brother -- after you tried to help prove your brother's innocence?

**A.** Yes, ma'am.

**Q.** You were then arrested?

**A.** I was detained the 16th of November of 2023.

**Q.** And you were held in a Colombian prison before you were extradited; right?

**A.** Yes, ma'am. I was at the Picota prison in Bogota for 16 months.

**Q.**    And then while you were in Colombia, the United States government approached you and asked if you wanted to make a deal; correct?

**A.**    Well, while being at Picota, no.  I hired my defense attorney, and he's the one who's been directing me as to what I should do.

**Q.**    And was your attorney offered a plea agreement by the United States government that he then told you about?

**A.**    Well, yes.  He mentioned an agreement to me for me pleaing guilty.

**Q.**    And then you were given evidence in this case; correct?

**A.**    Yes, ma'am.

**Q.**    And they told you that other Colombians would testify against you; correct?

**A.**    Well, yes.

**Q.**    And they threatened to indict other people in your family, including your wife; correct?

          **MR. LEATH:**  Objection, Your Honor.

          **THE COURT:**  Sustained.

**BY MS. CASTANEDA:**

**Q.**    They threatened to indict anybody else besides you?

          **THE COURT:**  Sustained.

**BY MS. CASTANEDA:**

**Q.**    And you were told that you were facing decades in prison; correct?

**A.** Well, the attorney supposedly -- it was mentioned that the minimum sentence was ten years.

**Q.** So you were threatened with at least a decade in prison. You were facing extradition. And you came to the United States, and you pleaded guilty; right?

**A.** Well, I don't know if I would call it a threat, but according to the law, it states that the minimum sentence for conspiracy is ten years.

**Q.** Have you ever been arrested before?

**A.** I was detained in 2014 due to a problem with a vehicle in the city of Cali, and it was cleared up. I went to trial, and I won at trial because I was being accused of something that wasn't so.

**Q.** And that was the government of Colombia that charged you with those?

**A.** Yes, ma'am.

**Q.** Have you ever been charged by the United States government?

**A.** No. First time.

**Q.** Have you ever been to the United States before this proceeding?

**A.** No, ma'am.

    **MS. CASTANEDA:** A moment, Your Honor.

    Nothing further, Your Honor.

    **THE COURT:** Any redirect?

MR. LEATH:  Yes, Your Honor.

Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. LEATH:

Q.   Mr. Rios-Silva --

A.   Yes, sir.

Q.   -- do you want to be here and testify against your brother?

A.   Well, more than testifying against my brother.  It's about clarifying many of the questions that were -- that came up at that interview.

Q.   And do you want to protect your brother?

A.   I'm not here to protect anyone.  I'm here to clarify my situation, and I hope my brother clarifies his as well.

Q.   And you had clients for engines, and your brother had clients for engines?

A.   Yes.

Q.   And were you truthful in your testimony to me a few moments ago in direct?

A.   Yes, sir.

Q.   And in your plea agreement, isn't it true that you pled guilty to conspiring with your brother?

A.   Well, in the agreement I'm included with my brother.  And, as I said, I'm here to clarify my situation, and I hope that my brother also clarifies his.

**MR. LEATH:**  Thank you.  No further questions.

**THE COURT:**  Thank you, sir.  You may step down.

Call your next witness.

**MR. LEATH:**  Your Honor, the United States calls Kegan Nelson.

And, Your Honor, we filed an updated exhibit list electronically.  I'd like to just approach.

**THE COURT:**  All right.

**THE COURTROOM DEPUTY:**  Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in these proceedings shall be the truth, the whole truth, and nothing but the truth?

**THE WITNESS:**  I do.

(Kegan Nelson sworn.)

**THE COURTROOM DEPUTY:**  Can you please state your name and spell your last name for the record.

**THE WITNESS:**  My name is Kegan Nelson.  The last name is spelled N-e-l-s-o-n.

**THE COURTROOM DEPUTY:**  Thank you.  Please take a seat in the witness box.

**THE COURT:**  Proceed.

**MR. LEATH:**  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. LEATH:

**Q.**   Good afternoon, sir.

**A.**   Afternoon.

**Q.**   Or good morning.

**A.**   Good morning.

**Q.**   Did you ever work for the United States Coast Guard?

**A.**   I did from 2014 to 2020.

**Q.**   And could you go ahead and give us a background of your jobs in the Coast Guard.

**A.**   Yes.  When I entered the Coast Guard, I was a deck seaman for about two years on a big ship in Seattle.  After that I was a maritime law enforcement specialist at the Pacific Tactical Law Enforcement Team in San Diego.  We primarily handled counternarcotics boardings.

**Q.**   And what kind of training do you have for counternarcotics boardings?

**A.**   I went to maritime law enforcement specialist school, which handles law enforcement boardings broadly, and then at my unit I was trained in a lot of specific counternarcotics techniques, like how to test for contraband, how to look for trace elements of contraband, how to search a vessel for hidden compartments, things like that.

**Q.**   And were you a qualified boarding officer in the Coast Guard?

**A.**   Yes, I was.

**Q.**   And what does that mean?

**A.**   That means that I was qualified to be able to lead a

boarding team on any given boarding with the assistance of other boarding officers and boarding team members.

Q.   And how many boardings have you conducted in your career?

A.   A couple dozen probably.

Q.   And do you remember the time frame of approximately September of 2019?

A.   Yes.

Q.   Where were you stationed?

A.   I was stationed in San Diego at the Pacific Tactical Law Enforcement Team.  I was deployed onboard Coast Guard cutter *Valiant*, which is out of Florida.

Q.   And do you remember an interdiction or a boarding that occurred approximately September 5th, I think, of that year?

A.   Yes.

Q.   And what was your role in that?

A.   I was the lead boarding officer on that boarding.

Q.   And can you go ahead and walk us through what you remember of that boarding.

A.   Yes.  I was onboard cutter *Valiant*.  We were in the eastern Pacific sometime around dinnertime, 5:00 or 6:00 PM.  I was told that a patrol aircraft had sighted a vessel that looked like a self-propelled semi-submersible vessel traveling west away from the coast.  We set course for it and went to catch up with it, launched the small boats, and went looking for the vessel while the aircraft sort of vectored us towards

where it was.

Q.   And once you got vectored in -- what does "vectored in" mean?

A.   That just means, you know, we're starting 10 miles away. It was nighttime.  It was very difficult to see the vessel because it was super low in the water.  It was painted kind of a dark blue color.  So the aircraft would call down to the small boat and basically say, "You need to come 10 degrees to your right.  You need to come 10 degrees to your left.  You're a mile away.  You're 500 yards away," until we could see it visually, which was probably at about 25 to 50 yards away.

MR. LEATH:  Your Honor, permission to approach the witness.

THE COURT:  You may.

BY MR. LEATH:

Q.   And, sir, I've handed you what's been marked for identification as Government's Exhibits 12(a) through (e). Could you go ahead and take a look at those and then look up at me once you're done.

And do you recognize those photos, sir?

A.   Yes, I do.

Q.   And how do you recognize them?

A.   I took most of these photos.  I believe I'm in one of the photos as well.

Q.   And are they fair and accurate depictions of what you

remember?

A.   Yes.

        MR. LEATH:   Your Honor, permission to admit
Government's Exhibits 12(a) through (e) into evidence.

        THE COURT:   They'll be admitted.

     (Government's Exhibit Numbers 12(a), 12(b), 12(c), 12(d),
and 12(e) were admitted into evidence.)

