**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


**UNITED STATES OF AMERICA,**            )
                                         )
            **Plaintiff,**               )
                                         )
                                         ) **Case No.**
      **vs.**                            ) **8:21-CR-00286-JSM-NHA**
                                         )
                                         )
**JUAN GABRIEL RIOS-SILVA,**             )
                                         )
            **Defendant.**               )

_____

**EXCERPT OF JURY TRIAL - DAY 1**
**BEFORE THE HONORABLE JAMES S. MOODY, JR.**
**UNITED STATES DISTRICT JUDGE**

**APRIL 21, 2025**
**1:21 P.M.**
**TAMPA, FLORIDA**
_____


        Proceedings recorded by mechanical stenography,
transcript produced using computer-aided transcription.
_____

**DAVID J. COLLIER, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

**APPEARANCES:**

**FOR THE GOVERNMENT:**

*Daniel Baeza*

*Michael Leath*

United States Attorney's Office

400 North Tampa Street, Suite 3200

Tampa, Florida  33602

(813) 274-6000

**FOR THE DEFENDANT JUAN GABRIEL RIOS-SILVA:**

*Rebecca Lynn Castaneda*

The Castaneda Law Firm

506 North Armenia Avenue

Tampa, Florida  33609-1703

(813) 694-7780

INTERPRETER    Jesse Leonor

Gabriela Loncar

Beatriz Velasquez

## I N D E X

**GOVERNMENT'S WITNESSES:**                                      **PAGE**


**JOSÉ MANUEL NARVAEZ-REINA**


Direct examination by Mr. Leath                                   17
Cross-examination by Ms. Castaneda                               32
Redirect examination by Mr. Leath                                44


**NESTOR FABIO BELTRAN-CABREJO**

Direct examination by Mr. Baeza                                   47
Cross-examination by Ms. Castaneda                               67


**FERNANDO PINEDA-JIMENEZ**

Direct examination by Mr. Baeza                                   71
Cross-examination by Ms. Castaneda                               91

**GOVERNMENT'S EXHIBITS**                                        **PAGE**


2      photograph                                                 31
1A     photograph                                                 62
1B     photograph                                                 62
4A     compact disc of recordings                                62
5A     compact disc of recordings                                62
14A    compact disc of recordings                                62
15A    compact disc of recordings                                62
16A    compact disc of recordings                                62
32A    compact disc of recordings                                62
33A    compact disc of recordings                                62
34A    compact disc of
6      photograph                                                 89
8      photograph                                                 89

*** EXCERPT BEGINS AT 1:21 P.M. ***

THE COURT:  All right.  We will now begin with opening statements.

The Government may proceed.

MR. LEATH:  Thank you, Your Honor.

May it please the Court, opposing counsel, ladies and gentlemen of the jury.

This case is about greed.  The defendant, Juan Rios-Silva, ran a maritime engine business in Colombia called Agronautica along with his brothers Milton and Oscar.  They ran that business since the early 2000s.

Juan Rios-Silva's greed is the reason we're here in court today, because since the early 2000s the evidence in this case will show that the defendant's business was a front for supplying engines to narco traffickers, narco traffickers who put those engines on vessels that were smuggling cocaine, and they smuggled hundreds of thousands of kilograms of cocaine from Colombia to receivers in Mexico, Panama, Guatemala, Costa Rica, just to name a few.

Now, it's not illegal to sell an engine, it's not illegal to sell an engine for cash, but it is illegal to sell an engine to someone who you know is a narco trafficker and who is using that engine to smuggle cocaine, and that is exactly what the defendant did.  He was not a simple Colombian small

businessman trying to make a living.  If he was, we would not be here today.  We are here because the evidence will show that his best customers were narco traffickers and that he knew they were using his engines on vessels smuggling cocaine and he spent years supplying those engines and helping make the trafficking of cocaine more efficient and more effective.

Now, the defendant's engines powered various types of vessels.  I'm going to focus on three.  The first is called a go-fast vessel, it's approximately a 20-foot vessel, high-powered engines, and would be loaded with cocaine for smugglers.  Just like the name implies, they were fast, so the most effective way for law enforcement to stop those vessels would be to shoot the engines out.

The second type of vessel is called a low profile vessel, as you'll hear during this trial.  They look like a speed boat, high-powered engines, designed to travel fast and carry large payloads of cocaine.

The third vessel, a little longer name, it's called a self-propelled semi-submersible, at trial you may hear it called an SPSS, which have just a small amount of the vessel above the water line.  It looks like a submarine, travels slow, but capable of carrying over 6,000 kilograms or more of cocaine, cocaine that was intended, as you will hear, for groups like the Sinaloa cartel and recipients like the drug trafficker Joaquín Guzman, who was known as El Chapo.  Metric

tons of that cocaine would travel north through Mexico and be smuggled into the United States.

The defendant knew the engines were being used in drug trafficking operations, he profited from it, he invested in it in individual kilos, and he offered traffickers ways to launder their dirty money.  So the money that was gained from smuggling cocaine, he would assist in making it appear clean, legitimate.

But here's the kicker, ladies and gentlemen, the defendant already admitted to supplying engines to drug traffickers, knowing they were going to be used for trafficking drugs.  Much of what I just told you he already admitted to doing.  Approximately four years ago, in an interview with two FBI agents, the defendant admitted to conspiring to traffic cocaine, and then just a few weeks ago, on the eve of this trial, he executed an affidavit under oath and stated that he did not confess.

Now, during his confession the defendant mentioned that he was approached by a man who claimed to work for the DEA, a man by the name of Sharky or Shaky, and this person asked the defendant if he would put tracking devices on the engines he was selling to narco traffickers and if he would do this on behalf of the U.S. Government.  In his confession the defendant admitted that he did not agree to this, that he did not cooperate with the U.S. Government.  He also said that

Sharky or Shaky told him that he wasn't doing anything wrong by helping the drug trade and selling engines to narco traffickers, but the evidence will show that before, during and after, the defendant continued to supply engines to narco traffickers, and in addition he took steps to conceal what he was doing and he continued to profit from it.

The defendant is charged in a Superseding Indictment with two counts. Count One charges a conspiracy to traffic cocaine on vessels subject to the jurisdiction of the United States. Count Two charges a conspiracy to commit money laundering. A conspiracy, you will hear, is an agreement to do something illegal with at least one other person.

For our case the drug conspiracy is straightforward. The defendant and his brothers Oscar and Milton were known to drug traffickers as Los Papis. They had a business in Tumaco, Colombia, a city on the southwestern edge of the country, located on the Pacific Ocean, ideal for narco traffickers. Just as you may go to a gas station and get gas, narco traffickers in Tumaco and other cities could go to Los Papis and get engines for narco trafficking. Traffickers, several of whom you'll hear from in this trial, worked with Los Papis, and Los Papis did what they could to supply those engines. As I mentioned, they helped clean their money, they falsified paperwork, all in order to get those engines, their engines into the hands of narco traffickers. Greed.

Now, the second count, the money laundering count, it also follows a logical sequence, the defendant conducted a financial transaction, so the movement of money, by transferring money to an engine dealer in Florida, but he used money which he gained from narco trafficking and he wanted to conceal the ownership as well as the origin of those funds, so he used an individual in Florida to deliver that money for him. He worked to disguise it.

Before moving on, I want to address two questions that you may be asking yourself. The first question could be why are drug interdictions in international waters prosecuted here in Tampa, Florida. The simple reason is that the primary maritime Federal strike force, a strike force that I will explain in detail in a few moments, is situated here in Tampa; and, most importantly, the statute charged in this count, Count One of the Superseding Indictment, permits the case to be tried here in Tampa.

Now, there are very few stipulations in this case, but we are striving to be done in approximately six days, and we will do -- the United States will do everything in our power to move this case along, so we may call witnesses out of order to keep the trial moving, but because we will be presenting numerous facts in granular detail, this trial will give you a crash course in international drug smuggling, and you will hear of the United States' counter-drug efforts from those who are

involved.

Before today you may have never known that in the same community filled with championship-winning sports teams and celebratory boat parades, Tampa Bay would also house the largest Federal Maritime strike force for counter-drug operations, known as Panama Express.  This is a collection of partner agencies all based here in Tampa, Florida, and they investigate drug smuggling in the Caribbean and across the Pacific, all with the goal of dismantling transnational criminal organizations, the organizations responsible for using the vessels powered by the defendant's engines.

The second question you may ask yourself is how did the United States identify Juan Rios-Silva.  Well, the evidence will show the United States identified the defendant as it interdicted numerous vessels upon the high seas and as it sought to dismantle those transnational criminal organizations I just disclosed.  The evidence pointed back to the defendant, because as law enforcement interviewed those people and it extradited the leaders and organizers of these organizations, it consistently identified that Juan Rios-Silva was actively engaged in the conspiracy by supplying the engines that kept that cocaine moving.

You're going to hear about this conspiracy that spanned nearly 20 years, but we're going to focus on a few key seizures on the high seas.  The first is a semi-submersible,

the vessel that I described that mirrors a submarine, travels slow, high payload of cocaine.  This one will be from 2015. That interdiction, the vessel was carrying over 5,000 kilograms of cocaine.  The next three are going to be interdictions from November 2017, September 2019 and December 2019.  Combined, those were carrying over 3,000 kilos of cocaine.

You're also going to hear from cooperators in this case.  The appearance and the testimony of the cooperators will remind you that this is not TV, this is real life.  These are real people facing real consequences.  Every one of the cooperators is going to walk through a side door in chains rather than the front doors we all walked into today.

Every time the United States calls a cooperator as a witness you will hear us ask about the crime they committed and their role in that crime.  We will not sugarcoat it.  The reason we do this is to better enable you, the jury, to assess the credibility of those cooperators and carefully follow the instructions that the Judge will give you at the end of this trial, which is to weigh their testimony.

Importantly, the cooperators' testimony will show that Juan Rios-Silva was not simply selling engines passively to narco traffickers, rather, he was an active participant in the drug trade and he sought to make cocaine trafficking more efficient and more effective.  You will hear that he did this by recommending the use of the SPSSes, or those submarine-type

of vessels.  You're going to hear, for example, if a narco trafficker was using a go-fast carrying maybe 2,000 kilos of cocaine, if he started using an SPSS he would be able to double that, carrying up to 6,000 kilograms of cocaine, making it more effective and efficient.

The defendant also ensured he had the inventory of engines to support the narco trafficking trade.  He would ensure he had the outboard motors, the motors that go on the back of a vessel, or the inboard motors that go into that submarine type of vessel.

The defendant, as I mentioned earlier, personally invested in the cocaine.  On at least one occasion traffickers stored cocaine at his business.  And the defendant provided accessories needed by the narco traffickers.  One such example is that when narco traffickers would buy engines from the defendant he would supply them accessories such as extended fuel hoses.  This would allow the traffickers to carry fuel drums on the deck of the vessel.  Those hoses would go into each of those fuel drums, allowing that vessel to travel farther and maximize its distance without stopping.  Once again, more efficient, more effective.

You will also hear corroboration through documents, text messages and wire intercepts conducted by the Colombian National Police.  The evidence will also confirm the defendant's confession.  Notably, his confession identified

information not known to law enforcement at that time that was later corroborated by law enforcement.

You will also hear from the individuals who witnessed and were involved in the defendant's money laundering when he utilized, as I said, someone in the United States to make a payment at an engine dealership on behalf of himself.

At the end of this trial, my colleague, Mr. Dan Baeza, will have the opportunity to speak to you on behalf of the United States.  He will summarize all the evidence in this case from all of the witnesses, and he will show you how that evidence that will be presented in trial leads to two conclusions, both of those conclusions beyond a reasonable doubt:  The first conclusion, that Juan Rios-Silva conspired to traffic cocaine in international waters; the second conclusion, that Juan Rios-Silva conspired to launder money.  These two conclusions are supported by what the evidence will show, which is for nearly 20 years he supplied the engines that Colombia's biggest traffickers used to smuggle thousands of kilograms of cocaine.  He knew what the traffickers were using the engines for, he profited from it, he worked to conceal the financial transactions with the dirty money, and he invested in the cocaine.  Greed.