        MR. LEATH:   And permission to publish, Your Honor.

        THE COURT:   You may.

        MR. LEATH:   Thank you, sir.

BY MR. LEATH:

Q.   I'm going to go ahead and put up Government's
Exhibit 12(a).  It should be popping up on your screen.

     Sir, can you go ahead and just walk us through.  What are
we looking at here?

A.   So this is the vessel that we boarded.  In the foreground,
that's the Coast Guard's small boat off cutter *Valiant* in the
background.

     The front of the vessel is on the left side of this
picture.  That's the bow.  There's a little pilot box cockpit
with a few small windows and a hatch on top.  That's where the
three people are sitting.  I'm the person on the right in that
photo.

     And then back from that is sort of the rear end of the
vessel, which houses the engine, and I think this pipe coming

up and out the back is the exhaust for the engine.

Q.   Okay.  I'm going to go ahead and show you Exhibit 12(b),
and we're going to walk through just the same process of just
describing what we're seeing.

A.   So once you go down that little hatch that's on top of the
vessel, there's a bunch of space behind that with the engine in
it and then a bunch of space in front of that.  That was closed
off.  To be able to access that space, we cut a whole through
the fiberglass wall that's there, and this is looking forward
into that compartment at what is contraband.

Q.   And we're going to go to 12(c).  And same thing.  Similar
photo.  But if you would, sir, just kind of narrate us through.

A.   Yeah.  So this is the hole we cut through the fiberglass
wall to be able to access that forward compartment, and you can
see into there the contraband laying in that forward
compartment packaged up in pretty big bails.

Q.   All right.  And then 12(d).

A.   That's another view of the vessel that's looking at it
from the back.  So you can see the hatch on top.  That's the
only way in and out of there.  Forward of that is where the
pictures of the contraband -- we're looking towards the bow,
and then you can see the exhaust pipe and things off the back
of the vessel.

     MR. LEATH:  And, ma'am, can I switch to the ELMO.

///

BY MR. LEATH:

Q. All right, sir. What are we looking at here? We may need more help on this one.

A. So this is a little out of focus, unfortunately.

Once you go down into the pilot box, there is a door into the back part of the vessel. This is the engine, which is housed back there. So it's a large white diesel engine. This is sort of the best picture we could get of the stamp that was on it with, you know, any information about the engine's serial number, manufacturer, things like that.

Q. And, sir, once you guys did the boarding, what did you do with the contraband?

A. So we took as much contraband as we could get from the front compartment, pulling it out through that small hole, and we sent that back to cutter *Valiant*. Unfortunately, the more contraband we took out, the more the bow of the vessel was coming up because it's -- essentially the contraband was weighing down the front, and so the stability was getting worse and worse as we unloaded contraband. So we left some of it onboard and sunk the vessel afterward just because we couldn't keep pulling it out and not trust the vessel to sink.

The rest of it, we took. We tested it onboard, and we have used a field narcotics identification kit, and it had tested positive for cocaine.

Once we took it back, we took a 10-kilogram representative

sample of cocaine.  We put that with the case package, all the nondrug evidence, and then the bulk cocaine -- we separate and tag that separately.

Q.   And then what -- do you know where that cocaine eventually goes or how it's transported?

A.   So the representative sample will go with the case package, anyone that we've detained, and all the nondrug evidence that we pick up.  Sometimes the bulk cocaine will also go with them.  How and where that goes just depends on what cutter's in the area, what Coast Guard ships have space to hold the cocaine and are on their way back into the United States. So sometimes the bulk of the cocaine will go separately from the representative sample.

Q.   And for -- for this case were you aware -- so you took it back to the cutter *Valiant*?

A.   Yes.

Q.   And then you initiated the documentation?

A.   Yes.

Q.   And does that documentation stay with the drugs?

A.   Yes.

        MR. LEATH:  One moment, Your Honor.

BY MR. LEATH:

Q.   And, sir, do you remember the brand of the engine onboard that SPSS?

A.   I believe it was a white Cummins diesel engine.

MR. LEATH:  Thank you, Your Honor.  Pass the witness.

THE COURT:  You may cross.

**CROSS-EXAMINATION**

BY MS. CASTANEDA:

Q.  Good morning.

A.  Good morning.

Q.  You said you were an ME; correct?

A.  Yes.

Q.  Where are you now?  Because you're obviously not wearing coastal "trops."

A.  I exited the Coast Guard in 2020.  I went to law school. I'm a law clerk at the Nevada Supreme Court.

Q.  Okay.  So you had to travel to come here?

A.  Yes.

Q.  Okay.  Do you know what an MK is in the Coast Guard?

A.  Yes.  That's a machinery technician.

Q.  Did you ever do any MK type of training while you were in?

A.  No, I did not.

Q.  And you said you've done about a couple dozen boardings?

A.  Yes.

Q.  Was that more than one patrol on the cutter?

A.  That was over about four or five patrols probably -- over the course of about four or five patrols.

Q.  Okay.  And how many years did you do four or five patrols?

A.  That would have been over about a four-year period.

**Q.** Okay. And you said you remember the boarding the Government asked you about; right?

**A.** Yes.

**Q.** How many boardings did you do since that boarding?

**A.** I would say maybe 10 or 12 boardings, only a few of which were interdictions.

**Q.** Okay. Can you explain for the jury what that means.

**A.** Yeah. So there are times where we board a vessel because we have suspicion that it's moving contraband, and we go onboard, and it turns out there's not contraband onboard. And so we -- once we finish searching the vessel and checking everything, we just let them go on about their way.

**Q.** Did you do any recreational boating boardings?

**A.** No.

**Q.** So strictly counterdrug boardings?

**A.** I did some fisheries boardings as well in the Coast Guard. All of that would have been prior to counternarcotics boardings.

**Q.** Okay. And you're including those types of boardings in your total numbers of boardings that you've done?

**A.** Yes.

**Q.** And how many of the boardings that you did did have alleged contraband found?

**A.** I want to say around five or six.

**Q.** Okay. And did you assist in the drug processing of all of

those?

**A.** Yes.

**Q.** Okay. And was that as a capacity of the lead boarding officer?

**A.** Sometimes it's the lead boarding officer, oftentimes as a boarding team member or as a secondary boarding officer.

**Q.** Okay. And you would agree that a chain of custody of drugs is important; right?

**A.** Yes.

**Q.** And Coast Guard's required to document any evidence that they take off of a boat that has been found to have alleged contraband on it; right?

**A.** Yes.

**Q.** And as part of this processing, documents are required; right?

**A.** Yes.

**Q.** And you as a boarding officer are the one that has to sign off on those; right?

**A.** Yes.

**Q.** And are these documents optional?

**A.** No, they're not.

**Q.** Okay. And what about completing an inventory tag?

**A.** Yes. We do, like, an evidence tag for each piece of evidence or we put it in an evidence bag that has a serial number on it as well.

**Q.**    And what about a seizure tag?

**A.**    Yeah.  That's just a tag that has a serial number on it. We'll use that for evidence if it doesn't fit in an evidence bag.