In a few days Mr. Baeza will ask you to return the one and only verdict that the evidence shows, which is guilty on Count One and guilty on Count Two.

Thank you for your time, and thank you for your service.

Thank you, Your Honor.

THE COURT:  The defense may proceed.

MS. CASTANEDA:  Good afternoon, Your Honor, members of the jury.  My name is Rebecca Castaneda and I have the privilege of representing Mr. Juan Rios.  At the outset, I want to thank you for your time and your attention.  The role you're playing to ensure justice is served is of the utmost importance and we are grateful for your service.

This case is about more than just allegations, it's about ensuring that the Government meets its burden of proof beyond a reasonable doubt.  That is the cornerstone of our justice system and it's a burden that cannot be taken lightly.

My client, Mr. Rios, stands before you today presumed innocent, and that presumption remains with him unless and until the Government proves every element of its case beyond a reasonable doubt.

The Government alleges that Mr. Rios was involved in drug trafficking activities.  The Government must prove not only that a crime occurred, but also that my client knowingly and intentionally participated in the alleged activities.  Intent and knowledge are critical elements of the charges, and the Government must prove these elements beyond a reasonable doubt.

The Government also bears the burden of proving the specific drug amounts alleged in the Indictment.  This is not a minor detail.  It is a requirement under Federal law.  We will show that the Government's evidence on this point is insufficient and unreliable.

Furthermore, the Government must present evidence that is admissible to support its claims.  Evidence obtained improperly cannot be used to convict my client.  The Rules of Evidence are designed to ensure that only reliable and relevant information is considered by the jury.  As we proceed, you will hear from witnesses and see and hear evidence presented by the Government.  I urge you to listen carefully and critically, pay attention to the details, and ask yourselves whether the Government has truly met its burden.  Is the evidence clear, convincing and beyond a reasonable doubt, or does it leave room for doubt, for questions, for uncertainty?

The United States would like for you to believe that the defendant in this case is a large narco trafficker from Colombia who operated in whatever manner he wanted with whomever he wanted, that he's a leader of narco trafficking, that he was out for spoils of richness.  That's incorrect.

This case is the product of something called Operation Panama Express.  Operation Panama Express is a drug task force, it's staffed by FBI, DEA, HSI and CGIS, which is the Coast Guard's Investigative Service.  They work together to

investigate drug cases; however, their work together is not always seamless.  There are competitions for statistics, for interviews, for interdictions, how many people can one agency indict, how many convictions can one agency get.  Operation Panama Express is only a successful operation if it can produce.  It produces by drug interdictions.  It produces by drug convictions.  It's that simple.  Their funding is tied to their success.  If they're not producing drug interdictions, they don't receive funding.

This operation is publicly known, it's known to the American public.  Well, not all of it.  The inner workings of it are not, but you're going to learn about those inner workings.  I expect you'll hear from Federal law enforcement. I expect they will testify as to how they investigate cases, how they develop their cases, how they develop their sources of information, how they get information needed to interdict boats carrying drugs, and how they interdict those boats carrying drugs.

We will demonstrate that Mr. Rios did not intentionally and willfully engage in illegal activity.  Intent is required for conviction.  It's required.  You aren't guilty because you're a Colombian and live by the sea.  You aren't guilty because you sell boat engines.

At the conclusion of this trial you will see that the Government has failed to meet its burden of proof.  At the

conclusion of this trial I will ask you to return a verdict of not guilty.  That verdict will not be a favor to my client, it will be a recognition that the Government has not met its burden of proof.  It will be a statement that in this country we do not convict people based on suspicion or assumption, we convict only when the evidence is clear, reliable and beyond a reasonable doubt.

Thank you for your attention, and I look forward to presenting our case to you.

THE COURT:  Call your first witness.

MR. LEATH:  Thank you, Your Honor.

The first witness will be José Manuel Narvaez-Reina.

*(José Manuel Narvaez-Reina enters proceedings.)*

THE COURT:  Swear or affirm the interpreter, please.

COURTROOM DEPUTY:  Yes, Your Honor.

Do you solemnly swear that you will truthfully and to the best of your ability interpret from English to Spanish and from Spanish to English all questions and response propounded by this Court?

INTERPRETER:  So help me God, I do.  My name is Jesse Leonor, L-E-O-N-O-R.

THE COURT:  Swear the witness, please.

COURTROOM DEPUTY:  Sir, could you please raise your right hand.

Do you solemnly swear or affirm, under penalty of

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 17 of 95 PageID 1213
JOSÉ MANUEL NARVAEZ-REINA APRIL 21, 2025        17
Direct examination by Mr. Leath

perjury, that the statements you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Narvaez-Reina, José Manuel.

COURTROOM DEPUTY:  Can you spell his last name for the record, please.

THE WITNESS:  N-A-R-V-A-E-Z.

THE COURT:  Thank you.  You may have a seat.

MR. LEATH:  And, Your Honor, may I approach for the stipulations that were previously admitted?

THE COURT:  You may.

MR. LEATH:  Thank you, sir.

Permission to proceed, Your Honor?

THE COURT:  Yes.

MR. LEATH:  Thank you, sir.

Good afternoon, Mr. Reina.

THE WITNESS:  Good afternoon, sir.

**DIRECT EXAMINATION OF JOSÉ MANUEL NARVAEZ-REINA**

**BY MR. LEATH:**

Q    Why are you wearing an orange suit?

A    Because I'm in jail.

Q    And why are you in jail?

JOSÉ MANUEL NARVAEZ-REINA   APRIL 21, 2025        18
Direct examination by Mr. Leath

A       For narco trafficking.

Q       Did you plead guilty to narco trafficking?

A       Yes, sir.

Q       Did you plead guilty because you were guilty?

A       Yes, sir.

Q       And have you been sentenced in your case?

A       Yes, sir.

Q       And what was your sentence?

A       235 months.

Q       When you pled guilty, was it pursuant to a plea agreement with the United States?

A       Could you repeat the question for me, please.

Q       Let me put it a little simpler.

        Did you have a plea agreement with the United States?

A       Plea agreement?  I don't understand.

Q       When you pled guilty, did you have an agreement with the United States which had provisions about you pleading guilty?

A       I'm not understanding the question.

Q       Let me -- let me make it maybe a little bit more simpler on my end.

        Did you have a cooperation agreement with the United States?

A       No.

Q       And, sir, where are you from?

A       I am Colombian, from an area named Tumaco, Nariño.

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025        19
Direct examination by Mr. Leath

Q    And what did you originally do for work?

A    Originally did fishing and the commerce of fish and seafood, a merchant.

Q    And how did you get involved in narco trafficking?

A    Well, since we are from the region of the coast, the opportunity came to me, because I was a bit low on capital, and so I started to travel from Colombia to Mexico with 2,500 kilos of cocaine to be able to make some money to increase my capital.

Q    And did you continue to work in narco trafficking?

A    Yes, I continued to work.  I started in two thousand and um -- and I stopped in 2003.  Then in mid-2003 my brother started, El Poli, and he got a -- we call it a line or route, and then we -- through that we started to -- with my brother we started to work again.

Q    And in total how many years did you traffic cocaine or work as a narco trafficker?

A    From 2000 to the year 2009.  October of 2009 is when I dispatched the last one.  October of 2009.

Q    And would you please describe for us the various roles that you filled as a narco trafficker.

A    Well, I started as a mariner, I was a mechanic, and then afterwards a captain, and once with my brother, I was -- I had to go and help with the dispatches to collect merchandise and to organize motorboats and semi-submersibles.

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025      20
Direct examination by Mr. Leath

Q    And can please describe for us, where would you send the smuggling vessels to generally and from where?

A    The vessels, we would send them from Colombia and Ecuador. Ecuador, Mexico.

Q    And who would you send them to in Mexico?

A    We were working with the Mexican cartels during that time with the Beltrán Leyvas, afterwards with El Chapo Guzman, El Mayo Zambada, and some customers that were from Mexico but that were not from the cartels.

Q    And, sir, you mentioned your brother.  Was your family involved in narco trafficking?

A    Well, the main one was my brother, Harold Narvaez-Reina, El Poli.  Narvaez-Reina.

         Harold Narvaez-Reina, Martin Narvaez-Reina. Martin Narvaez-Reina, and my nephew Mario Torres-Narvaez.

Q    Now, would you please describe for us, how would you dispatch the vessels?  Just walk us through that process.

A    We would first -- the first thing we would do is send the vessel to be made in fiberglass.  While it was being fabricated, then came obtaining the motors, and these are 200-horsepower engines.  And when we were making semi-submersibles, the same thing, as we were building the semi-submersible, while it's being obtained, you would start ordering the engines, everything that was needed, and I myself would go getting the merchandise in different areas but mainly

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025        21
Direct examination by Mr. Leath

at the border with Ecuador.

Q    And, sir, you mentioned engines.  Would you purchase the engines for these vessels?

A    Yes.  We bought many engines.

Q    And who did you buy those engines from?

A    We started buying the engines in Tumaco from Mr. Juancho, El Papi.

Q    And, sir -- oh.  Sorry.

A    Many engines, 200s, 115s, 140s, and the engines for the semi-submersibles.

Q    And, sir, will you just walk me through in specifics, let's deal first with the outboard engines, how many engines would you buy from this individual you called this Papi?

A    My brother would do the business, El Poli, or my nephew. We would receive all of the engines, we would take them to where we were building the motorboats.  Every motorboat carries four engines on the transom, working, and then two as substitutes.  We would use six engines for every motorboat.  If we would send two motorboats, we would buy 12 engines, four motorboats would be 24 engines, because we would have four working and two as substitutes, plus all of the accessories, we called them kits.

Q    And, sir, before we move further along with the engine calculations, do you see the individual Juancho in the courtroom here today?

A     Yes, sir.

Q     Would you please identify him by just describing what he is wearing.

A     He's dressed in white.

        MR. LEATH:  Let the record reflect that the witness has identified the defendant.

        THE COURT:  Let the record so reflect.

        MR. LEATH:  Thank you, Your Honor.

BY MR. LEATH:

Q     Now, sir, back to the engines.  How many of the SPSS, I believe you said, or semi-submersible engines did you buy from the defendant?

A     I purchased over ten, over ten inboard engines.  Over ten.

Q     And how many of those engines would go per vessel?  Was it one engine per vessel, or could you describe for us how many it would be?

A     One engine per vessel.  You would use one.  It would be a Cummins or a Caterpillar.

Q     And so of those ten engines, how many did you use to smuggle cocaine?

A     I got to send some 14 semi-submersible.  14.

Q     So 14.  And how many semi-submersibles did you send using the defendant's engines?

A     More or less -- more or less 10, 11.

Q     Now, how many -- how much cocaine would you ship at a time

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025        23
Direct examination by Mr. Leath

on a semi-submersible?

A     To each semi-submersible we would put in eight, seven, six tons to each one, and then on the last one that I sent, which was in October of 2009, we put 4 ton and 400 something.

Q     And what type of drugs were you sending?

A     Cocaine.

Q     Now, when did you first meet the defendant?

A     I met him in two thousand something.

Q     And how did you meet him?

A     Well, since in Tumaco you would hear, you ask around, Tumaco is a small town where everybody notices things, so we started to find out who it was that was selling the engines, and we were taken to Mr. Juancho, El Papi.  I've known him as Juancho Papi my whole life.  Juancho Papi.

Q     And did he work with anyone else in business?

A     Ah.  Well, there we would see also a brother of his.

Q     And do you remember his name?

A     I met him as Filipiño, but I heard he was named Milton.

Q     Now, how many engines -- I'm just going to go back a little bit, sir -- did you buy from the defendant in total?

A     Well, what kind of engines?  Because we purchased a lot of engines, Yamaha 200s, and we also bought a bunch of Suzukis, 115s and 140s, which we used for small motorboats, small motorboats, and we would send 1,000 kilos of cocaine in those, 1,000 with two small motors, and we'll send one after the other

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025          24
Direct examination by Mr. Leath

through Central America.

Q    And let me make it a little simpler, sir.

How much cocaine did you traffic using the defendant's engines?

A    Oh, boy.  Bunches.  Over 50 tons.  A lot more.