**Q.**    Okay.  And evidence bags -- are they small? big?

**A.**    They come in a variety of sizes, but they're usually pretty small, like that big.

**Q.**    Okay.  And are those tracked by a serial number?

**A.**    Yes.

**Q.**    Okay.  And you have to document that serial number as well; right?

**A.**    Yes.

**Q.**    Okay.  And you have to photograph evidence; right?

**A.**    Yes.

**Q.**    Okay.  And then you have to authenticate that you're the one who took the photo; right?

**A.**    Yes.

**Q.**    And then you do a statement about it; right?

**A.**    Yes.

**Q.**    And other people involved in the boarding also do a statement; right?

**A.**    Yes.

**Q.**    And you put together what's called a law enforcement case package; right?

**A.**    Yes.

**Q.**   Okay.  And part of that, you photographed the engine.

          **MS. CASTANEDA:**  May I have the ELMO, please?  Thank you, Ms. Kristin.

**BY MS. CASTANEDA:**

**Q.**   This is Exhibit 12(e), and you were just shown this by the Government.

**A.**   Yes.

**Q.**   Okay.  Can you see that okay?

**A.**   Yes.

**Q.**   Okay.  And you testified that you took that photograph?

**A.**   Yes.

**Q.**   Right?

          And you also testified that you don't have any sort of MK, or mechanical training; right?

**A.**   Yes.

**Q.**   Did you review the case package in this case before you prepared to testify today?

**A.**   No.

**Q.**   Did you review -- when you did your boarding and you looked at the engine, is this the only photograph you took?

**A.**   I don't remember.

**Q.**   Okay.  And do you see any sort of brand name on this engine?

**A.**   It's very faint.  It's right, sort of, at the top of this middle rounded piece, but yeah.  Very difficult to make out.

**Q.**    And when you testified, you said that that was a -- I'm sorry -- Cummins?

**A.**    Yes.

**Q.**    And is that -- is it your opinion that that's the brand because that's what you read on this photograph today?

**A.**    That is what I remember from conducting the boarding -- is identifying it as a Cummins engine.

**Q.**    And do you remember anything else about this engine?  I know it's been a while.  I know you've had several boardings.

**A.**    I know it was a fairly large diesel engine sitting, you know, in the back of the vessel; but other than that, no.

**Q.**    Okay.  And you said that you are aware that contraband -- how it's processed after Coast Guard interdicts a boat; right?

**A.**    Yes.

**Q.**    And it's then sent off to a lab; correct?

**A.**    As far as I know, yes.

**Q.**    And do you know why the Coast Guard doesn't process that?

**A.**    I do not.  I assume they just don't have the capabilities that other agencies do.

**Q.**    Okay.  So Coast Guard defers to -- do you know an agency that processes drugs?

**A.**    The DEA.

**Q.**    Okay.  So it's the DEA's job to determine what contraband's found onboard; correct?

**A.**    Yes.

**Q.**   Okay.  So you're not qualified to say if this is 100 percent cocaine, are you?

**A.**   No.

            **MS. CASTANEDA:**  Okay.  Thank you.

            **THE COURT:**  Any redirect?

            **MR. LEATH:**  No, Your Honor.

            **THE COURT:**  Thank you, sir.  You may step down.

            How long is your next witness?

            **MR. LEATH:**  I'd say approximately 15 minutes, Your Honor.

            **THE COURT:**  How long is the cross of the next witness?

            **MS. CASTANEDA:**  I don't know who --

            **MR. LEATH:**  Paul Maurizio, DEA.

        (Counsel conferring off the record.)

            **MS. CASTANEDA:**  Not more than 10 minutes, Your Honor.

            **THE COURT:**  Let's go ahead and take our 15-minute morning break.

        (Recess at 10:25 AM until 10:40 AM.)

            **THE COURT:**  Bring in the jury, please.

        (Jury in at 10:41 AM.)

            **THE COURT:**  Call your next witness, please.

            **MR. LEATH:**  Your Honor, the Government calls Paul Maurizio.

            **THE COURTROOM DEPUTY:**  Do you solemnly swear or

affirm under penalty of perjury that the testimony you shall give in these proceedings shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, ma'am.

(Steven Paul Maurizio sworn.)

THE COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Steven Paul Maurizio, M-a-u-r-i-z-i-o.

THE COURTROOM DEPUTY:  Thank you.

Please take a seat in the witness box.

THE COURT:  Proceed.

MR. LEATH:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. LEATH:

Q.   Mr. Maurizio, where do you work, sir?

A.   I work for the Drug Enforcement Administration.

Q.   And how long have you worked for the DEA?

A.   Approximately 21 years.

Q.   Can you just very briefly give us an overview of your career.

A.   Yes.  I was hired in 2004 and worked at the Dallas Field Division until 2011, at which time I transferred to the Bahamas and worked at the U.S. Embassy in Nassau from 2011 to 2017. And in 2017 I transferred to Operation Panama Express, where I currently am now.

**Q.**   And what have your roles been at Panama Express?

**A.**   To investigate transnational organizations mostly involving maritime smuggling.

**Q.**   And have you ever been involved in or one of your duties been the processing of drugs from those smuggling ventures?

**A.**   Yes, it has.

**Q.**   And can you go ahead and describe for the jury what your roles are or were for them.

**A.**   Yes.  So the United States Coast Guard does patrols in the eastern Pacific and the Caribbean, and when they make seizures in international waters, they confiscate the drugs from the maritime vessels.  And when they come into port -- normally in Miami, Fort Lauderdale, or San Diego -- we travel to those ports, take custody of the narcotics, and process them at our DEA laboratories.

**Q.**   And how many processings have you been a part of approximately?

**A.**   Fifty.

**Q.**   I want to direct your attention to September of 2019. Were you present for a drug offload involving a Coast Guard interdiction in -- approximately September 5th of 2019?

**A.**   Yes, I was.

**Q.**   And what do you recall about that offload, if anything?

**A.**   The offload took place on September 20th of 2019 in Miami, Florida.

Q.   And what was your role there?

A.   My role is to board the cutter and confirm the counts that the Coast Guard provide to us by comparing what is an FDIN number, which is the federal identification number, for the drugs that they had seized; and I also compare an SEV number, which is the surface event number that is assigned by the U.S. Coast Guard.

Q.   And from that FDIN number, does the DEA create its own number or tracking system?

A.   Yes.  That number is created by the El Paso Intelligence Center in El Paso, Texas.

Q.   And do you recall what that number was for this case?

A.   I don't recall the exact number, no.

Q.   Okay.  But you create it off the Coast Guard?

A.   The Coast Guard creates the number, and then we verify that number with what they provide us to the palletized narcotics that are on the deck of the cutter.

Q.   And once you get the drugs onboard the Coast Guard cutter, what do you do with those drugs?

A.   Once the count's verified, we offload the drugs usually by a crane.  They're put down on the -- the sea deck of the port, and then they're loaded onto a box truck, at which time they are escorted to a DEA laboratory for analysis and processing.

Q.   And is that what occurred in this case?

A.   Yes, it is.

**Q.** And does the DEA and do you follow a very regimented process each time you do one of these drug processings?

**A.** Yes, we do.

**Q.** And why do you do that?

**A.** Just to make sure that everything is consistent, make sure the counts are correct, make sure the custody of evidence is -- is documented.