Q    And what type of drugs?

A    Cocaine.

Q    And how did you pay for the engines?

A    Oh, the engines?  My brothers would mainly pay for it in dollars.  I also had the opportunity to make payments in dollars and in cash.

Q    And, sir, I'm going to backtrack a little bit.  You mentioned kits in addition to the engines.  What would be included in those kits?

A    Well, the kits have bunches of -- it's parts for the engines.  There are hoses, the bulbs, the pairs, there are head gaskets, there are valve cover gaskets, there's rain gear, there are boots, lots of other stuff, everything that you might need, tools.

Q    And everything you might need for what?

A    For the -- for the -- let's call it for the equipment of the motorboats.

Q    And what were those motorboats doing?  What was their purpose?

A    Their purpose was to transport cocaine destined to Mexico

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 25 of 95 PageID
1221
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025          25
Direct examination by Mr. Leath

and Guatemala.

Q    And would you register those vessels?

A    No.  A pirate motorboat can never be registered.  It's all pirated, the engines are pirated, no receipts, nothing, because an engine, if it's going to be legal, the person who is going to sell it is going to demand your national identification cédula number to be able to prepare a legal invoice, and then afterwards he would give me an ownership card so that then I can register it.  So for narco trafficking a pirated -- a pirate motorboat is never going to be registered, never.  Those are things that are all done in hiding, in secret.  We launch at night and everything.  If the Navy sees us bringing down some engines without paperwork, right away they'll take it and seize it.

Q    Now, sir, did you ever have interactions with the defendant where you personally picked up an engine from him?

A    Yes, I picked up engines from him.

Q    And do you know that the defendant knew what you were doing with those engines?  Do you have personal knowledge of that?

A    Yes.

        MS. CASTANEDA:  Objection.

        THE COURT:  Wait just a minute.  Can you rephrase the question?

        MR. LEATH:  Yes, Your Honor.

BY MR. LEATH:

Q    Did you ever tell the defendant what you were doing with those engines?

A    Yes, he knows.

Q    Can you explain that interaction.

A    One time we -- one time I was at El Naranjo at a dispatch location, yes, and we were going to send a semi-submersible, and he sent me an engine which was used, a Caterpillar, I'm never going to forget this, a Caterpillar, and the engineer told me, no, we can't send this engine because we're going to have trouble.  And then I told the engineer, well, hold on a moment, I'm going to go to land, I'm going to go to the town, I'm going to call Juancho immediately to fix this problem.

So I pick up the phone, call him, and I tell him, why are you doing this to me?  Either you swap out this engine and send me a new one, or if I send this one and something happens, you're going to answer for it, because you know what this is for.

So he tells me, oh, relax, Papi, don't -- don't get ahead of things, I'll swap out the engine immediately.

Okay.  So I answered him, okay, then you need to pay for the delivery, because I'm not going to pay for delivery again for you to send me another engine.  Send me another, and it better be a Cummins engine, a new one, not used.

I wish I had remembered the number, I would have

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 27 of 95 PageID 1223
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025        27
Direct examination by Mr. Leath

brought -- from the time of the call and everything.  He knew what it was for.  I scolded him time and again.

Q    And, sir, you mentioned a Cummings engine.  What --

A    Cummins.  Yes.

Q    -- uses or what purposes were those used for in Tumaco?

A    We would use them for the semi-submersibles, a Cummins 380 for the semi-submersibles.

Q    And did the defendant ever send employees to help install those engines on the smuggling vessels?

A    He would always use some kids that are mechanics.  When we needed one of those kids, we would ask it of them and then they would send them to us, all the way up to the last one that they sent in 2009.  In 2009 he sent me a gentleman he had as a mechanic there that they called Miche.  I don't know his name.  At that time I had some issues with -- because it was about to head out, but I had some issues with the starter and the alternator, so I had to promptly travel to Tumaco and I stopped by their store and I called my brother to send me money so I can buy the parts, and I obtained them in Tumaco for Miche to install them for me, then after two days, zip, that was it, out.

Q    And can you describe the process of how you got one of his mechanics to the launch site.

A    Oh.  The mechanics, we would bring them, because since we had the semi-submersible stored for a year, so he's brought

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 28 of 95 PageID 1224
JOSÉ MANUEL NARVAEZ-REINA   APRIL 21, 2025        28
Direct examination by Mr. Leath

because -- since he's knowledgeable about engines, so he can perform the maintenance.

Q    And would you call the defendant when you needed a mechanic or needed something, needed help with the engine?

A    We would go over there to them and they would loan us Miche.

Q    And you mentioned that you would store the semi-submersibles for a year.  Why would you do that?

A    We stored it for a year -- no, it was because we had a problem one time with a gentleman, a Mexican, Nacho Coronel, we weren't able to do the shipment, the shipment wasn't able to be done, and so we had to store the semi-submersible away.

Q    And where did you get your cocaine that you smuggled?

A    Well, we had a location of supply in the country that was of our property.

Q    And can you go ahead and just describe to us how that would happen, how you would get the cocaine, and eventually whether you would store it or move it to the lunch site.

A    I -- I would go out, I would go myself to pick up the cocaine, take four motorboats of the big ones that we had with 200-horsepower engines, I would leave San Juan and I would take an hour and a half to get to the border, at the border with Ecuador, then I would go into this river called Mataje, the Mataje River, on the Colombian side.  Then I would go directing the four motorboats, I would go in through an estuary towards

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 29 of 95 PageID
1225
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025        29
Direct examination by Mr. Leath

the inside, and a gentleman would wait for me there, he would already have the cocaine for me, and I'd pick up 10, 12 tons in one night, and I'd come down to the farm and I'd store it, then after two or three nights I'd go back up again or I would send people to pick up more.  I'd go gathering, gathering, this is for so-and-so, this is for so-and-so, I'd start gathering, like that.  Once it was ready for dispatch I would go and tell the guys, okay, today this merchandise here is leaving, because it's for so-and-so and so-and-so and so-and-so.

Q    And would they be for different cartels, or who would they be for?

A    No, different partners.  I myself would load.

Q    And whose engines were on those vessels?

A    The engines, we would buy them from Papis always, always, always.

MR. LEATH:  Request one moment, Your Honor.

THE COURT:  You may.

MR. LEATH:  Thank you, Your Honor, for that time.

BY MR. LEATH:

Q    Did you ever visit the defendant's place of business?

A    Oh, yes.  I got to know of several different stores.

Q    And did you become familiar with the locations where they would be located?

A    The Tumaco one was near the Los Polos dock.  They call that area Los Polos.  I knew one where they would do

Case 8:21-cr-00286-JSM-NHA   Document 269   Filed 05/23/25   Page 30 of 95 PageID 1226
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025        30
Direct examination by Mr. Leath

maintenance for the engines, they called that one Moto Rally; and I also got to know of one in Cali near the San Nicolás neighborhood.  Yeah, I went there about two times.

MR. LEATH:  Your Honor, permission to approach the witness?

THE COURT:  You may.

MR. LEATH:  Thank you, sir.

BY MR. LEATH:

Q    And, sir, could you go ahead and look at that folder and the photograph within, and please just respond to the questions I ask you about it for the meantime.

Do you recognize that photo?

A    Yes.  Yes.  Yes.  Of course.

Q    And have you been to that location?

A    Yes, I passed by there about two times.  This is the one that's on Los Estudiantes Avenue.

Q    And do you recognize the individual in that photo?

A    Yes, it's Juancho, El Papi.  He is the owner.

Q    And is that photo a fair and accurate representation of how that location appears?

A    Yes.  Yes.

MR. LEATH:  Your Honor, this photo has been marked as Government's Exhibit 2, and I move to admit it into evidence at this time.

MS. CASTANEDA:  No objection, Your Honor.

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025          31
Direct examination by Mr. Leath

THE COURT:  It will be admitted.

THE WITNESS:  Repeat the question.

MR. LEATH:  Permission to publish, Your Honor?

THE COURT:  You may.

A     Yeah, that's Juancho.

Q     All right.  Sir, so what are we looking at?  Please describe for us.

A     There you can see a big wheel, and at the top it says Moto Rally, and over here to the front, it seems to me this is where the sea was.

Q     This right here, sir?

A     Around there, yes.  The sea was to the back.

Q     And how many times have you been to this location?

A     No, that location very seldom.  I mainly went to the store that was at Los Polos.  There I went about two times.

Q     And did you ever pick up engines from this location?

A     On the back you can load engines, they had a warehouse.

Q     Thank you, sir.

Now, sir, you mentioned that you would send cocaine to numerous organizations.

A     Repeat the question?

Q     You mentioned you would send the cocaine to numerous organizations.  Which organizations in Mexico would you send cocaine to?

A     Well, we started with the Beltrán Leyvas, and El Chapo was

a partner, and there was also El Mayo during that time and other people from the Mexicans, and the rest were of Colombian partners.

Q   And what Mexican cartels would you send cocaine to?

A   The Beltrán Leyvas, El Chapo Guzman, El Mayo.  I had the opportunity, I myself, in around 2000 or so, I was in Mexico, I was in Huatulco, Acapulco.  Back then I traveled with 2500 kilos in each motorboat.

Q   And was El Chapo affiliated with any cartel?

A   Well, El Chapo has always -- always -- almost always been the same.

Q   And what cartels was he affiliated with?

A   No, he was no longer with the Beltráns.  Now he was alone.

Q   And did you ever send cocaine to the Sinaloa cartel?

A   Yes, we would always send to them.  My brother worked with them.

        MR. LEATH:  No further questions, Your Honor.

        THE COURT:  Cross.

        MS. CASTANEDA:  Thank you.

        Good afternoon.

        THE WITNESS:  Good afternoon.

    **CROSS-EXAMINATION OF JOSÉ MANUEL NARVAEZ-REINA**

**BY MS. CASTANEDA:**

Q   That photo you were shown, who took it?

A   No, I don't know who would have taken it.

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 33 of 95 PageID
1229
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025        33
Cross-examination by Ms. Castaneda

Q    You didn't take that, right?

A    No, I just got to see it here now.

Q    And the Government asked you how many times you'd been there, right?

A    Yes, he asked me, about two times, thereabouts.

Q    Okay.  And then you said the back of that you can load engines; is that right?

A    Yes, because the tide brings you up there, when the tide rises.

Q    But that's not correct, is it?

A    What do you mean it's not correct?

Q    What you just said isn't true, is it?

A    It's true.  Of course.  We would send for engines to be picked up from him and all over the place.  I always speak the truth.

Q    No.  I'm asking about the back of that building.

A    That's not a building.

Q    That building right there that you identified in the photograph you didn't take.

A    It's just a standard construction.  When I'd go by there, it was always a single story construction.  I call buildings things with three, four, five stories.

Q    And the back of that is a fishing shop, isn't it?

A    The back of that, there are warehouses in the back, warehouses, because everybody arrives there by motorboat, and

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025       34
Cross-examination by Ms. Castaneda

then just further along there's the house of the guy who is the mayor, Edward Castillo.

Q    And the back of that is actually owned by somebody else, isn't it?

A    No.  No.  No, I wouldn't know, because in the back I wouldn't -- I just leave my canoes, my boats, there up on the side, I don't go around repairing properties or looking at properties.  I tend to my business.

Q    So you don't actually know what the back of that building looks like, do you?

A    I have entered through the back.  I have seen it.  They have a warehouse, they had, in the back, you could store engines there and pick them up there.

Q    And you've only been there twice?

A    Yes, it's a -- no, but I've been -- been there, been there, been there two times, but in Tumaco everybody goes by there.  It's an avenue.  It's an avenue.  It's an avenue.  So if I go by ten times, ten times I'll see that.

Q    I'm asking if you've been to that particular building in the photograph.

A    Yes.  I was there twice standing there, and they have a bunch of motors outside, motors inside.  I always speak the truth.

Q    I heard you use the word "Papi" a few times.  That's a common nickname for people in Colombia, isn't it?

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 35 of 95 PageID 1231
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025        35
Cross-examination by Ms. Castaneda

A    Well, Papi -- they were known as El Papi, just like my brother is known as El Poli.