**Q.** And you might have mentioned it, but I believe I have missed it. Where did you take the drugs for this offload?

**A.** To the Miami laboratory -- DEA laboratory.

**Q.** And then what do you do with those drugs there?

**A.** At that time they're broken down and counted and then weighed and submitted as evidence.

**Q.** And, to your knowledge, does anything else happen to those drugs?

**A.** They get analyzed by the DEA lab.

         **MR. LEATH:** Okay. No further questions, Your Honor.

         **THE COURT:** Cross.

                    **CROSS-EXAMINATION**

BY MS. CASTANEDA:

**Q.** Good morning.

**A.** Good morning.

**Q.** You testified that you've done about 50 offloads of drugs from the Coast Guard?

**A.** Approximately, yes.

**Q.** And is each offload, just as far as you know, one drug case, or can there be multiple drug cases or interdictions off of one offload?

**A.** There is multiple drug cases.

**Q.** Okay. And you said you pulled off drugs from the Coast Guard cutter and you take them to a lab where the DEA tests whatever they believe is contraband; right?

**A.** That is correct, yes.

**Q.** Okay. And you testified that as part of the -- I believe it was called a regimented process --

**A.** Yes.

**Q.** I like that phrase.

-- you make sure that the custody of evidence is documented; right?

**A.** That is correct, yes.

**Q.** And the DEA has forms specific for that; right?

**A.** We do, yes.

**Q.** And can you tell the jury what those are.

**A.** It's a DEA-6, which is a report that we create to document the process that happened that particular day and ensure there's a custody of evidence documented.

**Q.** Thank you.

And in processing drugs, sometimes drugs get swapped; right?

**A.** I have not witnessed that personally on any of my

processings where the drugs were swapped.

**Q.** And -- but, obviously, that wouldn't happen with you; right? But that has happened before; correct? An offloading has mistakenly processed drugs for one case when it should have been for another; right?

**A.** Is it possible? Yes. I don't recall that ever happening.

**Q.** That never happened while you were at Operation Panama Express?

**A.** Not that I recall.

**Q.** Okay. And the forms that are required, if DEA doesn't do those, should somebody still trust the process of connecting those drugs from the cutter to the ones that went to the lab?

**A.** If the report wasn't created?

**Q.** Correct.

**A.** Well, that would be a matter of opinion.

**Q.** No. I'm asking you.

**A.** That -- I guess I'm not understanding your question.

**Q.** If the DEA Form 6 or 7 is missing, should the process for chain of custody still be trusted?

**A.** I mean, there could be doubt.

**Q.** And that's why those forms are required; right?

**A.** Correct.

          **MS. CASTANEDA:** Thank you. Nothing further.

          **THE COURT:** Any redirect?

          **MR. LEATH:** Briefly, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. LEATH:**

**Q.**   Agent Maurizio, so for this interdiction of September 5, 2019, of this processing, was there anything abnormal that you remember about it?

**A.**   No.

**Q.**   Did it follow the normal processes that you follow or that you conduct?

**A.**   Yes, it did.

          **MR. LEATH:**   No further questions, Your Honor.

          **THE COURT:**   Thank you, sir.   You may step down.

          **THE WITNESS:**   Thank you.

          **THE COURT:**   Call your next witness.

          **MR. LEATH:**   Thank you, Your Honor.   The United States calls McKenna Wychocki, I believe, Coast Guard witness.   I apologize for the mispronunciation.

          **THE COURTROOM DEPUTY:**   Please raise your right hand.

          Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in these proceedings shall be the truth, the whole truth, and nothing but the truth?

          **THE WITNESS:**   Yes, I do.

     (McKenna Wychocki sworn.)

          **THE COURTROOM DEPUTY:**   Could you please state your name and spell your last name for the record.

          **THE WITNESS:**   McKenna Wychocki, W-y-c-h-o-c-k-i.

THE COURTROOM DEPUTY:  Thank you.  Please take a seat in the witness box.

THE COURT:  Proceed.

MR. LEATH:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. LEATH:

Q.  Good morning, sir.

A.  Good morning.

Q.  First, I want to apologize.  I had to announce your name to request you to the judge, and I butchered it.

A.  That's all right.

Q.  Where do you work?

A.  I work -- right now I am in -- a petty officer first class in the United States Coast Guard, and I'm stationed aboard the Coast Guard cutter *Joseph Tezanos* in San Juan, Puerto Rico.

Q.  How long have you been with the Coast Guard?

A.  I've been in the Coast Guard for 11 years now.

Q.  And what have been your various roles in the Coast Guard?

A.  I have -- I started in California.  I served on a ship there.  From there I went to a small well station where I did general -- general law enforcement and search and rescue.  I then went to Tactical Law Enforcement Team South where we specialize in counternarcotics, and now I'm here in San Juan, Puerto Rico, where we do immigration and counternarcotics law.

Q.  And do you remember the time frame of December 2019?

**A.**    Yes, sir.

**Q.**    Where were you stationed?

**A.**    I was at Tactical Law Enforcement Team South.

**Q.**    And what would be your various duties at Tactical Law Enforcement Team South?

**A.**    Primary would be as a counternarcotics boarding officer. That's what we would specialize in as a tactical operator. We would deploy aboard U.S. Coast Guard, U.S. Navy, and allied vessels and with allied law enforcement partners to do counternarcotics operations.

**Q.**    And in December -- approximately December 17th of 2019, do you recall an interdiction?

**A.**    Yes, sir, I do.

**Q.**    And what was your role in that interdiction?

**A.**    I was -- during the initial phase of the interdiction, I was the assistant boarding officer, and then I later transitioned to assume the role of boarding officer as the interdiction progressed.

**Q.**    And can you go ahead and just give us a brief summary of what you recall.

**A.**    Yes, sir. So that night we had -- a maritime patrol aircraft had spotted a target of interest in the eastern Pacific Ocean. We were far from shore. We -- I was aboard the Coast Guard cutter *Tampa* at the time. I was augmenting their boarding team. The primary boarding officer was stationed

aboard the *Tampa*.  I was assisting him as the assistant boarding officer.  We launched an interdiction asset from the cutter *Tampa* approximately 15 nautical miles from our target of interest.

We were directed at night, vectored in by our maritime patrol aircraft, or MPA, and we were -- we had a difficulty -- difficult time trying to find the target because the way it was constructed.  It was -- the paint scheme onboard -- it was specifically designed to maintain a low profile.  There were no lights on it at all.

Once we did get a visual of the target, myself and the boarding team -- we boarded.  We gained positive control of the vessel.  We conducted a right of visit questioning to determine if the vessel had a nationality; if there was a master aboard upon the vessel, what their purpose of voyage was.  We didn't get a lot of answers from the occupants about purpose of voyage, but they claimed Colombian nationality, said they left in the vicinity of Colombia.

And once we were authorized to conduct a law enforcement boarding from the U.S. Coast Guard District 11, we discovered contraband onboard, conducted an investigation of the vessel. It was a low-profile vessel constructed a lot differently than most of the ones that we see in the eastern Pacific, and it ended up having inboard engines as opposed to outboards, which is not common.

We found a large diesel tank onboard, definitely suggesting that it was going to make a trip from South America to Central or North America across the eastern Pacific Ocean.

We detained -- after, you know, presumptive positive tests for cocaine, we had probable cause to detain the occupants, transferred them to the *Tampa*, and then that is about the -- where the interdiction ended.

MR. LEATH:  Your Honor, permission to approach the witness.

THE COURT:  You may.

BY MR. LEATH:

Q.   So, sir, I've just handed you what's been marked for identification as Government's Exhibits 17(a) through (p). Would you go ahead and please review those and then look up to me -- look up at me once you're done.

Sir, do you recognize those photos?