Q    No.  I asked you if Papi is a common nickname in Colombia.

A    I -- speaking my truth, I came to hear that about -- to them, to Los Papis, there in Tumaco, either Papi or Juancho. His name I didn't -- didn't know it back then, not until now.

Q    Whose name?

A    Juancho.  I also called him Juancho.

Q    So you just learned just now, in preparation for this trial, that his nickname is Papi?

A    Repeat the question for me?

Q    So you just learned, just now, in preparation for trial, that his nickname is Papi?

A    No.  For years.

Q    Okay.  And the word "Papi" is a common term of endearment in Colombia, right?

A    No.  Well, I don't understand that much.  Perhaps as friendship.

Q    So sometimes your children might call you Papi, right?

A    Oh, those are the children.

Q    And maybe your wife?

A    Yes, sometimes you're called Papi out of friendship, out of endearment.  They have always been Los Papis, to them, to anybody, to anybody that knows them in Buenaventura.  The business world knows them as Los Papis, Los Papis.

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025          36
Cross-examination by Ms. Castaneda

Q    And maybe when you were younger your girlfriends called you Papi, right?

A    No.

Q    They called you something else?

A    Always since first I heard in Tumaco, if we would ask who is it that's selling the engines, go to the store that's at such and such a place and there's some guys that are called Los Papis.

Q    Sir, you don't want to answer my questions, do you?

A    What is your question?

MR. LEATH:  Objection to the commentary.

THE COURT:  Sustained.

Q    You were arrested in 2012?

A    No.

Q    When were you arrested?

A    I was detained on 11 -- on the 29th of July of 2011.

Q    Were you arrested in Colombia?

A    I was in Colombia for how many months?  Eight months I was at La Picota.  I was first one to sign for express extradition.

Q    So you were in a Colombian jail before you came to the United States, right?

A    Eight months only.

Q    Okay.  And then when you came to the United States, was it about 2012?

A    Yes, I arrived in April of 2012.

Case 8:21-cr-00286-JSM-NHA     Document 269     Filed 05/23/25     Page 37 of 95 PageID
1233
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025          37
Cross-examination by Ms. Castaneda

Q     And you have been in jail since?

A     Yes.

Q     Okay.  You said that the last boat that you dispatched was in 2009, right?

A     Yes.

Q     And you were in jail since 2011?

A     Sorry.  Sorry.  It wasn't a motorboat, it was a semi-submersible.  Semi-submersible with four tons and 400 something, which was in October.

Q     2009?

A     No.  Well, yes, of 2009, and it was captured in Guatemala.  It's the only evidence I have.

Q     When you said it was captured in Guatemala, do you mean by the Guatemalan Government?

A     No, the Americans.

Q     Okay.  Near Guatemala?

A     Outside.  Outside of Guatemala.

Q     And you said you were a fisherman?

A     Yes, I was a fisherman.  Was.

Q     You grew up doing that?

A     Part.  Part of my youth, of my childhood.

Q     And you bought boats for fishing?

A     No.  No, because part of my youth, when I was fishing during that time, these were wooden canoes.

Q     You mentioned being a commercial fisherman, correct?

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 38 of 95 PageID
1234
JOSÉ MANUEL NARVAEZ-REINA    APRIL 21, 2025        38
Cross-examination by Ms. Castaneda

A    Excuse me?

Q    You mentioned being a commercial fisherman.

A    Yes, I was a commercial fisherman, but that was after the age of 20 onward.

Q    So you were a commercial fisherman as an adult?

A    Say it again.  I was born on the coast.  The majority of people on the coast, as kids they learn fishing.  From then on I learned to fish and to get around, to learn my way around motors.  Once I was older, I learned how to operate Penta and Johnson Motors that we had back then.  That was part of my youth.  Today I'm at the age of 63.  From the age of 20 onward I moved to Buenaventura to a place called La Bocana, to buy fish from families.  There I became a fish and seafood merchant.

Q    And you had boats for that?

A    At that time, yes, we had boats.

Q    And those boats had engines?

A    Yes, they had motors and registration, because the quartermaster demanded it.

Q    And those boats had kits, right?

A    No.

Q    None of those boats had anything with extra parts, tools?

A    No.  No, it was not necessary.  No, because from Buenaventura to La Bocana, the boats would come by there, and all that would take would be a half an hour.  Kits are for when

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 39 of 95 PageID
1235
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025       39
Cross-examination by Ms. Castaneda

you're going to travel far, far.

Q    And you were a commercial fisherman, right?  So don't you have to go off of the coast to fish?

A    No.

Q    Was your fishing for personal use or for actual commercial use?

A    At first for personal consumption, but afterwards for selling.

Q    Does everybody in that area have a personal boat for fishing?

A    Not everyone.  Whoever has the ability to buy one, because people are poor.

Q    You mentioned that you always picked up the engines, correct?

A    The engines?  I'd send for them to be picked up.

Q    Okay.  So it wasn't you personally that would go do it?

A    No, I'd send for them to be picked up.  I would negotiate them personally.  I would negotiate them personally with Juancho and my brother, and then I'd send for them to be picked up to where I would need them.  I would tell my brother, hey, I need X number of engines, and he'd say, okay, right away I'll send them.  I need ten engines.  I need 20 engines.  I'll send them right away.  I'll talk to El Papi right away because we need them right away.

Q    That was your brother that said that?

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025          40
Cross-examination by Ms. Castaneda

A     Excuse me?

Q     That was your brother that said "I'll find them right away"?

A     My brother would get the engines, he would get the Yamahas, and I would get the engines for the semi-submersibles with Juancho.

Q     This one right here, at this store?

A     No.

Q     Somewhere else?

A     No, he wouldn't sell them there, in Cali.

Q     And same thing with cocaine, right?  So you testified earlier that you personally got the cocaine, but that's not correct, is it?

            MR. LEATH:  Objection, Your Honor. Mischaracterization.

            THE COURT:  What's the legal basis?

            MR. LEATH:  Mischaracterization.

            THE COURT:  Sustained.

BY MS. CASTANEDA:

Q     You were the leader of a drug cartel, right?

A     No.  My brother.

Q     Your brother was.

            Did you answer to your brother?

A     I worked for my brother.

Q     And your brother's workers would go get the cocaine,

right?

A    I would go with them, with the workers.  I would get the workers, people from town.

Q    That worked for you?

A    Yes.  Yes, for -- I would get them and say, hey, come and help me tonight and then my brother will send for you to be paid.

Q    And these people would go help you load cocaine?

A    Yes.

Q    Without knowing you in advance?

A    No, they were people from town that know me, from my town.

Q    Okay.  So they would work for you and your brother?

A    Yes.

Q    And these --

A    And family.

Q    And sometimes these people would go get engines, right?

A    Yeah, all.

Q    You were sentenced to 235 months of jail time?

A    Yes, ma'am.

Q    That's a long time, right?

A    Yes, ma'am.

Q    Have you ever asked the United States Government to reduce your jail sentence?

A    No, because I'm already serving my time.  I have 23 months to go.

JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025 42
Cross-examination by Ms. Castaneda

Q    You've never asked to be released early from prison?

A    No.

MS. CASTANEDA:  Your Honor, may I approach the witness?

THE COURT:  You may.

BY MS. CASTANEDA:

Q    Do you recognize that?

A    Yes, I recognize it.  Yes.

Q    Is that your handwriting?

A    Yes.  Of course.

Q    Is that your request for reduction in sentence to the Government?

A    Yes.  Yes, for the -- for the guys that worked for us.

Q    There's five people there, right?

A    Valencia, Julio Garcia, yes, they're all here, because they worked with us.

Q    Is Mr. Juan Rios-Silva's name on that request?

A    Who?  Whose?

Q    The defendant in this case, Juan Rios-Silva, is his name in your Rule 35 request to be released early from prison?

A    No.

Q    It's not, is it?

A    No, ma'am.

Q    And you just told us that you never asked for reduction of sentence.  That wasn't correct though, was it?

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 43 of 95 PageID
1239
JOSÉ MANUEL NARVAEZ-REINA - APRIL 21, 2025    43
Cross-examination by Ms. Castaneda

A    No, it was not correct.

MS. CASTANEDA:  Your Honor, may I retrieve my laptop?

A    I did write the letter because of -- because of, you know, the guys.

MS. CASTANEDA:  May I approach, Your Honor?

THE COURT:  You may.

MS. CASTANEDA:  May I have one moment, Your Honor?

THE COURT:  You may.

BY MS. CASTANEDA:

Q    When you sent this request in that I showed you, that was a request for you to have a reduction in your sentence, right?

A    Yes.  I believe it was in 2018.

Q    And you asked for five people, credit worth five people, right?

A    Yes.  I believe you were there.

Q    That I was there?

A    Yes.

Q    Okay.

A    Ms. Rebecca.

Q    Do you know what a Rule 35 is?  Do you know what a Rule 35 request is?

A    Yes, of course.

Q    It's a request for a reduction in your sentence when you cooperate against other people, right?

A    Yes.

Q    And you asked for one?

THE COURT:  Asked and answered.

Do you have much longer?  Because we're going to take a break.

MS. CASTANEDA:  I do not, Your Honor.

THE COURT:  You do not have much longer?

MS. CASTANEDA:  Yes, sir.

BY MS. CASTANEDA:

Q    And Mr. Rios-Silva's name was not on that list, was it?

MR. LEATH:  Objection, Your Honor.

THE COURT:  Asked and answered.  Sustained.

MS. CASTANEDA:  Thank you.

THE COURT:  Any redirect?

MR. LEATH:  One question, Your Honor.

THE WITNESS:  Rebecca Castaneda was there.

MR. LEATH:  Thank you, Your Honor.

Your Honor, I apologize, it will be more than one, but I'll keep it brief.

THE COURT:  Brief meaning less than five minutes?

MR. LEATH:  Yes, sir.

THE COURT:  All right.  Proceed.

MR. LEATH:  Thank you, Your Honor.

**REDIRECT EXAMINATION OF JOSÉ MANUEL NARVAEZ-REINA**

**BY MR. LEATH:**

Q    So Mr. Narvaez-Reina, who in Tumaco buys multiple engines?

A     What was that?

Q     Who in Tumaco, in Tumaco, Colombia, buys large volumes of engines, multiple engines?

A     Well, when -- during the time that Juancho started, the man who bought a lot of engines from him was Mr. Wenceslao, W, he was over here; and my brother, Harold Narvaez, El Poli, also bought many engines from him.

Q     Is it common for fishermen to buy large volumes of engines?

A     No.  Never.  They don't have money.  How?

Q     And, sir, I'd like to direct you back to that Rule 35 request that defense counsel brought up with you.

A     Um-hum.

Q     You said you didn't file a request to reduce your sentence, and then you saw that.  Why did you have that discrepancy?

A     I remembered that I had that -- that was in 2018 and the counselor was my prosecutor, Rebecca Castaneda.  She spoke with me and then afterwards we kind of -- she was removed from the court or -- and then I don't know.  I didn't see her again.  She visited me in 2018.

Q     Who did?  Who visited you?

A     The prosecutor, Rebecca Castaneda, back then.

        MR. LEATH:  No more questions, Your Honor.

        THE COURT:  All right.  Take a 15 minute break.

*(Jury exits proceedings.)*

THE COURT:  This one witness took over an hour and a half.

MR. LEATH:  Yes, Your Honor.

THE COURT:  So how are we doing on time with your witnesses?

MR. LEATH:  Not well, Your Honor.

THE COURT:  And that goes to both sides.  I mean, you went far afield with your Cross, fishing around, it seems, it seems like, so we need to move along or we're not going to finish this month, all right?

Okay.  See you in 15 minutes.

- - - - -

(Recess at 2:50 p.m. until 3:03 p.m.)

- - - - -

THE COURT:  Bring in the jury, please.

Is your next witness in lockup?

MR. BAEZA:  No, Your Honor.  He's a law enforcement witness.

*(Jury enters proceedings.)*

THE COURT:  Call your next witness, please.

MR. BAEZA:  Your Honor, the United States calls Nestor Beltran-Cabrejo.

*(Nestor Beltran-Cabrejo enters proceedings.)*

COURTROOM DEPUTY:  Please raise your right hand.