A.   Yes, sir.

Q.   How do you recognize them?

A.   Those are from the interdiction that occurred on that day.

Q.   And are they fair and accurate representations of that interdiction?

A.   Yes, sir.

Q.   Did you see any alterations?

A.   No, sir.

MR. LEATH:  Your Honor, permission to move into

evidence what's been marked as Government's Exhibits 17(a) through (p).

THE COURT:  They'll be admitted.

(Government's Exhibit Numbers 17(a), 17(b), 17(c), 17(d), 17(e), 17(f), 17(g), 17(h), 17(i), 17(j), 17(k), 17(l), 17(m), 17(n), 17(o), and 17(p) were admitted into evidence.)

MR. LEATH:  Thank you, Your Honor.

Permission to publish.

THE COURT:  You may.

MR. LEATH:  Thank you, sir.

BY MR. LEATH:

Q.   So, sir, I'm going to go ahead and publish 17(a) up here on the screen, and if you could -- we're going to go through these photos in a somewhat timely manner -- just walk us through what we're looking at and what we're seeing.

A.   These are the engines onboard this low-profile vessel. They were in the aft or compartment just behind the cockpit. We've got twin inboard Yanmar diesel engines.

Q.   And what was the brand?

A.   Yanmar.

Q.   We're going to keep rolling to 17(b).

A.   That is the low-profile vessel.

Q.   17(c).

A.   Aft section of the vessel.

Q.   And can you just walk us through -- was there -- where

were the engines situated?

A.   So right behind -- you can see myself and my partner sitting in this image in the cockpit.  Just aft of us is where you have the hatch removed.  That is the engine compartment.

Q.   And let's look at 17(d).

A.   Yep.

Q.   And what's that vessel in the background, sir?

A.   That's the Coast Guard cutter *Tampa*.

Q.   That was the one you were on?

A.   Yes, sir.

Q.   17(e).  And we're going to -- I think we've covered this. We're going to go to (f) briefly.  17(f).

Yeah.  Walk us through this, sir, please.

A.   Okay.  So this is one of the kilograms-size packages that we removed from one of the bales onboard the vessel.  There was approximately, if I recall correctly, 40 to 45 bales of between 30- to 40-kilogram, you know, size bales onboard.

And what we do in order to -- we're conducting a narcotics identification test.  We're verifying what substance is inside this package.  That's Test G for cocaine because it was packaged similar to other cocaine seizures we've had in the past.  So we tested it, and it was positive for cocaine.

Q.   Okay.  I'm going to go ahead to 17(g).

A.   Yes.

Q.   And can you just walk us through -- what is this chart

here?

**A.** Sure. So these are the instructions on how to conduct a NIK test. So per Coast Guard policy, every time that we conduct a narcotics identification test, we have the instructions in front of us so we ensure that we're not making any mistakes or doing the test incorrectly.

**Q.** And 17(h).

**A.** In this image we are placing the suspected contraband inside of our NIK Test G.

**Q.** And 17(i).

**A.** And this is -- this is the image of the -- of our NIK test. What we should see is a pink over blue color change within the test. It's hard to tell in the photo but --

**Q.** And I'm going to go next to (j).

**A.** Yeah. This is us conducting a second test. Per policy we are required to conduct two. They don't have to be consecutive, but we do need two positive tests.

**Q.** Go to (k) -- 17(k). And here, sir.

**A.** Yep. So this is our positive result for our NIK test. You can see in the image we do have a pink over blue color change. Difficult to photograph, unfortunately, but --

**Q.** And I'm going to go to (l) next. 17(l).

**A.** Again we have images of the engine compartment of the low-profile vessel with the Yanmar diesel engines.

**Q.** And was there anything of note on these engines that you

remember?

A.    There was a few things.  So we don't typically see these vessels constructed in this manner.  Usually they'll have outboards.  This -- the engines were in good condition.  They seemed newer.  They had their serial numbers removed, which can be typical for smuggling vessels.  But yeah.

Q.    Go to 17(m) next.

A.    Yep.  Okay.  So this is the plate that we photographed that would have an identifying number or mark for the Yanmar engines where the serial number would be, and it was removed and scratched off.

Q.    And we're going to go to 17(n).

A.    And that would be the same image on the other engine of where the information plate should be.

Q.    And 17(o).

A.    This was discovered after we -- my partner found this while conducting a search of the master's belongings.  This was a nautical chart.  It had positions that -- I believe there were four positions indicating the route that they were directed to take, and it was starting in the vicinity of Colombia up to Central America.  And we had also found that handheld GPS among his possessions as well.

Q.    And the last one, sir, 17(p).

A.    That would be the control -- the controls for the diesel engines.  This was mounted on the next -- right next to the

helm inside the cockpit where the operator would be seated. They are the same controls, Yanmar, for the Yanmar engines. You've got your tach gauge, lube oil pressure, temperature, everything that's going to display to tell you that your engines are running properly.

Q.   Now, what did you do with the contraband in this case?

A.   The contraband was transferred to the Coast Guard cutter *Tampa* after we got permission to treat the subjects as detainees and to complete the boarding.  We would transfer it from the target onto the Coast Guard cutter *Tampa*.

Q.   And do you know what happened to that contraband later on in the process per Coast Guard procedure?

A.   Per standard procedure, we would either offload the contraband to another cutter, and it would eventually make its way up to where that cutter's making port, so usually Port Everglades, Florida, or on the east -- or on the West Coast.  I do not recall if we had conducted an ASI transfer with another cutter or if that bulk contraband had stayed onboard until it reached Port Everglades, Florida, or not.

                MR. LEATH:  No further questions, Your Honor.

                THE COURT:  Cross.

                        CROSS-EXAMINATION

BY MS. CASTANEDA:

Q.   Good morning.

A.   Good morning.

**Q.**   What is your rank?

**A.**   I'm a Boatswain's Mate.

**Q.**   And what is the duties of a Boatswain's Mates?

**A.**   Boatswain's Mates -- our primary duties would be -- we have small well stations or cutters.  On small well stations, we do search and rescue in law enforcement, drive the small boats.  For cutters we would pilot the vessel, also do -- we are boarding officers, law enforcement, and then we do search and rescue as well.

**Q.**   Okay.  Thank you.

Do you know what an MK is in the Coast Guard?

**A.**   Yes.

**Q.**   Do you have any MK type of training?

**A.**   No.

**Q.**   Okay.  How many boardings have you done since the one we just talked about?

**A.**   Many.  I couldn't give you an exact number.

**Q.**   More than 20?

**A.**   Yes.

**Q.**   And how many of those have had alleged contraband onboard?

**A.**   Over a dozen.

**Q.**   And did you assist in the drug processing of those cases as well?

**A.**   Yes.

**Q.**   You would agree that chain of custody is important for

drugs and anything related to a boat interdiction; correct?

A.    Yes.

Q.    And as part of processing anything off of an interdiction, documents are required; right?

A.    Yes.

Q.    And you said that you were the assistant boarding officer for this case; right?

A.    Yes.

Q.    Have you ever been the lead boarding officer on a case?

A.    Yes.

Q.    Okay.  And in either role are you required to sign, date, and complete forms related to what you found onboard?

A.    Yes.

Q.    Are these documents optional?

A.    No.

Q.    What happens if you don't have them?

A.    It depends which documents you're speaking about.

Q.    Let's say you're missing chain of custody documents.  What would happen?

A.    It would disrupt our chain of custody.

Q.    So it would be able to be unproven; right?

A.    It's possible.

Q.    And then you mentioned putting contraband -- I think you called it bulk contraband -- onboard the cutter.  That's a big Coast Guard boat; right?