Case 8:21-cr-00286-JSM-NHA   Document 269   Filed 05/23/25   Page 47 of 95 PageID 1243
NESTOR FABIO BELTRAN-CABREJO - APRIL 21, 2025      47
Direct examination by Mr. Baeza

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Could you please state and spell your name for the record.

THE WITNESS:  My name is Nestor Fabio Beltran-Cabrejo.

COURTROOM DEPUTY:  Please spell your last name for the record.

THE WITNESS:  B-E-L-T-R-A-N.

COURTROOM DEPUTY:  Thank you.  Please take a seat in the witness box.

THE COURT:  Proceed.

MR. BAEZA:  Yes, Your Honor.

Can you hear me, sir?

THE WITNESS:  Yes, sir.

**DIRECT EXAMINATION OF NESTOR FABIO BELTRAN-CABREJO**

**BY MR. BAEZA:**

Q   Good afternoon.  Would you state your occupation, please.

A   Good afternoon.  I am an officer with the Colombian National Police.

Q   How long have you been a Colombian National Police Officer?

A   26 years, one month, six days.

NESTOR FABIO BELTRAN-CABRERO - APRIL 21, 2025         48
Direct examination by Mr. Baeza

Q    How many hours and minutes?

And in those 26 years, one month, whatever days, what are your duties and responsibilities now?

A    I'm in charge of criminal investigations.

Q    Are you part of what is referred to as a Sensitive Investigation Unit?

A    Yes.

Q    Briefly describe for the jury what that term means.

A    The Colombian National Police is divided into different offices, within those offices is the Office of Criminal Investigation and INTERPOL, and within that office is a group called SIU, and SIU is interagency groups of investigation for special investigations, and these are the groups that support international agencies, and in this case my group supports the FBI.

Q    How long have you been serving in that role?

A    16 years.

Q    What kinds of cases are you involved in investigating?

A    Narco trafficking and terrorism.

Q    During the course of your time with the Sensitive Investigative Unit were you involved in an investigation that included Mr. Juan Gabriel Rios-Silva?

A    Yes, sir.

Q    And do you recognize him, sir?

A    Yes, sir.

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 49 of 95 PageID 1245
NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025      49
Direct examination by Mr. Baeza

Q    Will you describe him by where he's situated and an article of clothing, please.

A    He is wearing a white shirt.

MR. BAEZA:  Let the record reflect the witness identified the defendant.

THE COURT:  Let the record so reflect.

BY MR. BAEZA:

Q    In the course of your narco trafficking investigations, have you become familiar with organizational structures?

A    Yes, sir.

Q    Have you become familiar with how drug trafficking organizations handle the logistics of drug smuggling operations?

A    Yes, sir.

Q    I want to go through some of -- actually, withdrawn.

You received a lead regarding a man known as Chamuco in or around 2017; is that accurate?

A    Yes, sir.

Q    Who is Chamuco?

A    After the investigation it was determined that he was a member of a criminal organization devoted to the transnational trafficking of cocaine.

Q    You received a name and a phone number?

A    Within the cooperation with which we assisted the FBI, we received an official document with that name and a telephone

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        50
Direct examination by Mr. Baeza

number which he used to carry out coordinations related to
cocaine.

Q    So you're provided a phone number for a man known as
Chamuco, and around what time period was this?

A    Early in the year 2017.

Q    And we're going to go ahead a little bit and say as a
result of that investigation did you include, among others, the
defendant Mr. Juan Rios-Silva?

A    Yes.

Q    Let's talk very briefly about different types of
surveillance techniques.  Will you describe physical
surveillance for the jury, please.

A    According to the current criminal code in Colombian, it's
a special investigation technique which is that of surveillance
of people and things, and prior to the authorization of one of
the judges of our republic, he will then authorize a prosecutor
to order judicial officers to carry out the surveillance of
people.

Q    Let's talk about electronic surveillance, specifically
wiretaps.  How are those conducted?

A    That one is also a special investigative technique which
requires prior justification presented to the prosecutor by way
of the investigators, keeping in mind that information that is
obtained through a reliable or believable source, as
for example in this case, our source of information was the

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025       51
Direct examination by Mr. Baeza

agency known as the FBI, then based on that information the prosecutor of the case is requested to evaluate the possibility of intercepting a telephone line.  If after carrying out an evaluation test and he considers that it is viable, he submits an order authorizing the intercept.  Following that the request is made to the wiretapping department within the Attorney General's Office of the nation so that the conversations can be listened into as to that authorized line.  Then in a monitoring room that monitors communications of my investigative group, that order from the prosecutor is granted for 180 days, and based on the criminal code the taps can be extended for two additional periods.  Once the wiretapping is concluded, the results that have been obtained are presented to a judge of the republic so that it can be admitted as evidence, and then that evidence is also submitted to the chain of custody protocol.

Q    Did you follow the rules and regulations and chain of custody protocols for intercepts conducted in accordance with Colombian law in this case?

A    It is mandatory to submit it to chain of custody.

Q    As part of your typical investigative process do you maintain those recordings in the same manner in which they're obtained?

A    They are original elements.

Q    You were provided with one number.  In general terms, your investigation branches out into multiple numbers.  Is that a

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025      52
Direct examination by Mr. Baeza

fair characterization?

A     Yes.  In this case over 1500 calls, telephone lines, were intercepted.

Q     All right.  Let's go through those one-by-one.

All right.  We're not doing that, no.

About how many phone calls related to narco trafficking have you reviewed throughout your career?

A     Oh, I don't know.  I believe over 5,000.

Q     Over the course of your training, experience and review of intercepted communications, are you familiar with common terminology that is used in narco trafficking?

A     Yes, sir.

Q     And are you also familiar with the kinds of language that is used to describe narco trafficking?

A     Yes.

Q     So in America we say, you know, coded language.  What is the encrypted wording in Colombia?

A     In Colombia we say it's spoken in encrypted language.

Q     What does that mean?

A     Well, they change the name of illicit actions to throw off the possible apprehension by authorities.  It's distractions.

Q     Can you give an example?

A     Yes.  For example, when there's going to be a movement of cocaine, of picking them up to load them onto a ship, they're saying something like the bus is going to pick up the kids to

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025      53
Direct examination by Mr. Baeza

take them to daycare.

Q    What about references to papers?

A    In like manner, they prepare documentation that is similar to others so -- to make them seem as if they are real.

Q    Can you provide an example of that, please.

A    Origin documents and purchase of equipment documents are forged.

Q    Anything else?

A    They can also change documentation as to titles and vehicle registrations, the documentation, to give the appearance of having a different origin or with the end of throwing off the authorities.

Q    What, in your knowledge of Colombian law, is the general process to obtain a boat lawfully?

A    Well, you first have to have authorization, if you are a boat manufacturer, because it has to meet safety characteristics before the maritime authorities, and if you sell engines or accessories for motorboats, you need to have prior authorization to be able to sell those engines and tools.

Q    What kind of records are kept for the lawful sale of engines for maritime vessels?

A    Well, first you have to have a legally established business which is devoted to that work.  You need to obtain the permits from the authorities to be able to import, to import those engines to Colombia, you need to have maritime

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025       54
Direct examination by Mr. Baeza

authorizations to import that equipment into Colombia, and likewise to be able to do business with them further on within the country domestically, and all of that you need to have the documentation as to what happened from its beginning to the end, the history of that particular item.

Q   Now, I'm going to ask some particular questions regarding the defendant, but before I do, you spoke about the number of calls intercepted.  To be fair -- or to be clear, sorry, that is multiple people over a time period; is that accurate?

A   Yes, sir, or perhaps the same people but utilizing different phone numbers.

Q   So when we talk about, for example, 1500 calls, we're not talking about 1500 calls from Mr. Rios-Silva; is that fair?

A   No, it could have been many people with one or two phone numbers being used at the same time.

Q   Before I proceed with the exhibits, I want to first address a couple of examples of elements of your investigation, and then before that I just want to address another part of your testimony about the legality of both purchases.  Do you recall that testimony, about the legal purchase of boats?

A   Yes.

Q   During the course of your investigation of Mr. Rios-Silva and others, what if any evidence did you find of legal sales of engines to narco traffickers involving Mr. Rios-Silva's business?

A     Well, the result of the investigative process, we were able to establish that there were some people who had commercial establishments that were legally created through which outboard engines were being sold, and upon investigating the narco traffickers we got to find that these people by way of these established companies were able to obtain the motors for their vessels that were going to be tainted.

Q     And what do you mean by that, tainted?

A     With narcotics substances, which for this case, for our case, it's referring to cocaine.

Q     Now, we've been talking all day, jury selection, opening and testimony, about some elements of this case, but I think it's important for the jury to also have an understanding of where we are in Colombia.

        MR. BAEZA:  So, Ms. Carreon, can you put the first Government demonstrative up on the screen, please.

BY MR. BAEZA:

Q     Sir, I have up on the screen a Government demonstrative. Do you recognize the green shape that is depicted on that image?

A     Yes, sir.

Q     For the benefit of the jury -- and there's a place on the screen that you can circle certain -- you know, certain parts and everything.  Can you circle where Tumaco is on the map?

        Let's try that again so it stays.

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        56
Direct examination by Mr. Baeza

Let's try that one more time.

Okay.  So, sir, the City of Tumaco, I mean, how would you describe it?  Is it a metropolis, small town, what?

A    As a matter of fact, it's not a city, it's a small population whose financial or economic activity is largely represented with fishing and in other areas the growing, harvesting of coconut.

Q    You see this -- the Pacific Ocean on that as well?

A    Yes, sir.

Q    All right.  And is that west of Tumaco?

A    Yes, sir.

Q    And then the body of water north of Panama, what is that?

A    This one?

Q    I don't know what you're pointing to.  I'm asking about the body of water off the northern coast of Colombia.

A    To the north it would be the Caribbean Sea.

Q    Okay.  Your investigation of Mr. Rios-Silva, where were his Agronautica and motor businesses?

A    He had a main headquarters in the City of Cali.

Q    All right.  And can you depict where Cali is shown on the map, please, for the jury's edification.

All right.  So we have two locations that you identified, Cali and Tumaco.  Are there any more?

A    The development of the investigation allowed us to establish that the members of the organization also carried out

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        57
Direct examination by Mr. Baeza

their activities in Buenaventura.

Q    And would you depict Buenaventura on the map for the jury, please.

Did you ever identify any links to the City of Cartagena on the Caribbean coast?

A    Yes, sir.

Q    And what was that, please?

A    Members of the criminal organization would purchase engines in Cali, or with members of the organization in Cali, to be transported to the City of Cartagena.

Q    Are you familiar with common drug smuggling routes as well?

A    Yes, sir.

Q    I want to direct your attention now to another Government demonstrative.

Sir, do you recognize what is displayed on Government Demonstrative 2?

A    Yes, sir.

Q    In general terms, will you describe it for the jury, please.

A    We can find here Colombia and Central America and the Caribbean Sea and the Pacific.

Q    Can you mark on the map where Tumaco is located on Government Demonstrative 2 for the jury.

The narco trafficking vessels that are dispatched

from the Tumaco area, what are the intended destinations?

A    Well, they have -- their destination in the majority of occasions is Central America.

Q    About how far is it from Tumaco to, for example, the tip of -- the southern tip of Mexico?

A    Well, the criminal organization sends vessels not only from Tumaco but also from Buenaventura.

Q    Yes.  Let's just talk about -- about how far it is from the coast of Colombia to the south of Mexico.

A    I couldn't say how many miles it is.

Q    How long of a trip is that?

A    In terms of time on a vessel like they would build, four or five days.

Q    What about a semi-submersible?

A    In a semi-submersible, with the goal of not being detected by the authorities, they would follow a longer route.

Q    Can you draw that longer route on the map for the jury, please.

A    When it's by semi-submersible, they go south of Colombia, near Galapagos, and they climb up to Central America.

Q    About how long does that trip take?

A    About some eight days.

Q    A lot of rest stops or anything on that route?