**A.** Yes.

**Q.** And that sometimes gets moved to other Coast Guard boats; right?

**A.** Yes.

**Q.** Gets cross-decked from one to another?

**A.** Yes.

**Q.** And does that depend -- does that occur when maybe weather is going to interfere with a patrol?

**A.** No.

**Q.** So it's only moved when Coast Guards -- boats are going basically north or south or near a port where it can be operated; right?

**A.** Yes.

**Q.** And that can happen many times; right?

**A.** Yes.

**Q.** And you testified you weren't sure if that happened on this case; right?

**A.** Correct.

**Q.** Okay. Do you recall completing an inventory tag for this interdiction?

**A.** Yes.

**Q.** And what about a seizure tag?

**A.** I'm sorry. You said an inventory tag?

**Q.** Uh-huh.

**A.** No.

**Q.**    You didn't complete one?

**A.**    An inventory tag?  No, I did not.

**Q.**    Okay.  And what about bagging anything into an evidence bag.  Do you remember doing that?

**A.**    Any inventory we do in the Coast Guard is logged.  The inventory is included in the case package.  We do not have inventory tags, however.  We have evidence tags and seizure tags.  We did complete both -- utilize both of those for this interdiction.

**Q.**    Okay.  And those are tracked by serial numbers; right?

**A.**    Yes.

**Q.**    And you have to document that serial number as well; right?

**A.**    Yes.

**Q.**    Okay.  And you have to photograph evidence; right?

**A.**    Yes.

**Q.**    And do you recall who took the photographs in this case?

**A.**    This case was a mixture -- it was -- because we had two different boarding teams.  I know Officer Von Way (phonetic) assisted in photographs, Officer Black assisted in taking photographs, and myself as well.

**Q.**    So there was a couple people that photographed?

**A.**    Yes.

**Q.**    Okay.  And did you review those photographs or anything from this case before you came here today?

**A.** I saw these photographs, yes.

**Q.** Before right now, though?

**A.** Yes.

**Q.** Okay. Do you know where the contraband from this particular interdiction ended up?

**A.** No.

**MS. CASTANEDA:** Okay. Thank you.

Thank you, Your Honor.

**THE COURT:** Any redirect?

**MR. LEATH:** Just briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. LEATH:

**Q.** And, sir, you mentioned during my questions that the Yanmar engines were unusual?

**A.** Yes, sir.

**Q.** How many times have you seen it?

**A.** I've never seen that before.

**MR. LEATH:** No further questions, Your Honor.

**THE COURT:** Thank you, sir. You may step down.

Call your next witness.

**MR. LEATH:** Thank you, Your Honor. The United States calls Carlos Irizarry.

**THE COURTROOM DEPUTY:** Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in these proceedings

shall be the truth, the whole truth, and nothing but the truth?

**THE WITNESS:** I do.

(Carlos Irizarry sworn.)

**THE COURTROOM DEPUTY:** Could you please state your name and spell your last name for the record.

**THE WITNESS:** Carlos Irizarry, I-r-i-z-a-r-r-y.

**THE COURTROOM DEPUTY:** Thank you.  Please take a seat in the witness box.

**THE COURT:** Proceed.

**MR. LEATH:** Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. LEATH:

**Q.** Good afternoon, sir.

**A.** Good afternoon.

**Q.** Where do you currently work?

**A.** I'm assigned to the PANEX Strike Force.

**Q.** And how long have you been at the PANEX Strike Force?

**A.** I've been at the PANEX Strike Force for approximately ten years.

**Q.** And what agency do you work for?

**A.** I work for the Drug Enforcement Administration.

**Q.** And how long have you worked for the DEA?

**A.** Since 2003.

**Q.** Would you briefly, sir, just give us an overview of your career.

A.   Yes.   We initiate drug cases and at the PANEX Strike Force, specifically maritime smuggling cases.   We debrief sources, interview defendants, and process evidence.

Q.   And, sir, what positions have you held within the DEA? Where have you worked at?

A.   I've worked in San Juan, Puerto Rico; Dominican Republic; and Tampa, Florida.

Q.   And with your current role at Panama Express, are you involved at any time with drug processing?

A.   Yes, sir.

Q.   And can you go ahead and explain for us what that is briefly.

A.   Yes.   In this particular strike force, we will often meet with the U.S. Coast Guard at either the East Coast or the West Coast -- Miami, Fort Lauderdale, San Diego -- meet at the U.S. Coast Guard cutter with Coast Guard personnel where bulk drug evidence is transferred from the Coast Guard to the DEA for processing.

Q.   And, sir, do you remember the time frame of December of 2019?

A.   I don't.

Q.   Do you remember being involved in an interdiction from December 17, 2019 -- a drug processing from that day?

A.   I remember the case, yes.

Q.   Okay.   So can you go ahead and just tell us what you

remember about that case.

A.   Yes.   In that particular case, I witnessed, along with a fellow PANEX member, the transfer of a bulk drug evidence from the Coast Guard to the DEA.

Q.   And how does that processing work getting the bulk drug evidence from the Coast Guard?  Can you walk us through that --

A.   Yes.

Q.   -- the typical procedures.

A.   We'll meet at a Coast Guard cutter with Coast Guard personnel where we receive a receipt for the drug evidence, which often involves designated number of bales or packages or weight for that particular drug on the receipt and the paperwork.  We verify that the numbers are correct, and we sign for the drug evidence.

Q.   And did you do that for this processing in December 2019?

A.   I witnessed it, but I did not sign for it.

Q.   Okay.  And where did you take the drugs?

A.   The drugs were taken, in that particular day, from the pier or the dock where the Coast Guard cutter is to the DEA drug evidence lab.

Q.   And which lab would that be?

A.   The southwest lab.

Q.   And where is that located?  Do you know?

A.   California.

Q.   Okay.  Now, was there anything unusual about this offload

in your memory?

**A.**   Nothing unusual regarding this particular offload.

**Q.**   If there was something unusual, do you think you'd remember it?

**A.**   Yes.

          **MR. LEATH:**   No further questions, Your Honor.

          **THE COURT:**   Cross.

          **MS. CASTANEDA:**   Thank you.

                     **CROSS-EXAMINATION**

**BY MS. CASTANEDA:**

**Q.**   Good afternoon -- or good morning, I think.  Yes.  We're still in the morning.

**A.**   Good morning.

**Q.**   How many times have you assisted in processing drugs for the Coast Guard?

**A.**   Multiple times.

**Q.**   Can you please give us a number, even if it's a range.

**A.**   Fifty or more.

**Q.**   And when you say "processing," is that more than one drug case?

**A.**   Yes.

**Q.**   Okay.  Can I ask you how many drug cases even using a low figure?

**A.**   100, more or less.

**Q.**   Okay.  And as part of that process, documents are

required; right?

**A.**   Correct.

**Q.**   And I think you testified, for this particular time frame, you don't recall if those were executed?

**A.**   I don't remember that particular event; but, yes, I do recall vaguely what happened, and there's documentation on it.

**Q.**   Okay.  Are those documents optional?

**A.**   No, they're not.

**Q.**   And that's DEA Forms 6 and 7 that we're talking about; right?

**A.**   Correct.

**Q.**   Okay.  And drug mixups happen; right?

**A.**   They do.

**Q.**   And you've actually had that personally happen before when you were processing something; correct?

**A.**   I've seen it where sometimes drugs are mixed up, but at the time it's corrected and the mistake is corrected at the time and it's sorted out.