A    No.  Not that they don't stop for rest or restroom breaks, but the criminal organization, depending on how the people

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 59 of 95 PageID
1255
NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025    59
Direct examination by Mr. Baeza

operating the semi-submersible inform them of -- as to the progress of the trip, they can send other vessels to resupply them, or if some type of breakage occurs, a breakdown, they can send for assistance.

Q    In your experience, do semi-submersibles and go-fast vessels depart with various additional parts in order to make the longer trip?

A    Yes, they carry tools and various accessories to cover the possibility of any breakdowns that might happen during the route.

Q    Let's turn our attention now to Government Demonstrative 3.

Okay, sir.  Do you see what's depicted on the screen for Government Demonstrative 3?

A    Yes.  It is a vessel which is -- has been handmade.  I'm referring to it being artisanal, handmade, because there isn't a technical specification as to their construction, as would exist for legal vessels.

Q    An artisanal drug boat?

A    Yes.  In the case of this image here, it's a semi-submersible.

Q    What's the significance of the color that is used for a semi-submersible?

A    This color is used very often to avoid the law enforcement coming upon you, maritime law enforcement.

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        60
Direct examination by Mr. Baeza

Q    Okay.  All right.  So we've had a background now on where we are in the world, the vessels that are used.

MR. BAEZA:  I'd like to now approach, with the Court's permission, to present what has been marked for identification as Government's Exhibits 1A and 1B, 4A, 5A, 14A, 15A, 16A, 32A, 33A, 34A, 35A.

May I approach?

THE COURT:  You may.

MR. BAEZA:  Thank you.

BY MR. BAEZA:

Q    Sir, you've been presented with the Government exhibits that I've just identified.  Please take a moment to review them.  Look up when you are done, please.

THE COURT:  While he's doing that, would you repeat those numbers so that Kristin can doublecheck?

MR. BAEZA:  Yes, Your Honor.  1A and B, 4A and 5A, 14A, 15A, 16A, 32A, 33A, 34A, 35A.

Q    Okay.  Sir, you've had an opportunity to review the Government exhibits that I've cited.  Do you recognize them?

A    Yes, sir.

Q    What are 1A and 1B?

A    They are photographs that are of a business establishment located in the City of Cali, where, amongst other things, outboard engines are sold.

Q    All right.  And was this the Agronautica business that

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 61 of 95 PageID
1257
NESTOR FABIO BELTRAN-CABRERO - APRIL 21, 2025        61
Direct examination by Mr. Baeza

we've been talking about before located in Cali?

A    Yes, sir.

Q    And that's the same business that you identified as associated with Mr. Rios-Silva?

A    In the development of the investigative process, yes, sir.

Q    4A, 5A, 14A, 15A, 16A, 32A, 33A, 34A, 35A, these are all CDs; is that accurate?

A    Yes, sir.

Q    Are they CDs of recordings intercepted in accordance with Colombian law?

A    Yes, sir.

Q    When you reviewed every single one of those discs, what, if anything, did you see written on them?

A    The identification of the case.

Q    Let me clarify.  What, if anything, do you recognize you put on each of those discs?

A    Yes, sir.

Q    What did you write on each of those discs?

A    The initials to my name and the dates.

Q    Is that because you reviewed every one before your testimony today?

A    Yes, sir.

Q    Are each of those fair and accurate recordings of the intercepted communications conducted in accordance with Colombian law, as we have discussed?

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 62 of 95 PageID
1258
NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        62
Direct examination by Mr. Baeza

A     Yes, sir.

Q     Have they stayed in the same -- substantially the same condition as when they were first intercepted?

A     Can you repeat the question?

Q     Absolutely.  Were they in substantially the same condition, the recordings themselves, as when they were first intercepted?

A     Spot on.  Yes, sir.  Spot on.  Yes, sir.

Q     Okay.  Thank you.

What's Spanish for "spot on"?  We'll ask later.

And did you maintain all of those recordings in accordance with Colombian policies for the preservation and custody of evidence?

A     Yes, sir.

MR. BAEZA:  At this time I move for the admission of Government Exhibits 1A and B, 4A through 5A, 14A through 16A, and 32A through 35A.

THE COURT:  They'll be admitted.

BY MR. BAEZA:

Q     We're not going to publish all of these exhibits, sir, but I want to go through just a few.

MR. BAEZA:  Permission to publish, Your Honor?

THE COURT:  You may.

MR. BAEZA:  Thank you.

THE COURT:  Are you hoping to finish with this

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 63 of 95 PageID 1259

NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        63
Direct examination by Mr. Baeza

witness today?

MR. BAEZA:  Five minutes, Your Honor.

BY MR. BAEZA:

Q    Okay.  Zooming in, sir, this is Government Exhibit 1A.

Okay.  What is depicted on the screen, sir?

A    A photograph of the business establishment in the City of Cali.

MR. BAEZA:  May I just pick up the exhibits real quick, Your Honor?

THE COURT:  You may.

MR. BAEZA:  Thank you.

BY MR. BAEZA:

Q    You said you intercepted Mr. Rios-Silva.  Is that accurate?

A    With prior authorization from the prosecution, yes, sir.

Q    And you confirmed his identity through his national identity number that is given freely on a Colombian intercept?

A    Yes, sir.

Q    All right.  So I'm going to need you to educate real quick.  What is a Colombian cédula?

A    The cédula of Colombian citizenship is a document that's issued by the National Civil Registry Office by which a numeric place is given as a citizen of Colombia, and on it you print a fingerprint and the person's biographical information and their physical characteristics, in this case it would be height, and

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 64 of 95 PageID
1260
NESTOR FABIO BELTRAN-CABRERO - APRIL 21, 2025      64
Direct examination by Mr. Baeza

if the body has any type of deformity it would also be recorded in the document.

Q    Okay.  So the Colombian cédula number is used as a means of self-identification on phone calls; is that accurate?

A    Yes, sir.

Q    All right.  So if I want to schedule a doctor's appointment, I provide my cédula number, right?

A    Yes, sir.

Q    If I want to book a flight, I need my cédula number?

A    Yes, sir.

Q    If I want to get high speed internet installed in my house, I need my cédula number?

A    Yes, sir.

Q    It's a little different from a Social Security number. Do you know about those?

        MR. BAEZA:  I'll withdraw the question.

A    Can you repeat, please?

Q    Do you know what a Social Security number is?

A    Yes.

Q    Okay.  Do you know that it's different from how we handle that here with providing our identification?

A    Yes, sir.

Q    I'm going to play briefly Government Exhibit 32A that has been admitted into evidence.

        MR. BAEZA:  Ms. Carreon, the volume?  Nothing?

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 65 of 95 PageID
1261
NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        65
Direct examination by Mr. Baeza

Nothing ever works.

Q    Let's go turn to the projector.  I want to show you the transcript of the call that has been admitted as Government's Exhibit 32A.  This is transcript 32B.  Directing your attention first to the participants in the call, first of all, who is Robeiro Manuel Martinez=Perez?

A    Mr. Robeiro Manuel Martinez, as a result of the investigative process, we were able to establish that he is an expert in repair and installation of engines for vessels.

Q    Who is the second person in the conversation?

A    Mr. Juan Gabriel Rios-Silva.  And according to our investigative process, it was established that this was the person that provided or sold the outboard engines to members of the criminal organization.

Q    Do you see at the lower right -- or, excuse me, lower left of the screen the date, sir?

A    21st of April.

Q    No.  On the screen that is provided to you on the lower left, do you see the day, sir?

A    Got it.  It's February 13th, 2020.

Q    I'm going to read a portion of the transcript translated in Spanish to English.

Yes.

Robeiro Martinez-Perez, towards the bottom of the page:  Yes, yes, another thing, what was I going to tell you,

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 66 of 95 PageID
1262
NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        66
Direct examination by Mr. Baeza

something else.  Ten business days.  What was I going to tell you?  Oh, and the price is still the same?  You told me 128?

Juan Gabriel Rios-Silva:  Yes, 128.

Martinez-Perez:  Unintelligible.

Rios-Silva:  Honestly, the -- the -- the -- well, if it's on an -- it is with an invoice, plus iva.

Martinez-Perez:  No, no, we only need -- I don't think we need an invoice.

Rios-Silva:  Oh.  Then, all right, then 128.

Do you see that, sir?

A    Yes, sir.

Q    You talked about encrypted words in your prior testimony. Do you recall that?

A    Yes, sir.

Q    Would you explain the significance, in your training and experience, about the talk about an invoice.

A    As a result of the investigative process, we determined that the criminal organization obtained outboard engines without following legal importation into Colombia.

Q    We talked about 1A and 1B, the photo of Agronautica.  Did you identify who owned that business?

A    Yes, sir.

Q    Who was that?

A    Mr. Juan Gabriel Rios.

Q    Did he have any brothers that you identified as involved

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 67 of 95 PageID 1263
NESTOR FABIO BELTRAN-CABREJO - APRIL 21, 2025        67
Cross-examination by Ms. Castaneda

with him as well?

A    As a result of the investigation, we became aware of two other brothers which became a part of the process, which we investigated, and who carried out the same activity of providing outboard engines.

Q    Oscar and Milton?

A    Yes, sir.

Q    Thank you.

        MR. BAEZA:  I pass the witness.

        THE COURT:  Cross?

        MS. CASTANEDA:  May I inquire, Your Honor?

        THE COURT:  You may.

        MS. CASTANEDA:  Thank you.

   **CROSS-EXAMINATION OF NESTOR FABIO BELTRAN-CABREJO**

**BY MS. CASTANEDA:**

Q    Good afternoon.  I'm showing you the exhibit that the Government just had up.  The Government just translated for you a quote that they allege that the defendant stated, right?

        MR. BAEZA:  Objection.  Mischaracterization.

        THE COURT:  Overruled.

A    Could you repeat the question for me, please?

Q    Yes.  So I believe that an engine price was quoted, correct, the 128?

A    Yes.

Q    And this gentleman right here you're stating was Rios --

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 68 of 95 PageID
1264
NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025        68
Cross-examination by Ms. Castaneda

Juan Rios-Silva, right?

A     Yes.

Q     And is it fair to say that he quoted a price but he also referred to tax, correct?

A     Yes.

Q     And in your interpretation, is that sales tax?

A     It's a tax, and what he's referring to there is if it's including the tax or without the tax.

Q     Okay.  I'm going to show you the second page.  I'm going to direct your attention to right here.  That -- the initials JGRS, that's still Juan Rios-Silva, correct?

A     Yes.

Q     And in that sentence when he says "both Papi," what is he referring to?

A     The two engines.

Q     But what does the word "Papi" mean there?

A     Papi is a word that's used a lot in the City of Cali to identify someone that's close to you.

Q     So you would use it when you're speaking to a friend?

A     Yes.

Q     And is it a word that's commonly used in families?

A     Yes.

Q     You mentioned that you work with the United States Government, right?

A     No, I don't work with the United States Government.

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 69 of 95 PageID
1265
NESTOR FABIO BELTRAN-CABRERA - APRIL 21, 2025      69
Cross-examination by Ms. Castaneda

Q    In this case you assisted; is that right?

A    Assisted the FBI.

Q    Okay.  And who pays your salary?

A    The Colombian National Police.

Q    And what about the gear that you use?

A    Which gear?

Q    Like what you have to wear to do your job.

A    I do not work in uniform.

Q    Do you have to carry a firearm?

A    Yes.

Q    Who pays for that?

A    The Colombian National Police.

Q    And what about electronics or any listening equipment, anything you might have used to record wiretaps?

A    Those are the technology equipment which are provided by the Government of the United States to the Attorney General's Office of the nation.

Q    "Nation" being the Government of Colombia?

A    Yes.

Q    Does the United States --

A    But not to the Government but rather to the Attorney General's Office of Colombia.

Q    And those are different entities?

A    Yes.

        MS. CASTANEDA:  Okay.  Thank you.

Nothing further, Your Honor.

THE COURT:  Any redirect?

MR. BAEZA:  No redirect, Your Honor.

THE COURT:  Thank you.  You may step down.

Call your next witness.

MR. BAEZA:  The United States calls Fernando Pineda-Jimenez.

THE COURT:  Have we lost a witness?

MR. BAEZA:  They have to bring him up.