**Q.**   But it does sometimes happen; right?

**A.**   It does.

**Q.**   Okay.  And those documents we're talking about, DEA Forms 6 and 7 -- is it fair to say that those are required and completed to maintain the integrity of chain of custody for drugs?

**A.**   Yes.

**MS. CASTANEDA:**  Okay.  Thank you.

**THE COURT:**  Any redirect?

**MR. LEATH:**  No, Your Honor.

**THE COURT:**  Thank you, sir.

**MS. CASTANEDA:**  Your Honor, may I ask that this witness remain on recall, please.

**THE COURT:**  All right.  Don't leave the area.  You might be recalled as a witness.

**THE WITNESS:**  Yes, sir.

**THE COURT:**  Call your next witness.

**MR. LEATH:**  Your Honor, we're going to call Juan Caicedo-Valencia.

**THE COURT:**  Swear the witness, please.

**THE COURTROOM DEPUTY:**  Please rise and raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in these proceedings shall be the truth, the whole truth, and nothing but the truth?

**THE WITNESS:**  Yes.

   (Juan Caicedo-Valencia sworn.)

**THE COURTROOM DEPUTY:**  Could you please state your name and spell your last name for the record.

**THE WITNESS:**  Juan Caicedo-Valencia.  It's E -- no.  Sorry.  It's C-e-i-d-o-n V-a-l-e-n-c-i [sic].

**THE COURTROOM DEPUTY:**  Thank you.

THE COURT:  Proceed.

MR. LEATH:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. LEATH:

Q.  Good morning, Mr. Valencia.  Why are you wearing an orange suit?

A.  Because I'm in jail.

Q.  And what are you in jail for?

A.  For transporting drugs to Panama.

Q.  And did you plead guilty to conspiracy to traffic drugs?

A.  Yes, sir.

Q.  In your own words, describe your role.

A.  Well, I would dispatch vessels to -- motorboats to Panama.

THE COURT:  Let me stop you a minute.

Can you assist him in getting the headset.

THE INTERPRETER:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  Proceed.

MR. LEATH:  Thank you, Your Honor.

BY MR. LEATH:

Q.  And, sir, did you plead guilty because you were guilty?

A.  Yes, sir.

Q.  And did you plead guilty with a plea agreement with the United States?

A.  Yes, sir.

Q.  And do you understand you're required to tell the truth

here today?

A.   Yes, of course.

Q.   So, sir, briefly describe for the jury where you're from.

A.   I am from Colombia, from a port named Buenaventura.

Q.   And what did you do for work prior to narco trafficking?

A.   I would fish, and I'd work in tourism.

Q.   And how did you get involved in narco trafficking?

A.   Because in the tourism, I started to go to the different areas, like Chocó and Nariño, and I started to meet people.

Q.   And what happened when you met people?

A.   Then I started to transport drugs.

Q.   What type of drugs?

A.   Cocaine.

Q.   And briefly describe where would you send drugs to and from where.

A.   Sometimes I would get them from Nariño towards Chocó. Sometimes in Buenaventura also to Chocó.

Q.   And what were your various roles as a narco trafficker?

A.   Well, first of all, I traveled, and then afterwards I started to dispatch.

Q.   And go ahead and just give us some detail.  What is required when you dispatch?  What does that mean?

A.   One finds the people, you pay them, and you keep tabs. You organize.

Q.   And how many vessels do you approximate that you

dispatched?

A.   I don't remember well, but somewhere around eight to ten, more or less.

Q.   And for these vessels, did you purchase engines?

A.   I'd buy engines.

Q.   And where did you get those engines?

A.   Excuse me.  Repeat.

Q.   Where would you get the engines?

A.   I'd buy them.

Q.   And where would you buy them?

A.   From Mr. Juan, "El Papi."

Q.   And do you see this individual in the courtroom here today?

A.   The gentleman who's there.

Q.   Can you just go ahead and describe for the record what he's wearing.

A.   A gray sweater.

        MR. LEATH:  Let the record reflect he's identified the defendant.

        THE COURT:  Let the record so reflect.

BY MR. LEATH:

Q.   And when did you first meet the defendant?

A.   I met him in 2002, 2003.

Q.   And just go ahead and just describe your relationship with him.

**A.**   Well, he had a store there, in Polonuevo, which was at "quatro boca" or "cinco boca."  I don't remember what the name of the street.

**Q.**   And would you visit that store?

**A.**   Yes.  We'd buy parts at first.

**Q.**   And how many times did you meet the defendant in person?

**A.**   Many times.  Several times.  He'd be there.  Sometimes the cousin would be.

**Q.**   And did you know him by any nicknames?

**A.**   El Papi.

**Q.**   And did he -- that you know of, did he work with anybody in his store?

**A.**   A cousin Javier.

**Q.**   And how many engines did you buy from him approximately?

**A.**   We bought three -- two, three -- seven -- seven 200 engines, five 250s, and two 75s.

**Q.**   And what did you do with those engines?

**A.**   Traffic.

**Q.**   Traffic what?

**A.**   Drugs.

**Q.**   And what type of drugs?

**A.**   Cocaine.

**Q.**   And how would you pay for those engines?

**A.**   I'd pay cash.

**Q.**   And who would you pay?

A.   El Papi.

Q.   And who is -- is that the defendant in court here today?

A.   Yes, sir.

Q.   How much cocaine did you transport approximately using the defendant's engines?

A.   I don't remember well, but the first trip was 600-something.  The second one was 700-something.  The other was 1,400 and something.  Another one was 1,160 and so on. 1,200; 1,100.

Q.   And can you be a little more specific.  600 what?  What's the measurement?

A.   600 kilos.  630, 620 were the first ones.  I don't remember well.

Q.   So it would be 600 kilos?  When you paid the --

A.   600 kilos of cocaine.

Q.   Just trying to be specific.

A.   Oh, okay.

Q.   Now, would you ever remove the serial numbers from these engines?

A.   Well, they -- we'd get them without paperwork, but I'd put it under the paperwork of the ones I had, the old ones.

Q.   And why would you do that?

A.   Because he wouldn't provide me a receipt, and since I was going to traffic.  So I needed that in case the Navy stopped me.

**Q.** Now, did you ever have any interactions when you saw or witnessed the defendant invest in cocaine?

**A.** One time with us he invested 10 kilos.

**Q.** And can you go ahead and tell us that story.

**A.** Well, we went to -- me and my codefendant went looking for a gentleman there in "ameto" -- Cali, the man who would help us, in other words, by investing because we needed liquid money to pay people. And when we got there to the apartment of that man, Mr. Papi was there negotiating regarding an apartment with the man. Papi was buying it from the man. So we got there to speak with him. We proposed the deal to the man, and Papi said -- asked if we could help him with 10 kilos.

**Q.** And what did he mean by "help him"? Or what did you take that to mean?

**A.** In other words, for him to give the money and for us to include it -- carry it there on the trip loaded.

**Q.** So how did that work?

**A.** Because we needed money to purchase fuel. We didn't have money in cash. So we needed money to give people their up-front money for the crew members and to buy fuel.