THE COURT:  Tomorrow let them know the order in which you're going to call these witnesses.

MR. BAEZA:  We've already addressed that, Your Honor, and then there are logistical restraints depending on which jails are being -- which jails are transporting them.

*(Fernando Pineda-Jimenez enters proceedings.)*

THE COURT:  Please stand to be sworn.

Swear the witness, please.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Fernando Pineda-Jimenez.

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 71 of 95 PageID
1267
FERNANDO PINEDA-JIMENEZ  APRIL 21, 2025        71
Direct examination by Mr. Baeza

Pineda-Jimenez.

THE COURT:  Can you spell your last name.

THE WITNESS:  P-I-N-E-D-A.

THE COURT:  Thank you.  You may have a seat.

Proceed.

MR. BAEZA:  Yes, Your Honor.

Good afternoon, sir.

Good afternoon.

**DIRECT EXAMINATION OF FERNANDO PINEDA-JIMENEZ**

**BY MR. BAEZA:**

Q    You're wearing an orange jumpsuit.  Why?

A    Yes.

Q    Why?

A    Because I'm in jail.

Q    In your own words, tell the jury what you did.

A    With the work?

Q    Tell them what you -- what you did.

A    Well, what I did were some semi-submarines.

Q    What do you mean when you say what I did were semi-submersibles?

A    Semi-submersibles to transport cocaine.

Q    Did you plead guilty to conspiracy?

A    Yes.

Q    Did you enter into a plea agreement with the United States?

FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025        72
Direct examination by Mr. Baeza

A    Yes.

Q    Have you been promised a particular sentence by the prosecution?

A    No.

Q    Did you plead guilty because you are guilty?

A    Yes.

Q    Do you see any of your co-conspirators in this room right now?

A    Yes.

Q    Who?

A    Juan Rios.

Q    Do you know him by any other name or nickname?

A    El Papi.

Q    Can you identify him by an article of clothing and where he's seated?

A    White, a white shirt, and he's seated to my left.

        MR. BAEZA:  Let the record reflect the witness has identified the defendant.

        THE COURT:  Let the record so reflect.

BY MR. BAEZA:

Q    You said you were involved in semi -- I switched to Spanish.  I'm sorry.  Semi-submersibles.  What was your role in that organization?

A    Building, building the semi-submersibles, and I purchased engines and construction materials.

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 73 of 95 PageID 1269
FERNANDO PINEDA-JIMENEZ   APRIL 21, 2025         73
Direct examination by Mr. Baeza

Q    Is it fair to say that you were in charge of the construction organization for the semi-submersibles?

A    Yes.

Q    Is it also fair to say you were involved in organizing the logistics of these smuggling operations?

A    Yes.

Q    About how many people did you have in your employ?

A    15 people.

Q    Can you describe the process for constructing a semi-submersible.

A    The first thing is to obtain a location where you can build it that's in a -- in a jungle area.

Q    Okay.  Why would you pick a remote area like a jungle?

A    Because it's not legal to build one.

Q    All right.  So you pick a place to -- you pick a site to build a semi-submersible, then what?

A    We purchased -- well, afterwards the place where it's going to be built gets built, and then from then on we purchased the materials and the engines and all of the -- all of the accessories that are required for that.

Q    Was there security at these construction sites too?

A    Yes.

Q    Were there men with firearms at those sites?

A    I didn't have armed men, but the guerilla was in those areas and they had armed men.

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 74 of 95 PageID
1270
FERNANDO PINEDA-JIMENEZ APRIL 21, 2025          74
Direct examination by Mr. Baeza

Q    All right.  When you say the guerilla men, would you explain that for the jury, please.

A    The armed group that back then existed, las FARC, the FARC.

Q    And so you would build the -- you would construct these semi-submersibles in areas under the control of the FARC?

A    Correct.  Yes.

Q    And to operate there you'd have to pay a tax to them; is that accurate?

A    Yes.

Q    All right.  So you have picked your site, you have constructed the site.  Tell us what you do next.

A    We build, we purchase the materials, we purchase the engine and we move it over to the work site, we prepare until it's ready to transport the drugs.

Q    Where would you obtain the fiberglass for the construction of the outer frame of the semi-submersible?

A    On some occasions I purchased from Mr. Juan Rios.  Other occasions I purchased from other people.

Q    All right.  So you would build the semi-submersible from scratch; is that fair?

A    Yes.

Q    Can you build an engine from scratch?

A    An engine from scratch?  No, you have to bring it complete.

FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025          75
Direct examination by Mr. Baeza

Q    Who would sell the complete engines for these operations?

A    Mr. Juan Rios.

Q    Did he have anyone else who worked with him in this venture?

A    Yes, at the office where he was at there were other people.

Q    How many workers did he have?

A    I believe three.

Q    Did you ever know his brothers too?

A    Mr. Milton Rios.

Q    And what did Mr. Milton do?

A    Well, he had a store that sold outboard engines in Tumaco, and on some occasions I received the engines that Mr. Juan Rios would sell me, I would receive them over there.

Q    Were the Rios-Silva brothers known by any nicknames?

A    El Papi also.

Q    Have you ever heard the term Los Papis?

A    Yes.

Q    And who are Los Papis?

A    Juan Rios and Milton.

Q    What was the name of the business that Los Papis operated?

A    Agronautica.

Q    When did you first meet Mr. Rios-Silva, the defendant?

A    I started to get -- meet him more or less around 2000, 2006, thereabouts.

Q    In what context did you meet him?

A    When they had the store in Tumaco, that's when I began to meet them.

Q    Were you a drug trafficker in the 2006 timeframe?

A    No, not yet.

Q    All right.  When did you start becoming a drug trafficker?

A    More or less around 2009.

Q    And about what timeframe did you start getting supplied engines by Mr. Rios-Silva for drug trafficking?

A    Specifically, I started to purchase from him in 2016, 2015.

Q    Between 2009 and 2015 you were still a drug trafficker though, but not being supplied engines by Mr. Rios-Silva?

A    I didn't specifically buy from him, but my brother would.

Q    Okay.  And who is your brother?

A    Rodrigo Pineda.

Q    So tell us how you got involved with buying engines from Mr. Rios-Silva in the 2015 timeframe.

A    Well, first of all, I worked with my brother Rodrigo, and I would receive the engines, on occasions I would receive the engines for him that Juan Rios would send him.  Beyond that, once I stopped working with my brother, once we split up, that's when I began to purchase the engines directly from Mr. Juan Rios.

Q    What, if anything, did you ever tell Mr. Rios Silva about

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 77 of 95 PageID
1273
FERNANDO PINEDA-JIMENEZ  APRIL 21, 2025        77
Direct examination by Mr. Baeza

your legal profession?

A    Excuse me?

Q    Well, you're a narco trafficker, right?

A    Um-hum.

Q    I need an audible yes or no.

A    Yeah.

Q    What, if anything, did you ever tell Mr. Rios-Silva about your livelihood as a drug trafficker?

A    Yes.

Q    Well, what, if anything, did you tell him?

A    That I needed some engines for semi-submarines to transport drugs.

Q    Who talked you into trafficking drugs via semi-submersibles?

A    Mr. Nestor Hugo.

Q    And who is Nestor Hugo?

A    My boss, Nestor Hugo Garcia.

Q    What other uses are there for semi-submersibles other than trafficking drugs?

A    None.

        MR. BAEZA:  Can we go to the ELMO, please.

Q    All right.  Mr. Pineda, will you tell the jury, to the best of your recollection, the number of semi-submersibles you were involved in sending.

A    The ones that seized and the ones that made it?

FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025          78
Direct examination by Mr. Baeza

Q    Let's start with all of them and then we'll break down
which ones were seized and which ones got through.

A    Six.

Q    Six semi-submersibles in total you were involved in
sending?

A    (Nodding head yes.)

Q    How many were seized?

A    Three were seized with cocaine and one without cocaine.

Q    And so two got through?

A    Two made it.

Q    And what was the destination of those two successful
semi-submersibles?

A    Mexico.

Q    How much cocaine were on those two semi-submersibles?

A    Approximately 12 tons.

Q    Is that 12 tons in total or 12 tons each?

A    The ones that made it?

Q    Yes, sir.

A    12 total.

Q    12 total.  So an average of 6,000 per?

A    Yes.

Q    The ones that were seized with cocaine, to the best of
your recollection, how much cocaine were on those vessels?

A    Amongst the three, 20 tons.

Q    The vessel that was seized without any cocaine inside,

FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025        79
Direct examination by Mr. Baeza

this is one that was seized before it was loaded in Colombia?

THE COURT:  On this document, when he says 20 tons and you write 20,000, what does that mean?

MR. BAEZA:  Kilograms, Your Honor.  1,000 kilograms is a ton.  My apologies.

THE COURT:  They are 1.2 pounds in a kilogram?

MR. BAEZA:  There are 2.2 pounds in a kilo.

THE COURT:  2.2?

MR. BAEZA:  Yes, Your Honor.

THE COURT:  All right.

MR. BAEZA:  Can the court reporter read the last question?

 *(The last question was read as follows:  The vessel that was seized without any cocaine inside, this is one that was ceased before it was loaded in Colombia?)*

A    Yes.

Q    What was the intended payload of the vessel that was seized before it was loaded with cocaine in Colombia?

A    Five.

Q    That's 5,000 kilos?

A    Yes.

Q    Is it your testimony then, sir, that you were involved in sending or trying to send 30,000 -- 37,000 kilograms of cocaine using engines that were supplied by the defendant?

A    Yes.

Q    What kind of engine would you purchase from Mr. Rios-Silva to install on a semi-submersible?

A    A Cummins 6BT.

Q    Did you always use a Cummins 6BT?

A    Yeah, the ones I did, I did it with that engine.

Q    Mr. Pineda-Jimenez, I'm going to show you what's already been admitted into evidence as Government Exhibit 1A.  Do you recognize this image, sir?

A    Yes.

Q    What is it?

A    It's a store in Cali that belongs to Juan Rios.

Q    Is this Agronautica?

A    Well, Agronautica is the one that was in Tumaco, but that one there is where I went on several occasions.

     That's one of the engines.

Q    Yeah.  Would you circle -- would you circle the engine, please, sir.

     And what is -- in that zoomed-in portion of Exhibit A, what is represented, sir?

A    That's the rear part of the engine where the transmission goes.

Q    What kind of engine?

A    A 6BT.

Q    A 6BT Cummins?

A    Yes.

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 81 of 95 PageID
1277
FERNANDO PINEDA-JIMENEZ APRIL 21, 2025                    81
Direct examination by Mr. Baeza

Q    The same one you put on the semi-submersible?

A    Yes.

Q    Do you have a mechanics background, sir?

A    Yes.

Q    Is it fair to say you're knowledgeable about how all of these various engines work?

A    Yes.

Q    How to install them?

A    Yes.

Q    How to fix them?

A    Not repairing them as per se, no.

Q    All right.  Tell me how you would pick up the engines from the defendant.

A    He would always place them in Tumaco for me at the location that I would tell him to put them at.

Q    When you say "he," who are you referring to?

A    Juan Rios.

Q    Who would actually order the engines though?

A    I would request it from Juan Rios.

Q    Were there times where your boss, Nestor Hugo Gomez, would arrange the purchase of an engine?

A    Yes, he's the one who would give the money.

Q    All right.  So how often would money actually change hands between you and Mr. Rios-Silva?

A    I don't understand the question.

FERNANDO PINEDA-JIMENEZ APRIL 21, 2025          82
Direct examination by Mr. Baeza

Q    Okay.  Would you ever deliver cash to Mr. Rios-Silva for the purchase of an engine?

A    No, Nestor Hugo would do that.

Q    How much would an engine -- a Cummins 6BT engine cost when purchased from Mr. Rios-Silva for the smuggling of cocaine on a semi-submersible?

A    We would always pay him 190 million pesos, Colombian.

Q    Do you know, can you approximate what the conversion rate is on that for American dollars?

A    Right now, right now, where the dollar is at now, today, about more or less $40,000.

Q    How much would a Cummins 6BT engine cost that was not intended for a drug trafficking trip?

A    Back then, during that time, I think it would cost more or less 60 million.