**Q.** And was that crew members for the cocaine vessel?

**A.** Yes, sir. The ones that were going to carry it -- traffic it.

**Q.** And did that include the fuel for that vessel?

**A.** Also for the purchase of fuel.

**Q.** And was that trip successful?

**A.** Yes, sir.

**Q.** And did the defendant get his investment back?

**A.** We gave him 100 million or 105. I don't remember too well. Colombian. Colombian.

**Q.** And do you know approximately how much that is in U.S. dollars?

**A.** Back then it would have been about 50,000 or $49,000 at that time because it was cheaper.

**Q.** And did you pay the defendant personally?

**A.** Yes. We paid him in Cali.

**Q.** Face-to-face?

**A.** Yes, sir.

**Q.** The same man in court today?

**A.** Yes, sir. Yes, sir.

          **MR. LEATH:** One moment to confer with counsel, Your Honor.

          **THE COURT:** You may.

          **MR. LEATH:** Thank you.

          No further questions, Your Honor.

          **THE COURT:** You may proceed with cross.

                    **CROSS-EXAMINATION**

**BY MS. CASTANEDA:**

**Q.** Good morning.

          You work for the Colombian narco trafficker Juan David

Marino Bonilla; right?

**A.** We are partners.

**Q.** It's fair to say that you were his right-hand man; right?

**A.** Yeah. We were partners. We'd split fifty-fifty.

**Q.** And you worked in Buenaventura; right?

**A.** Buenaventura, of course.

**Q.** When did you find out that Mr. Rios had been arrested?

**A.** That Mr. Rios had been detained? About some three years and change.

**Q.** And your prior business partner told you that; right?

**A.** No.

**Q.** And you were held in Colombian prison before you were extradited to the United States; correct?

**A.** Yes.

**Q.** And you were held at the Cota; right?

**A.** Yes.

**Q.** And you were held with the other narco traffickers being extradited to the United States; right?

**A.** Yes, of course.

**Q.** And when you got to the United States, you were held in Pinellas County; correct?

**A.** Yes.

**Q.** And you were also housed with other Colombian narco traffickers there; right?

**A.** Yes.

**Q.** And are you there now?

**A.** At Pinellas? No.

**Q.** Are you at Hernando County?

**A.** No. I'm at Citrus.

**Q.** Okay. So are you housed with other Colombian traffickers at Citrus right now?

**A.** Well, there are a lot of people there. There are many people I don't know.

**Q.** You don't recognize any other Colombian man in that jail at all?

**A.** Well, that new Colombian that arrived, but as far as knowing them from outside, I don't know any of them at the unit that I'm at.

**Q.** Have you seen any Colombian narco traffickers at Citrus County?

**A.** Well, there are because they call us narco traffickers, almost all of us that arrive from over there. But there's some from Turbo, from all sorts.

**Q.** Have you ever been sent to Hernando County and housed there?

**A.** No.

**Q.** So just Citrus County and Pinellas County?

**A.** Yes.

**Q.** And what about federal prison? Where are you at now?

**A.** At Oakdale, Louisiana.

Q.   And you would agree with me that Oakdale, Louisiana, has a significant amount of Colombians housed there, wouldn't you?

A.   Yes.

Q.   In fact, probably has more top drug traffickers in that prison than anywhere else in the United States; correct?

A.   Well, I couldn't say because I don't -- I don't ask around a lot because that's not -- not my problem to ask.  My thing is to serve my time, do exercise, and not get in trouble with anyone.

Q.   And your prison cellmate is a Colombian narco trafficker; right?

A.   I don't know.  I don't know that guy that -- my "celly." I don't really know him.  I met him here.

Q.   In Louisiana, your prison cellmate -- you don't know him?

A.   Oh, the -- the one from Louisiana?  It's a guy called Perlaza, but he's from Costa Rica.  He's Costa Rican.

Q.   And what about your patio?  There are Colombian drug traffickers that are in your patio, aren't there?

A.   Yes, there are.  Of course.  But they're not, like, "known" known by me from outside like that.

Q.   And you eat breakfast, lunch, and dinner with Colombian narco traffickers in federal prison where you're located, don't you?

A.   Logically, it must be so.  Yes, of course.

Q.   And you're testifying against Mr. Rios because you would

like time off of your sentence; correct?

**A.**   Well, I'm testifying against Mr. Rios because that's the agreement I made with the Government, which I cannot lie.

**Q.**   And you decided to cooperate and give information about other people.  That's your agreement with the -- your plea agreement; correct?

**A.**   Yes, of course.  Ever since I arrived here, I set out to cooperate with the Government, and I cannot lie.  That's what I'm here for.

**Q.**   But you don't even know Mr. Rios, do you?

**A.**   I know him well, perfectly, of course.

**Q.**   But you didn't know the name of the street where his store is where you've been many times.

**A.**   Well, the store -- I don't remember what the name because it's been a long time.  But I did visit it many times, both in Buenaventura and in Cali as well.

**Q.**   What is the name of Javier's shop?

**A.**   I don't remember perfectly right now.

**Q.**   Which Colombian narco trafficker prepared you to testify today?

**A.**   No one.  No one.

          **MS. CASTANEDA:**  Thank you, Your Honor.

          **THE COURT:**  Any redirect?

          **MR. LEATH:**  No, Your Honor.

          **THE COURT:**  Thank you, sir.  You may step down.

How long is your next witness?

MR. LEATH:  Approximately the same amount of time, Your Honor.  I'd say 20 to 30 minutes.

THE COURT:  We'll break for lunch until 1:00.

(Jury out at 11:43 AM.)

THE COURT:  Let's talk about jury instructions.

Did you say there was a dispute about one or more?

MR. BAEZA:  Your Honor, I wouldn't characterize it as a dispute.  I just think -- or not think.  There's a couple things that we've agreed on that can be removed, and then there are one or two instructions that, because the defense hasn't presented a case yet, we can't agree to -- or -- there's not an agreement to excise those yet.

So the United States' proposed jury instructions -- I have not received any objections to those.  And ours substantially overlap with the defense with a couple of exceptions.

First is the entrapment instruction, S13.1.  We've already addressed that.

S13.2, which is entrapment, evaluating conduct of government agents.  We've already addressed that.  We would seek that those not be included within the final jury instructions.

The one where defense is asking that it still at least be on the table for inclusion is S17, their good faith

defense instruction.  The Government's position is that there hasn't been a sufficient basis established for good faith to be established as a defense or to be asserted as a defense, but we'll wait until the conclusion of their case on that.

And then their -- their offenses are not tracking the indictment because these are both substantive offenses.  Ours are conspiracy offenses, which are in the indictment.  And I've conferred with counsel, and we agree to have the conspiracy instructions as opposed to the substantive offenses.

THE COURT:  All right.  Anything from the defense?

MS. CASTANEDA:  Nothing.  That's correct.

THE COURT:  Okay.  And the verdict form is agreed upon?

MR. BAEZA:  It is, Your Honor.

THE COURT:  Okay.  See you at 1:00.

(Proceedings recessed at 11:45 AM to be resumed at 1:00 PM.)

**CERTIFICATE OF REPORTER**

I, HEATHER SUAREZ, RDR, CRR, FCRR, FPR-C, CA CSR, DO HEREBY CERTIFY that the foregoing is a correct transcript of the record of proceedings in the above-titled matter.

DATED this 7th day of May 2025.

Heather Suarez
Registered Diplomate Reporter
Certified Realtime Reporter
Federal Certified Realtime Reporter
Florida Professional Reporter-Certified #790
California Certified Shorthand Reporter #14538