Q    So he would charge more for a 6BT engine used for drug smuggling than for a commercial use?

A    Yes.

Q    Why were you paying extra?

A    Because of -- well, because of the ease of obtaining it with him, and he would handle placing it where one would tell him.

Q    When you say "ease," what do you mean by the ease of dealing with him?

A    The ease of transporting it where I could pick it up more

FERNANDO PINEDA-JIMENEZ - APRIL 21, 2025          83
Direct examination by Mr. Baeza

easily.

Q     You often picked it up in Tumaco?

A     In Tumaco.

Q     And how would that transaction occur?  Would you physically go to pick one up?

A     Yes, I was there when it was being picked up in the last one.

Q     Do you recall a storefront called Moto Rally?

A     Yes.

Q     What was Moto Rally?

      INTERPRETER:  May the interpreter inquire, Your Honor?

      THE COURT:  You may.

A     It was a store that as far as I know would sell motorcycles and would repair motorcycles.

Q     Who controlled that store?

A     I don't know who managed it at that time.

Q     What was the defendant's association with Moto Rally?

A     The owner of Moto Rally.

Q     Okay.  How many times have you been to Moto Rally?

A     I visited it sometimes.  I don't have the figure.

Q     Where in Tumaco would you pick up the Cummins 6BT engines from the defendant?

A     The last one I picked up at the Agronautica store. I picked up three at this area called El Molino at a dock, and

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 84 of 95 PageID 1280
FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025                84
Direct examination by Mr. Baeza

the other two I picked up at this place called Candalilla.

Q    Who delivered the engines to you?

A    The ones I received in Tumaco would always be delivered by Milton, and the others would be delivered by the driver of the truck.

THE COURT:  How much longer do you have on Direct?

MR. BAEZA:  15 minutes, Your Honor.

THE COURT:  How long will your Cross be?

MS. CASTANEDA:  Less than ten.

THE COURT:  I'm sorry?

MS. CASTANEDA:  Less than ten, Your Honor.

THE COURT:  All right.  Proceed.

BY MR. BAEZA:

Q    What were the kits that you purchased to accompany these engines?

A    They were a package of supplies, of replacement parts to carry with the -- on the trip for the engine.

Q    Why would you need replacement parts for these smuggling operations?

A    Well, perhaps if there were some type of mechanical failure, to be able to resolve it.

Q    What kind of pieces would accompany a kit for a semi-submersible?

A    Gaskets, injectors, water pumps.  Sometimes there were injection pumps.

Case 8:21-cr-00286-JSM-NHA   Document 269   Filed 05/23/25   Page 85 of 95 PageID 1281
FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025          85
Direct examination by Mr. Baeza

Q    What about a scuttle valve?

A    We would install four valves, two four-inch ones and two three-inch ones.  The three-inch ones would be used for the water to cool the engine, that was one of the three, and then the other three valves were used in case of an emergency, if they were going to be detained, to have that option of being able to sink it.

Q    Are you aware of any other kind of vessel that has an option to scuttle the entire vessel?

A    Not legal.

Q    Did you ever register any of these semi-submersibles with the Colombian Government?

A    No.

Q    Why not?

A    Because building one is not legal.

Q    Were you ever asked to remove the serial number from an engine?

A    Yes.

Q    Who instructed you to do that?

A    Juan Rios.

Q    What, if any, reason did he give for removing the serial number?

A    Because if the semi-submarine is seized, by way of that serial number they can find out who sold the engine.

Q    Are you aware of anyone else who bought Cummins 6BT

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 86 of 95 PageID 1282
FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025          86
Direct examination by Mr. Baeza

engines in Tumaco for non-drug purposes from the defendant?

A    No.  No.

Q    Describe the community in Tumaco.  Big, small?

A    It's a place that's not very big.  It's small.  It has a lot of fishing area, but it's artisanal, independent fishing. There aren't fishing ships, per se, that -- the boats that fish are very few.  There's also tourism, but there are no yachts. The -- there are motorboats with outboard engines and there are motorboats that transport passengers, but those are motorboats that have 200-horsepower outboard engines and they're registered.

Q    Is it fair to say that the two biggest businesses on the water in Tumaco are fishing and drug trafficking?

A    Yes.

Q    Is it also fair to say that the drug traffickers are well-known in Tumaco?

A    Yes.

Q    Were you ever solicited to invest in any businesses with the defendant?

A    No.

Q    Did you ever instruct him to transport any bulk cash, anything of that nature?

A    To bring to Tumaco?

Q    No, from Tumaco to Cali.

A    From Tumaco to Cali?  No.

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 87 of 95 PageID
1283
FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025          87
Direct examination by Mr. Baeza

MR. BAEZA:  Okay.  Permission to approach the witness?

THE COURT:  You may.

BY MR. BAEZA:

Q   Mr. Pineda-Jimenez, I provide you Government Exhibits 6 and 8.  Please take a moment to review, and let me know when you're finished.

A   Yeah, 6.

Q   All right.  And 8, have you seen that?

A   Yes.

Q   What is Government Exhibit 6?

A   In 6 it's a semi-submarine.

Q   And do you recognize that particular semi-submersible?

A   Yes.

Q   How do you recognize it?

A   I recognize it because of the shape that we would place up here and the carbon fiber and the shape of the exhaust.

Q   All right.  Government Exhibit 8, do you recognize that, sir?

A   Yes.

Q   What is it?

A   It's a 6BT engine.

Q   Cummins?

A   Cummins.

Q   Do you recognize anything else in the photo that stands

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 88 of 95 PageID
1284
FERNANDO PINEDA-JIMENEZ    APRIL 21, 2025              88
Direct examination by Mr. Baeza

out to you?

A    Yes, the intercooler, which is kind of a silencer.

Q    A silencer used in what?

A    Just to minimize the noise of the escape, of the exhaust as it exits.

Q    In a semi-submersible?

A    Yes.  It also has an additional function.

Q    What is it?

A    And it's used so that the water can circulate in here and that it can exit through the exhaust as well.

Q    Is that an engine that you were involved in purchasing and installing?

A    Yes.

Q    Is it fair to say that you did not take either of those two photos?

A    No.

Q    And these are from the same semi-submersible that was interdicted that you were involved in sending, right?

A    Yes.

Q    But they're fair and accurate representations of the vessel you built and the engines you used?

A    Correct.

        MR. BAEZA:  The Government moves for the admission of Exhibits 6 and 8.

        THE COURT:  They will be admitted.

FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025          89
Direct examination by Mr. Baeza

MR. BAEZA:  Can I retrieve them?  May I?

THE COURT:  You may.

MR. BAEZA:  And permission to publish?

THE COURT:  You may.

BY MR. BAEZA:

Q    Very brief, Mr. Pineda-Jimenez, I just want to confirm one more thing, was bulk cash ever moved from Cali to Tumaco?

A    The only thing I received were 150 million pesos only.

Q    From who?

A    From Mr. Milton.

Q    For what purpose?

A    For the work with the semi-submarines.

Q    Government Exhibit 6, that is the semi-submersible that you were involved in building?

A    Yes.

Q    Can you mark the exhaust with your finger, please.

A    This one.

Q    All right.  And where would the engine go?

A    Right here, below.

Q    Inside the vessel?

A    Yes.

Q    Government Exhibit 8.

What is depicted in Government Exhibit 8, sir?

A    This is the Cummins 6BT engine and this is the intercooler with the muffler silencer.

FERNANDO PINEDA-JIMENEZ - APRIL 21, 2025          90
Direct examination by Mr. Baeza

Q     Who built the intercooler?

A     All of that would be purchased from Juan Rios.

Q     Are these things that typically accompany a Cummins 6BT engine?

A     Well, normally for that vessel, yes.

Q     For a drug vessel?

A     Yes.

Q     Are you familiar with the lists for the kits that you used in various smuggling ventures?

A     Yes.

Q     Would you explain to the jury the lists that would be provided for smuggling ventures.

A     The materials?

Q     The kits, yes.

A     Well, the travel -- what I said, the travel kits are the -- like the gaskets, injectors --

Q     Right.  But were there lists that were exchanged as well?

A     Yes, the lists for building, for the entire construction and the materials being used.

Q     Did Mr. Rios-Silva have lists that he would provide you of materials that would be part of these kits?

A     The materials list.  The materials always -- well, at first, on the first occasions, I would provide him the list, but then afterward he would always have the list already, and whether he would need something, he would say so, but he would

Case 8:21-cr-00286-JSM-NHA    Document 269    Filed 05/23/25    Page 91 of 95 PageID
1287
FERNANDO PINEDA-JIMENEZ, APRIL 21, 2025          91
Cross-examination by Ms. Castaneda

already have the list.

MR. BAEZA:  I pass the witness.

THE COURT:  Cross?

MS. CASTANEDA:  May I inquire, Your Honor?

**CROSS-EXAMINATION OF FERNANDO PINEDA-JIMENEZ**

**BY MS. CASTANEDA:**

Q    You said it was 2015 that you started buying engines from Mr. Juan Rios, right?

A    Yes.

Q    You also said that you didn't buy them from him, it was your brother that bought them, right?

A    The first ones.

Q    Okay.  The first ones your brother purchased?  Yes or no?

A    Yes.

Q    Thank you.

And you said that your boss paid for the engines, not you, right?

A    Yes.

Q    And you sent a drug sub that didn't have any cocaine on it, right?

A    Yes.

Q    And you said the only payment you received was 150 million Colombian pesos from Mr. Milton, right?

A    That wasn't a payment.

Q    What was it?

FERNANDO PINEDA-JIMENEZ - APRIL 21, 2025          92
Cross-examination by Ms. Castaneda

A    It was money that was being sent to me for the work.

Q    What work?

A    For the drug trafficking work on the semi-submersible, but it wasn't a payment.

Q    What was it for?

A    To purchase other materials, food, gasoline, and implements used in the building.

Q    And you mentioned that there were kits sold with the engines, rights?

A    Yes.

Q    And those are required to be sold for a lawful sale in Colombia, right?

A    Usually when an engine breaks down, yes, but nobody purchases -- purchases it prior to an engine breakdown for a normal vessel.

Q    Is it required by law that they be sold with an engine?

A    No.

Q    It isn't?

A    No.

            MS. CASTANEDA:  Thank you, Your Honor.

            THE COURT:  Any redirect?

            MR. BAEZA:  No redirect.

            THE COURT:  Thank you.  You may step down.

            We'll be in recess until 9:30 tomorrow morning.

                    (Jury exits proceedings.)

THE COURT:  Is Exhibit 6 intended to be admitted or not?

MR. BAEZA:  It is, Your Honor.  I thought I moved to admit it.

THE COURT:  Kristin says it's not admitted.

COURTROOM DEPUTY:  No, it was just admitted but it was shown as a demonstrative.

MR. BAEZA:  It was also a demonstrative, yes.  This was prior to the admission.

THE COURT:  But it's been admitted, Kristin?

COURTROOM DEPUTY:  Yes, Your Honor.

THE COURT:  Okay.  All right.  See you tomorrow morning.

MR. BAEZA:  Thank you.

MR. LEATH:  Thank you, Your Honor.

THE COURT:  We have a question from the jury.  The question is from Ms. Castillo.  "My manager wants to know how long I'll need to be out of work so she can schedule coverage for me."  I think I've already answered that in voir dire, that we expected it to be a six or seven day trial.

MS. CASTANEDA:  Yes, Your Honor, I agree.

THE COURT:  Any objection to me having Eddie just tell her we expect it to be a six or seven day trial?

MS. CASTANEDA:  No, Judge.

MR. BAEZA:  No, Judge.

THE COURT:  Just give that back to her and tell her we expect it to be six or seven days.

- - - - -

(Proceedings adjourned at 4:51 p.m.)

- - - - -

C E R T I F I C A T E


        This is to certify that the foregoing transcript of
proceedings taken in a jury trial in the United States District
Court is a true and accurate transcript of the proceedings
taken by me in machine shorthand and transcribed by computer
under my supervision, this the 22nd day of April, 2024.




                                /S/ DAVID J. COLLIER


                                DAVID J. COLLIER

                                OFFICIAL COURT REPORTER