**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


**UNITED STATES OF AMERICA,**          )
                                       )
          **Plaintiff,**          )
                                       )
                                       ) **Case No.**
     **vs.**                      ) **8:21-CR-00286-JSM-NHA**
                                       )
                                       )
**JUAN GABRIEL RIOS-SILVA,**           )
                                       )
          **Defendant.**          )

_____

**JURY TRIAL - DAY 2**
**BEFORE THE HONORABLE JAMES S. MOODY, JR.**
**UNITED STATES DISTRICT JUDGE**

**APRIL 22, 2025**
**9:52 A.M.**
**TAMPA, FLORIDA**
_____


     Proceedings recorded by mechanical stenography,
transcript produced using computer-aided transcription.
_____

**DAVID J. COLLIER, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

**APPEARANCES:**


**FOR THE GOVERNMENT:**


      *Daniel Baeza*

      *Michael Leath*

      United States Attorney's Office

      400 North Tampa Street, Suite 3200

      Tampa, Florida  33602

      (813) 274-6000



**FOR THE DEFENDANT JUAN GABRIEL RIOS-SILVA:**


      *Rebecca Lynn Castaneda*

      The Castaneda Law Firm

      506 North Armenia Avenue

      Tampa, Florida  33609-1703

      (813) 694-7780



INTERPRETER    Jesse Leonor

              Gabriela Loncar

              Beatriz Velasquez

## I N D E X

**GOVERNMENT'S WITNESSES:**                                    **PAGE**

**BRIAN MILCETICH**
Direct examination by Mr. Leath                                  6
Cross-examination by Ms. Castaneda                             14

**ERIC SAVITTS**
Direct examination by Mr. Leath                                18
Cross-examination by Ms. Castaneda                             25
Redirect examination by Mr. Leath                              29

**NESTOR HUGO GOMEZ-GARCIA**
Direct examination by Mr. Baeza                                31
Cross-examination by Ms. Castaneda                             58
Redirect examination by Mr. Baeza                              67

**KYLE DAVID**
Direct examination by Mr. Leath                                70
Cross-examination by Ms. Castaneda                             81

**RICK GREER**
Direct examination by Mr. Leath                                91
Cross-examination by Ms. Castaneda                             96

**HANS SEIDEL-QUINTERO**
Direct examination by Mr. Leath                                99
Cross-examination by Ms. Castaneda                            115
Redirect examination by Mr. Leath                             120

**ROBIN CASTRO GOMEZ**
Direct examination by Mr. Leath                               123
Cross-examination by Ms. Castaneda                            131
Redirect examination by Mr. Leath                             133

**JUAN MORENO-BONILLA**
Direct examination by Mr. Leath                               135
Cross-examination by Ms. Castaneda                            139

**OSCAR QUINTERO-RENGIFO**
Direct examination by Mr. Baeza                               145
Cross-examination by Ms. Castaneda                            160

**GOVERNMENT'S EXHIBITS**                                                    **PAGE**

| Exhibit | Description | Page |
|---|---|---|
| 7 | photograph | 9 |
| 9-E | video | 9 |
| 9-B | photo | 22 |
| 9-C | photo | 22 |
| 9-D | photo | 22 |
| 3 | photo | 51 |
| 28-A | photo | 74 |
| 28-B | photo | 74 |
| 28-C | photo | 74 |
| 28-D | photo | 74 |
| 28-E | photo | 74 |
| 28-F | photo | 74 |
| 28-G | photo | 74 |
| 28-H | photo | 74 |
| 28-I | photo | 74 |
| 28-J | photo | 74 |
| 29-A | photo | 106 |

P R O C E E D I N G S

- - - o0o - - -

THE COURT:  Good morning.

First let me apologize for us starting late.  I had a sentencing hearing at 9:00 and it didn't seem to matter much, as hard as I pushed, I could not get them to finish by 9:30, so I apologize for that.

Call your next witness, please.

MR. LEATH:  Thank you, Your Honor.

The United States calls Brian Milcetich.

COURTROOM DEPUTY:  Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Brian Milcetich, M-I-L-C-E-T-I-C-H.

COURTROOM DEPUTY:  Thank you.  Please take a seat in the witness box.

THE WITNESS:  Yes, ma'am.  Thank you.

THE COURT:  Proceed.

MR. LEATH:  Thank you, Your Honor.

Good morning.

THE WITNESS:  Good morning.

**DIRECT EXAMINATION OF BRIAN MILCETICH**

**BY MR. LEATH:**

Q    Sir, where do you work?

A    Currently I work with the Coast Guard's Maritime Security Response Team in San Diego, California.

Q    And how long have you been in the Coast Guard?

A    I've been in the Coast Guard for 27 years.

Q    And could you go ahead and just tell the jury a brief overview of your career.

A    It's 27 years, so it's a lot to cover, but I actually -- I joined the Coast Guard in 1992 and I served on a Coast Guard vessel and at a Coast Guard law enforcement unit in California. I left the Coast Guard around 1996 and joined the New York City Police Department, and after 9-11 I came back active duty in the Coast Guard, served at another local law enforcement unit in Los Angeles, California, and then at another local search and rescue and law enforcement unit in New Jersey.  After that I went to a team called Tactical Law Enforcement Team, which is specifically a counter-narcotics unit in San Diego.  After I left there I went to a Coast Guard cutter called the STRATTON, it's a large ship stationed out of San Francisco, and then I worked on a local law enforcement team in San Francisco and then to my current assignment here, which is specifically an anti-terrorism team.

Q    And have you ever been involved in the counter-drug

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 7 of 166 PageID
1298
BRIAN MILCETICH - APRIL 22, 2025                    7
Direct examination by Mr. Leath

mission with the United States Coast Guard?

A    That's been the bulk of my career, yes, sir.

Q    And just briefly, what type of training or experience do you have for counter-narcotics missions with the United States Coast Guard?

A    Well, everything with the -- or most of the training with the Coast Guard is on-the-job training.  I have conducted law enforcement operations since I came in in 1992 and have been doing that since.  The specific training is you're -- when I was a young man fresh out of boot camp, you're supervised by a -- by a more experienced officer and you learn on the job, and once you've showed that you're proficient at it you become certified in it, which is called a boarding officer, and I first achieved my boarding officer certification in 1994 and have maintained it ever since.

Q    And I'd like to draw your attention to the timeframe of July 2015.

A    Yes, sir.

Q    Where were you stationed at the time?

A    I was attached to the Coast Guard cutter, which is a ship named the STRATTON.

Q    And what was your role on board that ship at the time?

A    I was the lead boarding officer for the ship.

Q    And do you remember specifically a Coast Guard interdiction that occurred on July 18th of that year?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 8 of 166 PageID
1299
BRIAN MILCETICH - APRIL 22, 2025                    8
Direct examination by Mr. Leath

A    I remember it very well.

Q    And what was your role in that?

A    I, again, was the lead boarding officer with two other boarding officers for that case.

Q    And can you go ahead and just run us through that boarding.

A    Yeah.  So how it works when you're on a Coast Guard ship, we just patrol for many months at sea, and when you're in the law enforcement role you just -- you get notified by someone on the ship we're going after some bad guys, basically, or, correction, some -- we have a case, as they say, and my role is just to prepare the team, because we are the ones that are going to physically go out and interdict the vessel.

So that particular day when we were notified, I went and advised the commanding officer what I think the best plan to intercept the vessel was, and there's a lot of components involved, aircraft and electronic means of tracking a vessel, and I simply readied my crew and we launched and attempted to find the vessel.

MR. LEATH:  Your Honor, permission to approach the witness?

THE COURT:  You may.

THE WITNESS:  Thank you, sir.

BY MR. LEATH:

Q    So I've handed you what's identified as Government

BRIAN MILCETICH - APRIL 22, 2025                    9
Direct examination by Mr. Leath

Exhibits 9-E and 7.

A    Yes, sir.

Q    Can you go ahead and just look at those briefly and then look up once you're done.

A    Okay.  Yes, sir.

Q    And Exhibit 7, how do you recognize that?

A    That is the vessel I boarded -- well, that's actually the day after, but that's the vessel I boarded, and that's me taking the bales of the contraband out of the vessel.

Q    And what about Exhibit 9-E?

A    9-E is a video taken from the aircraft of us making initial contact with the -- with the vessel.

Q    And were both of those fair and accurate representations?

A    Yes, sir.

Q    And were there any alterations when you looked at those?

A    No, sir.

        MR. LEATH:  Your Honor, the Government moves to enter Exhibit 7 and 9-E into evidence.

        THE COURT:  Admitted.

        MR. LEATH:  Permission to publish, Your Honor?

        THE COURT:  You may.

        MR. LEATH:  And the United States is going to publish Exhibit 9-E.

        Ma'am, could we get the screen?  Thank you.

        And for the record, I'm going to go ahead and --

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 10 of 166 PageID
1301
BRIAN MILCETICH - APRIL 22, 2025                    10
Direct examination by Mr. Leath

let's go ahead and zoom in.

(Video played.)

BY MR. LEATH:

Q    And, sir, could you go ahead and just describe to the jury what we're looking at.

A    Right.  So this is the vessel in question, and what you're about to see is we're making our approach very fast.  This is a very dynamic situation.  The goal is to get on board as quickly as possible and get all the occupants out as quickly as possible, because we treat them as though they are sinking.

I can explain that if you'd like.

Q    And where are you in this?

A    I am the first one you'll see.  I -- right there, I'm approaching the hatch and I'm pulling it up, and those are my two assistant boarding officers coming to provide cover for me as I pull open the hatch of the vessel.

Q    And please just keep describing what you're doing.

A    Yeah.  So like I said, these vessels, they're specifically designed to sink very fast, there's a valve inside the engine room that they can actuate to sink the vessel and thus sinking the contraband to the bottom of the ocean, so the goal is to get them off as quickly as possible so they don't activate the valve, and here I am getting all four of the occupants off of the vessel and checking them for weapons.

Q    Now, what did you do after this initial approach?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 11 of 166 PageID
1302
BRIAN MILCETICH - APRIL 22, 2025                    11
Direct examination by Mr. Leath

A    After the initial approach we -- because we still didn't know if the vessel was sinking or the stability of it, as you can see, it's very low to the water, so we took the occupants for their safety and put them on that orange -- that smaller boat right there, that Coast Guard boat, and then me and my fellow boarding officers stayed on board that vessel to ensure its stability and verify that we had what we call positive control of the vessel and then wait for permission to conduct our investigation.

Q    And, sir, I'm going to show you what's been entered into evidence as Government's Exhibit 7.  Exhibit 7.

A    Yes, sir.

Q    And go ahead and just walk us through what we're looking at.

A    Right.  So like I said, that was the next day.  These permissions that we look for to enter the vessel and remove the contraband, they take many hours.  Obviously this is about almost 24 hours, the next day, and we are -- finally had permission to remove the sealed hatch.  Where I'm looking down was where the hatch was, and we were able to remove it and then start taking the contraband out one at -- one at a time, literally.

Q    Thank you.

A    Um-hum.

        MR. LEATH:  And, Your Honor, permission to approach

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 12 of 166 PageID
1303
BRIAN MILCETICH - APRIL 22, 2025                12
Direct examination by Mr. Leath

the witness one more time, sir?

THE COURT:  You may.

BY MR. LEATH:

Q    All right.  Sir, so once you got the drugs, what did you do?

A    So once we had a large enough amount, we would put them on that smaller orange boat and transport them back to the Coast Guard ship, and then I would go with the ship and then we would load them into an area of the ship that's -- if you ever seen a picture of a Coast Guard ship that's underneath the cannon, it's a large empty space that usually has ammunition in it, but in this case we were putting the contraband.

Q    And once you got the contraband on board, where did you take the contraband?

A    To this -- it's called the forward magazine, we call it, it's a large space that's locked and only I have access to when there is contraband inside of it.

Q    And do you remember how much cocaine approximately you found on board the vessel?

A    Well --

Q    Let me ask it this way.

A    Yes.

Q    Was it more than 5 kilograms of cocaine?

A    We estimated just the at-sea weight, because we don't have any way of weighing it at sea, we just -- just those

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 13 of 166 PageID
1304
BRIAN MILCETICH - APRIL 22, 2025                13
Direct examination by Mr. Leath

individual -- those black squares you see we usually estimate have about 30 kilograms inside each one, and just by counting the bales we estimated it was about 6,000 kilograms, give or take.

Q    So more than 5?

A    Yes, sir.

Q    Okay.  And where did the Coast Guard -- what did they do with the drugs once you got on board the Coast Guard ship?  Did you take it anywhere, to another agency?

A    Yeah, eventually, when our patrol was over, this was a long patrol, we were away from home for five months, and we took it to San Diego, California.

Q    And what happened once you got to San Diego?

A    When I arrived in San Diego we were met by a lot of agents from the Drug Enforcement Administration and they brought a bunch of trucks and we loaded the drugs from the ship after we verified the individual cases, because there was more than just this case, and we loaded them all onto trucks and took them to a DEA warehouse.

Q    And did you accompany it to the DEA warehouse?

A    I did.  Yes, sir.

        MR. LEATH:  One minute, Your Honor.

        THE COURT:  All right.

        MR. LEATH:  No more questions, Your Honor.

        THE COURT:  Any Cross?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 14 of 166    PageID
BRIAN MILCETICH - APRIL 22, 2025    14
1305
Cross-examination by Ms. Castaneda

MS. CASTANEDA:  Yes, Your Honor.  Thank you.

Good morning.

THE WITNESS:  Good morning, ma'am.

**CROSS-EXAMINATION OF BRIAN MILCETICH**

**BY MS. CASTANEDA:**

Q    You mentioned that you accompanied the drug load to the warehouse, right?

A    Correct.

Q    And with that is there paperwork the Coast Guard does?

A    There is.

Q    Is that required?

A    Yes.

Q    Do those forms need to be signed and dated?

A    Correct.

Q    And that's important because it proves chain of custody, right?

A    Yes, ma'am.

Q    And that's part of your job as the Coast Guard?

A    Yes.

Q    And how many boardings have you done since July 18th, 2015?

A    Counter-narcotics or just in general?

Q    Both.

A    40.  40 plus.

Q    Have you done any other drug boardings on drug subs or

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 15 of 166 PageID
1306
BRIAN MILCETICH - APRIL 22, 2025              15
Cross-examination by Ms. Castaneda

SPSSes?

A    Yes, I've encountered three in my career, or two and then this one, two other ones, yes.

Q    Okay.  Thank you.

A    Um-hum.

Q    And the documents and the video you saw, did you review those shortly before this case?

A    The documents and the video?  I'm sorry.

Q    The documents and the video that you were shown.

A    Oh.  Yes.  Yes.

Q    And you saw those recently, correct?

A    Yes.

Q    Okay.  And did you locate the engine on that vessel?

A    Yes, ma'am.

Q    Did you examine the engine on that vessel?

A    As best we could.  Like I said, we had to wait for permissions to go inside, because we receive our permissions from a command center in California and they would only let us go inside the vessel for five minutes at a time, and the space where the engine is, it's attached to where the passenger compartment is, and it's no bigger than a closet, so the three of us were in there and I sent one of my assistant boarding officers in to take a picture and examine the engine while I was collecting evidence from the passenger compartment.  It had to be completed within five minutes.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 16 of 166 PageID
1307
BRIAN MILCETICH - APRIL 22, 2025                    16
Cross-examination by Ms. Castaneda

Q    So a photograph was taken of the engine?

A    Yes, ma'am.

Q    And did you review that photograph?

A    Yes, ma'am.  I was there when he took it.  Um-hum.

Q    And as the lead B.O., Boarding Officer --

A    Yes, ma'am.

Q    -- you would finalize a case package that had that photograph in it?

A    Correct.  Um-hum.

Q    And do you recall being able to examine the engine block on that engine?

A    No, I did not.  There wasn't enough room and I was busy grabbing electronics and other pieces of evidence that were vital to the case.

Q    Do you recall what electronics were on board that boat?

A    We recovered a -- as best I can recall, it's been a while, but I know it was a satellite phone, and that's all I can remember.

Q    Okay.

A    Um-hum.

Q    I know it was a long time ago.

A    Yeah.

Q    Do you know what happened to that boat?

A    Yes.

Q    The one you interdicted.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 17 of 166 PageID
1308
BRIAN MILCETICH - APRIL 22, 2025          17
Cross-examination by Ms. Castaneda

A    Yes.  So after many days, because it took awhile to get the drugs off, we were notified by our command center they wanted us to tow the vessel to Guatemala, I believe, and we hooked it up for a tow, and after about three days of towing it we were -- we were 300 miles away, so it was going very slow, and the engines quit at some point, which the engines are attached to what's called a bilge pump, which keeps water out of the vessel, and once the engines quit working and our engineers couldn't get it back, the vessel just eventually filled up with water and sank.

Q    Okay.  So are you unable to offer anything additional in terms of engine information besides what you've already stated?

A    No, sir.

        MS. CASTANEDA:  Okay.  Thank you, your Honor.

        THE COURT:  Any Redirect?

        MR. LEATH:  No, Your Honor.

        THE COURT:  Thank you.  You may step down.

        THE WITNESS:  Thank you, sir.

        THE COURT:  Call your next witness.

        MR. LEATH:  Your Honor, the Government calls Eric Savitts.

        MR. BAEZA:  Your Honor, the witness has been excused. May he be permitted to sit in the courtroom and observe?

        THE COURT:  He may.

        MR. BAEZA:  All right.

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 18 of 166 PageID 1309
ERIC SAVITTS - APRIL 22, 2025                    18
Direct examination by Mr. Leath

*(Eric Savitts enters proceedings.)*

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  My name is Eric Savitts, S-A-V-I-T-T-S.

COURTROOM DEPUTY:  Thank you.  Please take a seat in the witness box.

THE COURT:  Proceed.

MR. LEATH:  Thank you, Your Honor.

**DIRECT EXAMINATION OF ERIC SAVITTS**

**BY MR. LEATH:**

Q    Mr. Savitts, where do you work?

A    I work for the U.S. Drug Enforcement Administration.  I'm currently stationed here in Tampa.

Q    And how long have you been with the DEA?

A    22 years.

Q    And where are you currently assigned?

A    I'm currently assigned to the DEA Special Operations Division, but I'm forward deployed to the Panama Express Strike Force.

Q    And could you just briefly describe what roles you fill

within the Panama Express Strike Force.

A    At the moment I'm assigned as a staff coordinator, it's a headquarters position, so my job is to coordinate between various offices, foreign and domestic, on some of our larger investigations.

Q    And is part of your duties to help with drug processing?

A    It was at one time.  It is not at this time.

Q    Okay.  In what years did you assist in the drug processing?

A    I was originally assigned to the Panama Express Strike Force in 2015, and I filled that role from 2015 until 2023.

Q    Now I want to direct your attention to 2015.  Do you recall assisting a drug processing for a Coast Guard interdiction that took place approximately July 15th, 2015 or July 18th?

A    Yes.

Q    And what was your role that day?

A    My role that day was to travel with other agents to San Diego, California to meet with the Coast Guard to take custody of a large quantity of cocaine that they had seized during their most recent patrol.

Q    And how many drug processings do you estimate you've been involved in?

A    I couldn't even venture a guess.  Fifty plus.

ERIC SAVITTS - APRIL 22, 2025                    20
Direct examination by Mr. Leath

Q    Okay.  And 2015 is some years ago.

A    Yes.

Q    How is it that you remember this one?

A    That was my first drug processing offload with PanEx. I had just been assigned to the unit a few weeks before, so it was my first time in San Diego, my first time being on a cutter.  There were a lot of firsts that day.

Q    And can you go ahead and just run the jury through, describe for us how that occurred, from picking up the drugs with the Coast Guard and what you did with it.

A    Okay.  On August 10th, 2015, myself and other agents from PanEx met with the U.S. Coast Guard Cutter STRATTON at the U.S. Naval Base in San Diego.  Myself, Agent Steve Macklin and some other agents boarded the Coast Guard cutter and met with the crew on the cutter, identified the exhibits or the drug items that we were to take custody of.  Once we identified them, my job was to facilitate the offload of the exhibits from the Coast -- the deck of the Coast Guard cutter to the dock below, where they were loaded onto a box truck.

Once the box truck was full, we secured it, Agent Steve Macklin and Armando Guerrero drove that truck to the Southeastern Regional -- excuse me, Southwestern Regional Laboratory in Vista, California.  I followed in another vehicle with Agents Mike Smith and Ryan Kmieck.  Once we arrived at the lab on the 10th, we secured the drugs for the night, we left,

came back on the 11th, the morning of the 11th, when we then processed the drugs and submitted them into evidence.

MR. LEATH:  Your Honor, permission to approach the witness?

THE COURT:  You may.

BY MR. LEATH:

Q    And, sir, I've just handed you Government's Exhibits that's been marked for identification 9-B, C and D.  Are those the ones you currently have?

A    Yes.

Q    Could you go ahead and just review those briefly, sir, and then look up at me once you're done.

A    Okay.

Q    Do you recognize those photos, sir?

A    I do.

Q    And how do you recognize them?

A    That was the drug exhibit, or one of them that we took possession of from the Coast Guard and we processed at the Southwestern Lab that day, on the 11th.

Q    And were you there for when those photos were taken?

A    I was.

Q    And are those fair and accurate representations of how it looked and what occurred that day?

A    Yes.

Q    Has it been altered in any way?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 22 of 166 PageID 1313
ERIC SAVITTS - APRIL 22, 2025                22
Direct examination by Mr. Leath

A     Not that I can tell.

MR. LEATH:  Your Honor, move to admit Government's Exhibits 9-C, D -- B, C and D, Your Honor, into evidence.

THE COURT:  They will be admitted.

MR. LEATH:  Permission to publish, Your Honor?

THE COURT:  You may.

MR. LEATH:  And I'm going to go ahead and show it on the screen.

BY MR. LEATH:

Q    Sir, I'm going to go ahead and show you Government's Exhibit 9-B, and can you go ahead and just describe for the jury what we're looking at here, sir.

A     Those are individual kilo bricks from the main exhibit. So what -- the exhibit will come in bundled in large jute bags covered in other -- other wrappings, depending on what they decided to wrap it with that day.  So this is those kilo bricks removed from that outer wrapping and stacked against the wall for visibility.

Q    And is there more than 5 kilos here?  How do you -- how do you measure the bricks, approximately, for the weight?  What does each brick represent in terms of a weight quantity?

A     Those are actually ten bricks bound together, so if you look at the individual rectangles, those are 1 kilogram each, 2.2 pounds approximately.

Q    Sir, I'm going to go ahead and zoom in one more time for

ERIC SAVITTS - APRIL 22, 2025                 23
Direct examination by Mr. Leath

you on a portion of this and just ask you the same question, to describe what we're looking at.

What are we looking at here?  Could you walk us through those numbers, if you could read those, and just what that represents.

A     Okay.  The first number, G6-15-0135, that's a DEA case number.  Anytime we open an investigation of any kind, it will be assigned a case number to keep all things related to that case kind of together.  In this case that is the case number assigned to this particular event, the seizure of the semi-submersible.

Ex Number 1 is Exhibit Number 1, that is the drug exhibit, again, in subsequential order, this is first exhibit in that case.  San Diego, California is where the processing was done.  8-11-15 is the date on which it was done.

DEA/SWL is the DEA Southwestern Laboratory.  Monica Price is the forensic chemist in charge of the analysis.

Q     And, sir, so could you just walk us through on the left-hand side of that photo, how many kilograms of cocaine are we looking at, approximately?  If you could just walk us through your math, just section by section.

A     Well, they're in blocks of 10, so --

Q     Okay.  So each block would be about 10 kilograms of cocaine; is that correct?

A     Correct.  Each banded block is 10 kilograms of cocaine.

Q    All right.  Sir, I'm going to go ahead and show you what's Exhibit 9-C.  What are we looking at here, sir?

A    That is forensic chemic -- forensic chemist Monica Price taking representative samples from the overall exhibit.

Q    And in your training and experience, are you aware of how the representative samples work?  What's the process for getting those?

A    In a very elementary fashion, yes.

Q    And what is that?

A    So forensic chemists will go to the main exhibit, you see there are lots and lots of kilos there, and they will randomly take 30 of those from the bunch, from different sections, and that will be the overall sample that will be tested ultimately. It's not feasible to test 5,600 kilograms of cocaine individually, so they take a representative sample that will be the representation for the entire exhibit.

Q    And, sir, I'm going to go ahead and show you now 9-D. And are we looking at the same process here, or what are we observing here, sir?

A    Yes, that's the same process.  That's Chemist Price removing that particular kilo brick from the overall bundle.

          MR. LEATH:  Request one minute, Your Honor.

          THE COURT:  You may.

          MR. LEATH:  Thank you.

Case 8:21-cr-00286-JSM-NHA Document 270 Filed 05/23/25 Page 25 of 166 PageID 1316
ERIC SAVITTS - APRIL 22, 2025                25
Cross-examination by Ms. Castaneda

BY MR. LEATH:

Q   And, sir, when you were present for the processing, when you did the layouts, were there multiple layouts of drugs for this case, do you remember?  Do you recall?

A   For case 0135?  Yes.

Q   And so there was multiple times you filled the wall with cocaine?

A   Yes.

Q   And approximately how many times, do you remember?

A   Three.

Q   Three?  So three sets of these photos?

A   Correct.

        MR. LEATH:  No further questions, Your Honor.

        THE COURT:  Any Cross?

        MS. CASTANEDA:  I do, Your Honor.  Thank you.

        Good morning, Mr. Savitts.

        THE WITNESS:  Good morning.

                **CROSS-EXAMINATION OF ERIC SAVITTS**

**BY MS. CASTANEDA:**

Q   You mentioned that you've done over 50 drug processings; is that correct?

A   More or less, yes.

Q   And is that per case?  Is it more than 50 drugs cases?

A   Yes.

Q   Okay.  And is it fair to say chain of custody regarding

drugs is important?

A    Yes.

Q    And are there forms that go with any sort of controlled substance or drugs that are found by Federal agents?

A    Yes.

Q    And those forms are required?

A    Yes.

Q    So a Federal agent has to complete those forms when a drug is found, right?

A    There are forms that need to be completed, yes.

Q    And those forms are DEA Forms 6 and 7, right?

A    Those are two of the forms, yes.

Q    And you are a supervisor, or you were at least at one point; is that correct?

A    At one point, but not at this point.

Q    Okay.  But you were during the time that you handled the drug processing for this case, right?

A    No.

Q    You weren't?

A    I was not.

Q    You were later in time?

A    Correct.

Q    Okay.  And was that while you were at Operation Panama Express?

A    I was at Panama Express as a supervisor and in a different

enforcement group as a supervisor.

Q   Okay.  How many drug cases happen on one Coast Guard patrol?

A   It varies wildly.

Q   So you mentioned that this boat that you offloaded had several, correct?

A   Yes.

Q   Do you know how those are stored on a Coast Guard cutter?

A   I don't.

Q   Okay.  So it's DEA's job to just -- Coast Guard comes in, there's drugs on board, and you all process it off the cutter, right?

A   Correct.

Q   Okay.  And then from the cutter it goes straight to the lab?

A   Yes.

Q   Okay.  And those forms I mentioned, DEA Forms 6 and 7, do those forms prove that the Coast Guard cutter is offloaded with those particular drugs and then it's then taken to the lab?

A   I don't know if I'd use the word "prove."  It documents the transfer and it documents the event.

Q   Are those forms required to show the transfer of drugs from the Coast Guard to the DEA?

A   They're necessary to show the chain of custody, where we got them and where we brought them to.

ERIC SAVITTS - APRIL 22, 2025                    28
Cross-examination by Ms. Castaneda

Q    And why does DEA have that in the first place?

A    To maintain the integrity of the chain of custody so we can document it.

Q    Do you have those in this case?

A    I don't have those.

Q    Does the Government have them in this case?

A    I couldn't say.

Q    Isn't it your job, if you're the one who processed the drugs off the Coast Guard cutter?

A    I know there is a DEA-6 and a DEA-7 related to the event, yes.

Q    But you don't have them now?

A    I don't have them with me, no.

Q    And the Government doesn't have them right now?

A    I don't know if they do or not.

        MR. LEATH:  Objection, Your Honor.  Asked and answered.

        THE COURT:  Overruled.  He says he doesn't know.

Q    You said this is the case number?

        MS. CASTANEDA:  May I have the ELMO?  Thank you.

        COURTROOM DEPUTY:  Exhibit Number?

        MS. CASTANEDA:  9-D.

        THE COURT:  You've got to switch to the ELMO.

        MS. CASTANEDA:  9-D, please.

BY MS. CASTANEDA:

Q    Can you see that okay?

A    Yes.

Q    And you mentioned that this right here, that's the DEA case number?

A    Correct.

          MS. CASTANEDA:  Thank you.

          No further questions, Your Honor.

          THE COURT:  Any Redirect?

          MR. LEATH:  Briefly, Your Honor.

                **REDIRECT EXAMINATION OF ERIC SAVITTS**

**BY MR. LEATH:**

Q    So, sir, when you -- in your experience, when you pick up drugs from the Coast Guard ships and there's multiple interdictions, do you just grab all the drugs at once or are they separated by the appropriate tracking number?

A    They're separated.

Q    So you don't combine those drugs and just take them all and mix them up?

A    They're not mixed up, no.  They're separated by case.

Q    And is that why we had a case number in one of those photos?

A    Correct.

Q    And does the Coast Guard have any tracking numbers it uses for the drugs, to your knowledge?

A     They do.  They track it a couple of different ways.

Q     And then do you -- does the DEA use those numbers, or how does that come into play for the DEA tracking system?

A     The Coast Guard has an internal number that they use that we don't, but there is a common number that we both use called an FDIN, Federal Drug Identification Number.

Q     And what's the purpose of that?

A     It's a -- it's a recordkeeping thing mostly, is how it started, but we can use it to identify drug exhibits attached to different cases.  The Coast Guard also uses it and attaches it to their proprietary internal number so we know we're talking about the same exhibit when we get on board.

MR. LEATH:  No further questions, Your Honor.

THE COURT:  Thank you, sir.  You may step down.

Call your next witness.

MR. BAEZA:  The United States calls Nestor Hugo Gomez-Garcia.  He's in lockup.

*(Nestor Hugo Gomez-Garcia enters proceedings.)*

THE COURT:  Swear the witness, please.

COURTROOM DEPUTY:  Please rise and raise your right hand.

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Swear.

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 31 of 166 PageID 1322
NESTOR HUGO GOMEZ-GARCIA   APRIL 22, 2025      31
Direct examination by Mr. Baeza

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Nestor Hugo Gomez.  Shall I spell it? G-O-M-E-Z.

COURTROOM DEPUTY:  Thank you.

THE COURT:  You may have a seat.  Proceed.

MR. BAEZA:  Yes, Your Honor.

Before we proceed though, there were some exhibits from the prior witness.  Can we just have those removed from the witness stand?

Okay.  Good morning, sir.

THE WITNESS:  Good morning.

**DIRECT EXAMINATION OF NESTOR HUGO GOMEZ-GARCIA**

**BY MR. BAEZA:**

Q    You're wearing an orange jumpsuit.  Why is that?

A    I am in jail.

Q    In your own words, tell the jury what you did.

A    I participated in the transporting of narco trafficking.

Q    Okay.  Did you plead guilty to that offense?

A    Yes, sir, the 18th of August -- the 18th of December of 2023.

Q    And that was conspiracy?

A    Yes, sir.

Q    Are any of your co-conspirators in the courtroom with you today?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 32 of 166 PageID
1323
NESTOR HUGO GOMEZ-GARCIA    APRIL 22, 2025        32
Direct examination by Mr. Baeza

A    Yes, sir.

Q    Who is that?

A    Juancho.

Q    Will you identify the person you know as Juancho by an article of clothing and where he is sitting.

A    White sweater and glasses.

Q    Front row to your left?

A    Yes, sir, across from me at this moment.

        MR. BAEZA:  Let the record reflect the witness identified the defendant.

        THE COURT:  Let the record so reflect.

BY MR. BAEZA:

Q    Did you enter into a plea agreement with the United States?

A    Yes, sir.

Q    Did you plead guilty to the offense we described because you are in fact guilty?

A    Yes, sir.

Q    How would you describe your relationship with the defendant?

A    Friends.

Q    All right.  You were friends?  Were you also business associates?

A    Juan was the person who provided me with the engines, which I would ask him for guidance as to which engine you could

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 33 of 166 PageID 1324
NESTOR HUGO GOMEZ-GARCIA    APRIL 22, 2025          33
Direct examination by Mr. Baeza

use for a semi-submersible, which engine I should use for a go-fast, be it in terms of for fuel consumption or for load capacity, and when he would tell me which engine to use, I would negotiate with him and he would sell them to me and that's what would be -- what would be used.

Q    Okay.  But I want to stop there.  You were friends first though, right?

A    Yes, sir.

Q    What was your -- what was your occupation when you became friends?

A    The same thing.  Narco transporting.

Q    Where did you reside?

A    In Tumaco.

Q    When did you meet Mr. Rios-Silva?

A    I met him in the year 2001, I believe, or '2.  I don't remember too well.

Q    What was his occupation when you first met him?

A    He had a hamburger -- he'd sell hamburgers.

Q    Like a cart, or like a food truck?

A    Location.

Q    And did there come a time where he switched from making hamburgers to supplying engines to narco traffickers?

A    When we met, he asked me what could be done in Tumaco. I suggested that he sell engines, engine parts or liquor, which is what was sold in Tumaco.  And he started selling engines in

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 34 of 166 PageID 1325
NESTOR HUGO GOMEZ-GARCIA, APRIL 22, 2025      34
Direct examination by Mr. Baeza

about 2003 or '4.  He'd sell the majority of them to the Narvaezes, to the -- Harold, the brothers, Harold and El Poli.

Q     Jairo and Poli Narvaez?

A     Yes, sir.

Q     Do you recall a brother named Juan Narvaez as well?

A     I met -- knew of a brother Martin Narvaez and Manuel Narvaez.

Q     Could this be the same José Manuel Narvaez-Reina?

A     Yes, the same.

Q     You said you knew him as Juancho.  Did you know the defendant by any other names?

A     Papi.  Los Papis.

Q     And "Papi" is a common term of endearment in Cali, to your knowledge?

A     Yes, and that was how Juancho would also refer to people, Papi, how are you doing, Papi, how is this, and that was also how I would refer to him.

Q     Who were Los Papis?

A     Juancho and Milton.

Q     Did you know of any other brothers that were called Los Papis?

A     I knew of Oscar.

Q     Who did you work with the most though for the supply of engines for drug trafficking?

          MS. CASTANEDA:  Objection, Your Honor.  Leading the

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 35 of 166 PageID 1326
NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025          35
Direct examination by Mr. Baeza

witness.

THE COURT:  Overruled.

MR. BAEZA:  Can the court reporter repeat the question, please.

THE COURT:  Who did you work with the most?

A    I only worked with Juancho.

Q    How would you describe the drug trafficking community in Tumaco?

A    In Tumaco?  It's something normal.  The majority of people know what one does.

Q    When you say the majority of people know what one does, what do you mean by that?

A    Well, people that you know or that know you in general, they know what one is about, doing, they know you.

Q    When did you start buying engines from the defendant for drug trafficking purposes?

A    Well, I started buying motors from Juancho back in 2004, 2005 or so, but as far as me telling him what I needed them for, that would have been about 2014, which was when I did my first semi-submersible.

Q    Describe in your own words what you told the defendant about your profession.

A    No, to help me with the -- that I was going to build a semi-submersible and to -- that I needed for him to help me as to which engine I could use, because in 2010 he had helped us,

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 36 of 166 PageID 1327
NESTOR HUGO GOMEZ-GARCIA, APRIL 22, 2025        36
Direct examination by Mr. Baeza

Rodrigo and Fernando, with a Yamaha which we were interested in.  I believe that was between 2010 and 2012.  And on this occasion he suggested I use a Cummins.

Q    All right.  What was the name of his business, the defendant?

A    Agronautica.

Q    Where was the main store location for Agronautica?

A    Well, at first it started in Tumaco on El Comercio Street, but then afterwards it was in Cali, I believe on 4th.

Q    Have you ever been to the office in Cali?

A    Yes, sir.

Q    What, if any, other businesses did the defendant have?

A    I had heard he was into mining, but I never got to know anything about that.

Q    What was Moto Rally?

A    Moto Rally was, I believe, a motorcycle parts shop that he got in 2003, 2005 or so, I don't remember the date too well, and I believe he also had one for agricultural chemicals, for selling supplies for agriculture, that I remember.

        MR. BAEZA:  Can we switch to the Trial Director, please.

        COURTROOM DEPUTY:  Has it been admitted?

        MR. BAEZA:  It has, yes.

BY MR. BAEZA:

Q    Mr. Gomez, I'm going to put what has been already admitted

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 37 of 166 PageID 1328
NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025        37
Direct examination by Mr. Baeza

into evidence as Government Exhibit 1-A.  Do you recognize the image on the screen?

A    Yes, sir.

Q    What is that?

A    That's the location in Cali near the middle of town.

Q    All right.  And what business is this?

A    Agronautica.

Q    Zooming in on one of the objects within the -- within the store, do you recognize this, sir?

A    Yes, sir.

Q    What is that?

A    Cummins marine engine.

Q    Did Mr. Rios-Silva explain why he recommended a Cummins 6BT engine for your use in semi-submersibles?

A    It is a small engine with low fuel consumption.

Q    Let's go through your history with Mr. Rios-Silva.

        MR. BAEZA:  And can we switch to the ELMO now, please.

Q    Is your prior testimony, sir, that you started with go-fast vessels, or lanchas rapidas?

A    Yes, sir.

Q    How many go-fast vessels were you involved in dispatching prior to 2010?

A    It could be one per week or at a minimum one per month.

Q    For how long of a period of time?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 38 of 166 PageID
1329
NESTOR HUGO GOMEZ-GARCIA   APRIL 22, 2025        38
Direct examination by Mr. Baeza

A     From 2002 until 2006, and from 2010 to '12 I participated
in the construction of two semi-submersibles, and from 2014
onward six semi-submersibles, and motorboats likewise, it could
be one per month.

Q     Okay.  So what's -- how do you explain the gap between
2006 and 2010?

A     I didn't work.  I retired.

THE COURT:  Let me stop you a minute.  How much
longer do you have on Direct?

MR. BAEZA:  This will be about a half hour more.

THE COURT:  This would be a time for us to take our
morning break, unless you can keep going.  If you can keep
going, we'll break for lunch probably about 11:45.  Can you go
another hour, do you think?

All right.  Keep going.

MR. BAEZA:  All right.  We'll keep going.

BY MR. BAEZA:

Q     All right.  So you said you retired from 2006 to 2010;
is that accurate?

A     Yes, sir.

Q     All right.  But that didn't stick, you went back to
drug trafficking in 2010?

A     Yes, sir.

Q     And from 2002 to 2006 you were involved in sending in
upwards of one go-fast vessel per week for a period of

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 39 of 166 PageID
1330
NESTOR HUGO GOMEZ-GARCIA  APRIL 22, 2025        39
Direct examination by Mr. Baeza

four years?

MS. CASTANEDA:  Objection.

THE COURT:  Sustained.

MS. CASTANEDA:  Leading the witness.

MR. BAEZA:  Okay.

BY MR. BAEZA:

Q    Let's break it down.  We're going to take a while.

2002, when did you start?

THE COURT:  Well, I don't want you to take a while.
I think his testimony was anywhere from one to four per month.

MR. BAEZA:  Okay.  We'll proceed with that then,
Your Honor.

Q    One to four per month for a period of four years, would
you agree, sir, that that could be between 48 and -- 12 to 48
go fasts per year?

A    Yes.

Q    2002, 2003, 2004, 2005, 2006, five years?

A    Yes.

Q    All right.  About how many -- of those go fast vessels
that you dispatched, how many, to the best of your
recollection, included engines that you purchased from the
defendant, Mr. Rios-Silva?

A    At that time my transporting was from land to some ships.
I purchased maybe four or six 75 horsepowers during that time.
It wasn't over that.  The rest of the transporting was done on

Case 8:21-cr-00286-JSM-NHA Document 270 Filed 05/23/25 Page 40 of 166 PageID 1331
NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025 40
Direct examination by Mr. Baeza

ships, from where the ships would be loaded up and then to Guatemala or Mexico. Then in 2006 I believe we did seven ships, and these ships had 7 tons each, and we knocked those up with go-fasts that carried 2 and 3 tons. Two of them had 2 tons, one of them had 3, and those go-fasts had 200-horsepower engines which we bought from Manuel, which Manuel and Martin provided, but they purchased that from Juancho. This was in partnership with Harold Narvaez.

Q All right. So in 2004, about how many kilograms of cocaine were you involved in dispatching involving engines that were purchased from the defendant?

A I don't remember too well, but the ones from 2006, they were all moved on motorboats with engines purchased from Juancho.

Q What was the minimum quantity of cocaine, to the best of your recollection, in 2006?

A 2 tons.

Q Is that 2,000 kilos?

A Yes, sir.

Q All right. And the year before?

A The year before?

Q Dos mil cinco. 2005.

A In 2005 the ones I participated in were the motorboats knocked up -- the ships knocked up by the motorboats. I don't remember too well. I don't remember too well the motors that

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 41 of 166 PageID
1332
NESTOR HUGO GOMEZ-GARCIA, APRIL 22, 2025          41
Direct examination by Mr. Baeza

I purchased or used at that time.  It very well could have been 75-horsepower engines on 25-foot motorboats to get the -- to get them out 1 ton at a time, and the motorboats were reused in the different knock-up events.

Q   So to the best of your estimate, how many kilograms of cocaine were transported on engines supplied by the defendant, Mr. Rios-Silva?

A   At that date or during all that I participated in?

Q   I'm talking about just the 2002 to the two thousand now five timeframe, because you already answered 2006.

A   All of the cargo had been moved with engines purchased from Juancho.

Q   I understand that, but to the best of your recollection what is the minimum amount of cocaine that you recall combined on these vessels?

A   Per year?  I'd say some 40 tons or more.

Q   Per year?  Is that 40,000 kilos?

A   Yes, sir.

Q   Directing your attention now to the timeframe beginning in or around 2014, you previously testified to semi-submersibles; do you recall that?

A   Yes.

Q   How many of those semi-submersibles were seized?

A   Three.

Q   Of those three semi-submersibles that were seized, what is

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 42 of 166 PageID 1333
NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025        42
Direct examination by Mr. Baeza

the best of your recollection as to the quantities?

A    6,700, the first one; the second one was 5,400; and the last one 5,000.

Q    You said some were seized.  How many got through, to the best of your recollection?

A    Three.

Q    How -- what were the payloads on those?

A    One was 5,000 and two were 5500.  I don't remember too well.

Q    What was the destination for all the semi-submersibles?

A    Mexico.

Q    What location in Mexico?

A    Boca del Cielo.  I believe that's in Chiapas.  I believe it's in Chiapas.

        MR. BAEZA:  Can we switch to the computer again?

Q    Mr. Gomez-Garcia, I have Government Demonstrative 2 on the screen.  Do you recognize this area of the world?

A    All of it.

Q    All right.  What is it?

A    Well, it's a map of Central and South America.

Q    And can you -- you can put on the screen -- you can just press on the screen and show where certain locations are.

        Can you mark where the Chiapas area is of Mexico.

A    Around this area.

Q    You described a place called Boca del Cielo.  What

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 43 of 166 PageID 1334
NESTOR HUGO GOMEZ-GARCIA   APRIL 22, 2025        43
Direct examination by Mr. Baeza

is that?

A     It's a beach where Diamante would receive for us.

Q     Who is Diamante?

A     Diamante is or was a Mexican who worked for Guero, for Toby, Oliver and El Paisa, and El Indio, who were the owners of the merchandise.

Q     Do you know what cartel these recipients were associated with?

A     El Guero, as far as I understood, he answered to Los Chapitos.

Q     Who are Los Chapitos?

A     The children of El Chapo.

Q     Pretend like we don't know who that is.  Who is El Chapo?

A     El Chapo Guzman is renowned for drug trafficking in Mexico.

Q     On the screen you can also run your finger, you can trace a line or a route as well.  Can you show for the jury the route that a semi-submersible would take from Colombia to Boca del Cielo?

A     Yes.

Q     Please do so.

A     That's one, this is another option, of the ones we use.

Q     You use the option north of the Galapagos Islands in the corner?

A     Yes.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 44 of 166 PageID
NESTOR HUGO GOMEZ-GARCIA 1335 APRIL 22, 2025        44
Direct examination by Mr. Baeza

Q    About how long does it take for a semi-submersible to get from Southwestern Colombia to the area of Boca del Cielo using the north Galapagos route?

A    The northern one is closer, so it could be from 10 to 12 days.

Q    In addition to a Cummins 6BT engine to complete that trip, what if any other equipment would you need to purchase from the defendant for the semi-submersible to reach its distinction?

A    With Fernando it was our custom to purchase a starter motor, an injection pump, gaskets, and the oils, in case there were any breakdown in high seas, to be able to repair it.

Q    Are you familiar with the term kits de carreteras?

          MR. BAEZA:  I apologize to the court reporter, I will spell it during the break.

A    Yes.  Yes.  Fernando and I would use that term referring to the package that Juancho would have to sell us aside from the engine.  Aside from that, Fernando would also purchase shafts, propellers, steering wheels.

Q    What about scuttle valves?

A    I never -- I was never inside of a semi-submersible to know if it had scuttle valves or not.  I was above the semi-submersible when it was ready, at the moment of loading it.  The matter of construction and all that was handled entirely by my cousin Fernando.

Q    And your cousin Fernando, is that Fernando Piñeda-Jimenez?

NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025          45
Direct examination by Mr. Baeza

A     Yes, sir.

Q     Is it fair to say he worked for you though?

A     Yes, that's fair to say.

Q     Where were these vessels constructed?

A     We built the first one, I believe it was at the Mataje River at the border with Ecuador.  That one, someone burnt it down and we had to build another one in San Juan.  In the area there of lower San Juan and Catal, that's where the six submersibles were built, the three that made it and the three that were lost.

Q     Why do you build these in the jungle?

A     A semi-submersible can't be built in the open or it can be seen by people, the way we -- and then you lose it, the way we lost the one we were building near Ecuador in Mataje.  We were looking for mangroves with deep estuaries and tall mangroves that can cover you from above, that way you're not seen in case a helicopter or plane went by.

Q     How often did you register these vessels with the Colombian Government?

A     No, none.

Q     Why not?

A     Because, well, they're pirate ships to transport coke, so no.  Why register something that's going to be used to transport coke?  It makes no sense.

Q     Which organizations controlled the jungles that you used

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 46 of 166 PageID 1337
NESTOR HUGO GOMEZ-GARCIA, APRIL 22, 2025        46
Direct examination by Mr. Baeza

to build semi-submersibles?

A    Las FARC.

Q    What if any taxes did you have to pay to the FARC in order to operate there?

A    I worked with Calavera, El Indio -- or for Calavera, El Indio, and even though Oliver was a commander in -- of the guerilla, we still had to pay 100,000 per kilogram back then.

Q    100,000 what?

A    Pesos.

Q    All right.  And to the best of your knowledge, what is the conversion between 100,000 Colombian pesos and American dollars?

A    Back then it was about some $35 per kilo.

Q    Were these groups armed?

A    Yes.

Q    Let's talk about the semi-submersibles that were seized. Do you recall seizures in July of 2015, August of 2015 and March of 2016?

A    Yes.

Q    All right.  Let's go through those.

      The first interdiction, July 2015, would you describe your recollection about how you arranged the purchase of an engine from the defendant.

A    Well, likewise, we would always -- after the first one we had done with the Cummins, I had already tipped Juancho off to

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 47 of 166 PageID 1338
NESTOR HUGO GOMEZ-GARCIA - APRIL 22, 2025          47
Direct examination by Mr. Baeza

have one or two on the way for me to build the others we were making.

Q    Who did you delegate to actually pick up the engines?

A    I would pay Juancho for the engine myself in Cali in cash, and Juancho would handle placing the engine for me in Tumaco, and then in Tumaco Fernando's workers would pick it up, or Fernando himself, and it would be taken on a boat to the build site, just like the shaft, propeller, the steering wheel and the equipment that Juancho would provide to Fernando.

          MR. BAEZA:  Can we clear that screen, at least the drawing.

Q    All right.  I'm showing you Government Demonstrative 1. Can you mark where Cali is on the map for the jury as well as Tumaco.

A    Cali, Tumaco.

Q    Are you aware of any frequent checkpoints involving Colombian police between Cali and Tumaco?

A    There are several points along the whole way between Cali and Tumaco.  I can -- can I indicate the points here on the highway?

Q    You may.

A    There can be many points along that way.

Q    How does an engine get from Cali to Tumaco despite these checkpoints?

A    The engine would arrive legally with an invoice.

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 48 of 166 PageID 1339
NESTOR HUGO GOMEZ-GARCIA, APRIL 22, 2025          48
Direct examination by Mr. Baeza

Q    Would you describe the invoices that you asked for.

A    I'd ask him, put it in the name of whoever you want and get it to me, and once it's at my build site I'll take the tag off and no one will know where -- its origin.

Q    Let's break that down.  When you say put it in the name of whoever you want, was that you saying it or was that Juancho?

A    I'd say it.

Q    All right.  And why did you need an invoice for your motors?

A    I didn't need an invoice.  The matter was for him to transport it to Tumaco, to deliver it to me in Tumaco.

Q    All right.  So why did you need a name of someone on the invoice?

A    You needed an invoice, not someone's name, to move it from Tumaco to the build site, which was in my hands.  I needed an invoice in case the Navy stopped me, so they wouldn't take it from me.

Q    But the name on the invoice -- withdrawn.

Who would be the actual purchaser of the engine that was reflected on the invoice?

A    I never really paid attention to whose name was put down. I simply -- as a matter of fact, there never was an invoice, because I would buy the engine from Juancho and Fernando would pick it up to place it in Tumaco, and Fernando would transport it from Tumaco to the build site.  He's the one who would see

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 49 of 166 PageID 1340
NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025         49
Direct examination by Mr. Baeza

the invoice and would remove the tag and make it disappear.

Q    How many times were you aware of the name Nestor Gomez-Garcia being on an engine invoice?

A    No, never.

Q    Why wouldn't your name be on an invoice?

A    No.  No, I knew what the engine was going to be for. I wasn't going to put it in my name.

Q    What about Fernando Piñeda-Jimenez, how many times was his name on the invoice?

A    No.

Q    Why is that?

A    No.  We were transporting coke.  How were we going to put an engine in our name?

Q    When you talked to Mr. Rios-Silva about the tag number being removed, what did you mean by that?

A    The tag is the serial number of the engine which says in whose name it is and where it's coming from.

Q    Why didn't you want the serial number on an engine that you're using in a semi-submersible?

A    It made no difference to me, but the commitment was that when I buy the engine from Juancho, I'd say put it in whosever name you want, and then I would have to remove the tag so it cannot be seen who purchased it.

Q    How did you pay for all these motors?

A    In cash.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 50 of 166 PageID 1341
NESTOR HUGO GOMEZ-GARCIA, APRIL 22, 2025    50
Direct examination by Mr. Baeza

Q    Why did you use cash?

A    Well, everything we did was in cash because you can't leave any traces in any form of bank or anything of the sort.

Q    Where would you -- where would you deliver the cash?

A    At Juancho's location.  On some occasions I handed it to Fernando to hand it to Juancho, and on some occasions I'd hand it to Juancho at his locale.

Q    How often did you use the phone to talk about drug activity with the defendant?

A    No.  Me with Juancho, talk on the phone, no.

Q    Why not?

A    Because I couldn't leave any traces that I needed an engine for that sort of thing.  No.  I got Juancho a Blackberry phone so we could communicate by text regarding the engines and everything else that had been purchased from him, and through that route he would communicate with me and Fernando.

Q    This Blackberry phone, was that an encrypted application?

A    I don't know.  It was a common Blackberry phone, those that were often sold.

Q    Well, why would you use a Blackberry phone over talking on the phone?

A    It was more secure to text and not talk.

        MR. BAEZA:  Permission to approach the witness?

        THE COURT:  You may.

BY MR. BAEZA:

Q    Mr. Gomez-Garcia, I've given you what's been marked as Government's Exhibit 3.  Please take a moment to look at it and let us know when you're done.

A    It's a photo of mine with Juancho, and Michael and John are there, workers of mine, and an attorney who would ride motorcycles with us, Roberto Beltrán.

Q    Is that a fair and accurate representation of the photograph with you, the defendant and a Colombian attorney named Roberto Beltrán?

A    Yes, he's a friend of ours, Attorney Roberto.  He would ride motorcycles with us.

Q    About when was that photo taken?

A    It could have been between 2010, 2014.  I don't remember too well.  It is old.

        MR. BAEZA:  At this time, Your Honor, I move for the admission of Government Exhibit 3.

        THE COURT:  It will be admitted.

        MR. BAEZA:  Permission to publish?

        THE COURT:  You may.

        MR. BAEZA:  Please switch to Trial Director, please.

BY MR. BAEZA:

Q    Okay.  Mr. Gomez, can you circle the defendant in this photo, please.

        And can you show where you are in that photo as well.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 52 of 166 PageID 1343
NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025        52
Direct examination by Mr. Baeza

You let your hair grow out.

A    Yes.

Q    Where is Mr. Beltrán?

Let's talk about him real quick before we move on to another topic.

In or around December of 2017, did you meet with the Government in Bogotá, Colombia?

A    Yes.

Q    After that meeting, sometime after, did you agree to cooperate with the Government prior to your arrest?

A    At that -- at that meeting I accepted.

Q    After that meeting and after you agreed to cooperate with the Government, what, if any, involvement did Mr. Beltrán have in the sale of information about drug trafficking movements that you reported to law enforcement?

A    No.  Mr. Beltrán, no.

Q    All right.  What about an associate of his in the United States named Nelson Alfaro?

A    He did.

Q    And did Nelson Alfaro have an associate in the United States who you later learned was an informant?

A    Yes, sir.

Q    And what were they selling to you about drug activity?

A    Information regarding motorboats that were going to head out.

Case 8:21-cr-00286-JSM-NHA Document 270 Filed 05/23/25 Page 53 of 166 PageID 1344
NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025 53
Direct examination by Mr. Baeza

Q     Did you purchase this information?

A     Yes, sir.

Q     What -- who did you provide it to?

A     To Gabriel, who was the agent that had been placed in charge of me.  Later I found out it was not Gabriel but Odimar Pandales.

Q     To your knowledge, was the information true?

A     Yes.

Q     Did you later learn that either Mr. Pandales or Mr. Alfaro were prosecuted?

A     Yes, sir.

Q     What was your intention with respect to purchasing this information that could then be used to help law enforcement?

A     Well, it was safer and easier than trying to meet with the guerillas or Juancho or David or Daniel or anyone from the guerilla or any other narco trafficker.

Q     Were you hoping it would help your sentence?

A     Yes.

Q     As part of your plea agreement did you agree to be held accountable for this, with the knowledge that it may increase your sentence?

A     Yes.

Q     Has the Government promised you any sentence?

A     No.

Q     Let's go back to the three semi-submersibles.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 54 of 166 PageID
NESTOR HUGO GOMEZ-GARCIA 1345 APRIL 22, 2025          54
Direct examination by Mr. Baeza

COURTROOM DEPUTY:  Has it been admitted?  Exhibit Number?

MR. BAEZA:  Exhibit 3.

BY MR. BAEZA:

Q    Let's go back to the semi-submersibles that were interdicted in 2015 and 2016, and then we'll be done.

What if any conversations did you have with Mr. Rios-Silva following the interdiction of the first semi-submersible?

A    No, I just mentioned to him that I had lost it, that it had been captured just across from Mexico.

Q    Captured?

A    Yes.

Q    What was his reaction?

A    None.

Q    What about the second interdiction?

A    I don't remember having told him.

Q    What about the third one?

A    Yeah, I did tell him that one.  As a matter of fact, I told him I was not going to do another semi-submersible again, and as a matter of fact he had another engine for me, a seventh engine.  I told him that I was going to concentrate only on the motorboats, with 75 horsepowers.

Q    What was his reaction to that?

A    None.

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 55 of 166 PageID 1346
NESTOR HUGO GOMEZ-GARCIA   APRIL 22, 2025        55
Direct examination by Mr. Baeza

Q    How much more were you paying for a Cummins 6BT engine to use in a drug trip as opposed to buying it legitimately?

A    I never really investigated how much the engine cost, and I would always tell him in a tongue and cheek way that, El Juancho, with you it's better because you only rob me a little bit compared to like Milton.  I always paid 130 per engine, 130 million pesos, 130.

Q    How much extra for the kits?

A    I don't remember.

Q    And what would -- what would be Fernando's cut from that?

A    No, none.

Q    What about with the outboard engines?  You said that Milton was robbing you more.  What do you mean by that?

A    Well, whenever I would ask Milton, he would always tell me 1, 2 or 3 million pesos more expensive than Juancho.

Q    And a million pesos, about how much is that in American dollars?

A    Back then, some 400, $500.

Q    Did the defendant ever talk to you about investing your money in any business?

A    On some occasion he got to mention something related to mining to me and something about some concerts that he was doing.

Q    What was the -- what was the stated purpose for why he wanted you to invest in those?

A    He needed money for those businesses.

Q    What about you and cleaning the money from your drug activity?

A    What about me?

Q    Well, your money is drug money, right?

A    Yes.

Q    So how do you make it look legitimate?

MS. CASTANEDA:  Objection, Your Honor.  He's leading the witness.

MR. BAEZA:  It was a how.

THE COURT:  Overruled.

A    I had businesses of palm harvesting, livestock.

Q    Where did the money come from to buy the engines from the defendant?

A    No, not narco trafficking, from the transportation that I'd be paid up front for.

Q    You said you grew up in Tumaco?

A    I was born in Salaunda, which is near Tumaco, and I grew up in Tumaco, I was there until about 19, 20 years old, and then I went to live in Cali.

Q    You know it as a small town?

A    Yes.

Q    Is it fair to say that everybody knows everybody there?

A    Yes, generally.

Q    All right.  How many -- how many yacht owners are there?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 57 of 166 PageID
1348
NESTOR HUGO GOMEZ-GARCIA    APRIL 22, 2025    57
Direct examination by Mr. Baeza

A    Yachts?  No one.

Q    What about frequent purchasers of engines for tourist boats?

A    No, Tumaco is not a place you could say is really a tourist location.  Tumaco is a red zone under the guerilla, and people that go there, really it's more to the Pasto area. Anything about engines in large amounts, it's used for drug trafficking, not for -- not for tourism.

Q    When you say anything with engines in large amounts is only for drug trafficking, what do you mean by that?

A    Well, in that area, all of us that were working there were the ones buying engines in amounts.  A fisherman is only going to buy you an engine maybe once every five years.

MR. LEATH:  I pass the witness.

THE COURT:  How long will your Cross be?

MS. CASTANEDA:  About 35 minutes, Your Honor.

THE COURT:  How long?

MS. CASTANEDA:  35 minutes.

THE COURT:  Would you like to get started and then we'll break for lunch, or would you rather break for lunch now?

MS. CASTANEDA:  I'd rather break for lunch, Your Honor.

THE COURT:  All right.  We'll take an early lunch until one o'clock.

*(Jury exits proceedings.)*

- - - - -

(Recess at 11:35 a.m. until 1:00 p.m.)

- - - - -

*(Jury enters proceedings.)*

THE COURT:  You may proceed with Cross.

MS. CASTANEDA:  May I inquire, Your Honor?

THE COURT:  As I said, you may proceed with Cross.

MS. CASTANEDA:  Thank you.

Good afternoon.

THE WITNESS:  Good afternoon.

**CROSS-EXAMINATION OF NESTOR HUGO GOMEZ-GARCIA**

**BY MS. CASTANEDA:**

Q    You testified that you sent drug subs with tons of cocaine, right?

A    Yes.

Q    You also said you never went inside any of them.  Is that accurate?

A    Yes.

Q    So you built a drug sub that you had to hide in the jungle that shipped tons of cocaine and yet you never went inside it?

A    I said I did not enter into the submarine, but I was on top of the submarine every time we would load them and dispatch them.

Q    But you are confident that you know about the types of engines that went in them, right?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 59 of 166 PageID 1350
NESTOR HUGO GOMEZ-GARCIA  APRIL 22, 2025          59
Cross-examination by Ms. Castaneda

A    Yes.

Q    You said you bought six to eight engines from Mr. Rios in total, correct?

A    I had not remembered that it was eight, but it was eight. I had said that it was seven, but, you know what, it was eight. With the one that was burnt down, it was eight.

Q    And you estimated that you sent approximately one to four boats with drugs per month, right?

A    Go fasts we would do sometimes one per week in a month or sometimes up to four in a month or even one per week.

Q    And this was from 2002 to 2005, right?

A    Excuse me?  Two thousand what?

Q    2002 to 2005?

A    No, 2002 until 2006.

Q    So for four years.  And you said you were sending approximately 48 to possibly 192 boats over this time period?

A    Participated in the transport.  I wanted to clarify that I was not the owner of the cocaine.

Q    But I'm asking about you sending out boats.

A    Yes.

Q    Okay.  So you testified when the Government asked you that you were sending one to four boats per month for about four years.  Is that correct?

A    Well, I began to work from the year 2000, 2001 up until 2006, from 2006 until 2010 I stopped, and between 2010 and 2012

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 60 of 166 PageID 1351
NESTOR HUGO GOMEZ-GARCIA, APRIL 22, 2025          60
Cross-examination by Ms. Castaneda

I participated in two submarines.  Then in 2014 to 2016 I participated in submarines that were lost, three that were captured by the United States and one that was burned down in Mataje at the border with Ecuador.

Q    And you testified that all the cargo that was moved with these boats was using engines bought from Mr. Rios, correct?

A    Yes.

Q    Wouldn't you agree that if we used the low end of the boats that you sent, using the numbers that you told the Government, you sent at least 48 boats in that time period?

A    I didn't hear well.  Could you repeat the question, please?

Q    Wouldn't you agree that if we used the numbers you gave the Government on the low end, you were sending out at least 48 boats during this time period?

A    Semi-submersibles?  No.  Go-fasts.

Q    Correct.

A    Semi-submersibles were the amount that we had already mentioned.  I did not participate in any other semi-submersible event.  Go-fasts would be one per month to four, depending on the amount of work that was available.

Q    And each boat, go-fast boat, has at least two engines on it, right?

A    Yes.

Q    And they have up to four?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 61 of 166 PageID
NESTOR HUGO GOMEZ-GARCIA 1352 APRIL 22, 2025        61
Cross-examination by Ms. Castaneda

A    They could be with three, they could be with four. I never used them for long trips, I only used them to -- the knocking up.

Q    Okay.  So using your numbers, low end, go fast vessels, only two engines, you would have purchased almost 100 engines to make those loads go out, correct?

A    In the time I've been working, I think I've purchased over 100 engines.

Q    But you said you only bought around six to eight engines from Mr. Rios.

A    The ones I purchased from Rios.

Q    And you also testified that you would always tell Mr. Rios that he only robs you a little bit compared to his brother Milton, right?

A    I never purchased an engine from Milton because they were always overpriced.

Q    How would you know what Milton charged?

A    He would always go high.  Like, for example, if an engine is a 24 or 14, depending on the engine, because for a time the 75 horsepowers were going for 14, and Rios or Milton would offer them for 15, for 25, and I'd always buy between two, four, six engines, so I always did business with Papi, with Juancho.

Q    When did you find out that Mr. Rios had been arrested?

A    When I was in jail at La Picota in Colombia.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 62 of 166 PageID
1353
NESTOR HUGO GOMEZ-GARCIA APRIL 22, 2025          62
Cross-examination by Ms. Castaneda

Q    Who told you?

A    It was told to me first of all by a cousin, they call him Super, who I believe had rented an apartment for him or had found an apartment in the United States for him, which he never made it to it apparently because he had been detained, or that he had got in contact with his wife or something like that. I don't remember too well.

Q    When did you find out that Mr. Rios was going to trial?

A    While at La Picota.

Q    Who told you?

A    I believe it was Roberto Beltrán, the attorney.

Q    Your attorney?

A    Yes.

Q    Before you were arrested in Colombia, did you find out you were facing Federal charges here in the United States for drug trafficking?

A    If I found out?

Q    Yes.  Did you find out about your own charges?

A    Not that I had charges, but in 2015 or '16 some attorneys from the United States started to ask about me, and Roberto, my attorney, told me that Mr. Nelson Alfaro and Mr. Perez, and I don't remember his first name, something with the last name Perez, Joaquín Perez, they said that the Government of the United States was asking questions about me, and at that moment I didn't tell Roberto that they had any reason to be asking

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 63 of 166 PageID 1354
NESTOR HUGO GOMEZ-GARCIA   APRIL 22, 2025        63
Cross-examination by Ms. Castaneda

about me because I had not told him about those events, the ones that had been lost, yet.  So I started to think about that idea back then, to approach the Government and turn myself in.

Q    And you did that?

A    In the year 2017 I made the decision and I asked a friend who was going through the same situation and he suggested that I do -- that I not do it with Colombian attorneys but rather to do it with attorneys that were based in the United States, so I offered Fernando, my cousin, I suggested to him that the best path would be to turn ourselves in, because Fernando already had an Indictment in Miami.

Q    So you decided to cooperate before you left Colombia?

A    Yes.

Q    And you gave information about other people because it would help you, right?

A    Yes.

Q    Because if you talk about other people, it can reduce your sentence, correct?

A    At that time that -- those were my thoughts.

Q    And that's in your plea agreement with the Government, right, that you could potentially cooperate and get jail time reduced?

A    The first thing I put on the table was Fernando Piñeda.

Q    I need you to answer my question.

A    What's the question?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 64 of 166 PageID 1355
NESTOR HUGO GOMEZ-GARCIA  APRIL 22, 2025        64
Cross-examination by Ms. Castaneda

Q    So your plea agreement has a clause with the Government that says if you cooperate they could potentially reduce your sentence?

A    No, if I -- if I tell the truth regarding all of my actions.

Q    That's correct.  And the truth is required, isn't it?

A    Yes.

Q    But that's not what happened.  You didn't provide truthful information, did you?

        MR. BAEZA:  Objection.  Lack of foundation.

        THE COURT:  Sustained.  Lay a foundation.

Q    Whenever you were arrested in Colombia, you were held in Picota.

A    Yes.

Q    Before you were arrested, you were approached by a United States attorney?

A    Before I was captured?

Q    Yes.

        INTERPRETER:  Excuse me, Your Honor.  There's an issue with the placement of my microphone, apparently.

Q    You hired a United States attorney, right?

        INTERPRETER:  Excuse me, Counsel.  A private attorney?

        MS. CASTANEDA:  I just said United -- oh, as opposed to a Federal prosecutor.  Yes.

Case 8:21-cr-00286-JSM-NHA  Document 270  Filed 05/23/25  Page 65 of 166 PageID 1356
NESTOR HUGO GOMEZ-GARCIA  APRIL 22, 2025         65
Cross-examination by Ms. Castaneda

BY MS. CASTANEDA:

Q   So you hired a private defense attorney?

A   I hired two attorneys from the United States in the year 2017.

Q   And at least one of those arranged for you to give information about drug trafficking activities, correct?

A   No.

Q   Have you always provided truthful information to the Government?

A   Yes.

Q   So you previously testified, when the Government was asking you, about how you did not do that, how you bought information that you didn't have any awareness of.

A   The prosecutor did not ask me if I had given truthful information, he simply asked me if I had given information regarding the Alfaro matter.

Q   So you were represented by Nelson Alfaro.

A   No.

Q   You never hired Nelson Alfaro as your attorney?

A   No.  I hired him as the attorney for my uncle.

Q   And you sought information about drug trafficking activities?

A   It was offered.  I didn't seek it.

Q   And you paid for it?

A   Yes.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 66 of 166 PageID 1357
NESTOR HUGO GOMEZ-GARCIA    APRIL 22, 2025    66
Cross-examination by Ms. Castaneda

Q    And then you gave it to the Government so you could get a reduction on your sentence?

A    Yes.

Q    And that's just what you're doing here today, isn't it?

A    No.

Q    You're testifying here today about a person, Mr. Rios, that you don't know about, but your cousin told you about him while you were in jail in Colombia, and now here you are in his trial.

MR. BAEZA:  Objection.  Lack of foundation.

THE COURT:  Sustained.

A    I'd like to answer, but, oh, well.

Q    Is the information you're providing today information that you personally know, or did you purchase it?

A    Well, Fernando we could say was my worker.  I was a intermediary between the owners of the merchandise, the cocaine, and Fernando.  Fernando was the builder of the semi-submersibles, that's what I sought Fernando out for, because had I not needed the semi-submersibles I would not have sought out Fernando.

Q    I'm asking you if the information that you're providing today in court right now is from your own experience.

A    Yes.

Q    And you didn't pay anybody for this information?

A    No.

Q    But you've done that before?

MR. BAEZA:  Objection.  Asked and answered.

THE COURT:  Overruled.

A    Yes.

MS. CASTANEDA:  No further questions, Your Honor.

THE COURT:  Any redirect?

MR. BAEZA:  Very brief, Your Honor.

**REDIRECT EXAMINATION OF NESTOR HUGO GOMEZ-GARCIA**

**BY MR. BAEZA:**

Q    Mr. Gomez, there was a question about the number of engines you bought from the defendant while on cross-examination.  Do you recall that testimony?

A    Yes.

Q    And you were asked about six to eight engines.  Do you recall that testimony?

A    Yes.

Q    What kind of vessel was -- did you purchase the six to eight engines for?

A    I would purchase the six to eight engines to send three to four motorboats with two 75 each.

Q    Okay.  Let's clarify that, please.

How many semi-submersible motors did you buy in total from the defendant?

THE COURT:  Approach the bench, please.

*(The following bench conference was held.)*

THE COURT:  In the interest of time, because this could go on forever, I think he's been pretty clear.

MR. BAEZA:  Yes, Your Honor.

THE COURT:  He bought six to eight 75-horsepower --

MR. BAEZA:  Yes, Your Honor.

THE COURT:  -- for these go fast vessels which only went back and forth to load the ships.

MR. BAEZA:  Yes, Your Honor.

THE COURT:  The eight Cummins engines were for the semi-submersible.  So he's been clear that -- the separate time periods and the separate boats and --

MR. BAEZA:  Right.  I can clarify that, because there was a question about six to eight, about the number of engines he bought, and that's the same answer for the Cummins.

THE COURT:  I understand.  Just try to keep it --

MR. BAEZA:  Yes, Your Honor.

BY MR. BAEZA:

Q    Just to be clear here, sir, six to eight Cummins engines that you purchased for semi-submersibles?

A    I was asked about the engines for the go-fasts, aside from the semi-submersibles.

Q    Okay.

A    And of the semi-submersibles, as to their engines, I remembered, which the lady that was asking me the questions reminded me of, that there was an additional one which was

burned down when they burned down the semi-submersible at Matajes.

Q   Okay.  That is a mistake on my part.  I apologize for the confusion.  Let's move on.

You've said a couple times -- you used the term "knocking up."  What does that mean?

A   We'd bring the cocaine out on go-fasts from land, sometimes 20, sometimes 100, sometimes 120 miles, and we'd load it onto ships, fishing ships.

Q   Last topic.

MR. BAEZA:  And can we have the screen, please.

Q   Mr. Gomez, you were asked the question about not knowing the defendant.  Do you recall that?

A   Of not knowing the defendant?  No.

Q   You were asked a question on cross-examination about whether you actually knew the defendant.  Do you recall that?

A   No, I don't remember.

Q   The second person from the left, who is that?

A   Juancho.

Q   And the person in the middle?

A   Me.

MR. BAEZA:  No further questions.

THE COURT:  Thank you.  You may step down.

Call your next witness, please.

MR. LEATH:  Thank you, Your Honor.

The United States calls Kyle David.

(Kyle David enters proceedings.)

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  My name is Kyle David, K-Y-L-E, D-A-V-I-D.

COURTROOM DEPUTY:  Thank you.  Please take a seat in the witness box.

THE COURT:  Proceed.

MR. LEATH:  Thank you, Your Honor.

**DIRECT EXAMINATION OF KYLE DAVID**

**BY MR. LEATH:**

Q    Sir, where do you work?

A    I work for the United States Coast Guard.

Q    Is that why you've got the uniform on?

A    I do, sir.

Q    And how long have you been with the Coast Guard?

A    I've been in since 2012, so 13 years.

Q    And what's your current rank?

A    Currently a E-6, and that is a Petty Officer First Class

for rank in the Coast Guard.

Q    And what's your current job in the Coast Guard?

A    My current job is I'm a Maritime Enforcement Specialist, it's basically just like a law enforcement specialist for the Coast Guard.

Q    And what kind of jobs do Maritime Enforcement Specialists do?

A    So we do like boardings, lots of training, running weapons programs, just training a lot of people, and doing boardings is kind of the main thing.

Q    And have you ever served as a boarding officer for the Coast Guard?

A    I have.

Q    And what kind of training do you have in terms of counter-narcotics boardings?

A    Before becoming a boarding officer, it's a very long process, I went to an eight week school, then from after that I do like on-the-job training.  After on-the-job training I had to go back to another two week school.  After the two week school I had to do more on-the-job training, had to do an oral board with my peers, they basically can certify me as a boarding officer, and then before I can even do like -- then there's like specialized schools within boarding officer, so I went back and did another week's school for -- so I would say my pipeline was about eight to ten months.

KYLE DAVID - APRIL 22, 2025          72
Direct examination by Mr. Leath

Q    Have you been involved in counter-narcotics boardings?

A    I have.

Q    Approximately how many?

A    I'd say, I think, probably eight to nine in my time.

Q    And what roles have you done during those boardings?

A    I served as an assistant boarding officer or boarding officer for the LE side of the boarding.

Q    And, sir, we're going to go ahead and just jump ahead here.

Do you remember the timeframe of approximately November 2017?

A    Yes.

Q    Where were you stationed?

A    I was stationed on the Coast Guard Cutter STEADFAST out of Astoria, Oregon.

Q    And what was your role on that ship?

A    I was the Law Enforcement Petty Officer on board, so I ran the law enforcement program as well as all the boardings, I was the only boarding officer for the ship.

Q    And do you remember a boarding that occurred on November 30th of 2017?

A    I do.

Q    And what was your role in that boarding?

A    I was the boarding officer.

Q    And just from your memory, could you go ahead and just

KYLE DAVID - APRIL 22, 2025                    73
Direct examination by Mr. Leath

describe for us what you recall for that, walking us through it.

A    Yeah.  So I was on board Cutter STEADFAST.  We received report of a TOI, which is a target of interest.  I was briefed that we would launch a small boat to go investigate, and we pulled up and it was a -- called a low profile vessel that we came alongside.

Q    And in your training and experience, what's a low profile vessel?

A    So a low profile vessel is like -- there is different types.  You have like a go-fast vessel, which is just like open hull like Panga style, which is just meant to go fast; then you have a low profile vessel, which is kind of the same style, with like outboard engines but the top of the boat is like enclosed; and then you have like a semi-submersible, which is like designed to kind of like ride underneath the water. So this was a low profile vessel.

        MR. LEATH:  Your Honor, permission to approach the witness?

        THE COURT:  You may.

BY MR. LEATH:

Q    Petty Officer David, once you get your water, will you please go ahead and look at the folders I've given you. They're marked as Government's Exhibits A through J for identification.  And once you're done, if you could just

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 74 of 166 PageID 1365
KYLE DAVID - APRIL 22, 2025                74
Direct examination by Mr. Leath

go ahead and look up at me.

A    Yes, sir.

Q    Sir, do you recognize those photos?

A    Yes.  Those are from November 30th, 2017.

Q    And how do you recognize those photos?

A    A couple of them, I'm in them, or I took them, and it's just the boarding team and the low profile vessel that we encountered.

Q    And are those fair and accurate depictions of what occurred in the photos that took place?

A    Yes.

Q    Any alterations or edits that you've seen on those?

A    No.

        MR. LEATH:  Your Honor, permission to move Exhibits 28-A through J into evidence.

        THE COURT:  They'll be admitted.

        MR. LEATH:  Thank you, Your Honor.

        Permission to publish, Your Honor?

        THE COURT:  You may.

        MR. LEATH:  Thank you, sir.

BY MR. LEATH:

Q    I'm going to go ahead and show you Exhibit 28-D, and, sir, if you could, once this loads, can you go ahead and just describe for the jury, what are we looking at here?

A    So that's a Coast Guard small boat, it's an OTH,

over-the-horizon, so that launches from the Coast Guard Cutter, and then you can see that is a -- would be a low profile vessel, and that is myself as the boarding officer with the yellow -- or the orange life preserver, and then my assistant boarding officer that is kneeling, and then we have the individuals that were on board the low profile vessel, they're out on deck right now.

Q    Sir, I'm going to go ahead and show you another photo, 28-E, and we're going to follow the same process.

If you could, sir, just describe for us, you know, what are we looking at?

A    So over in the top right, that's the Coast Guard cutter that the small boat had launched from, and then this is a stern shot of the low profile vessel.  You can see the three outboard engines as well as the -- kind of the hatch, and then below that hatch is like where the individuals were when we came up alongside the vessel.

Q    Sir, I'm now going to show you Exhibit 28-F, and if you would, sir, please just describe what we're seeing here.

A    That is the inside of the low profile vessel, like from the hatch, like looking down.

Q    And, sir, I believe you can go ahead and draw on your screen if you use your finger.  Can you kind of just go through the different items we're looking at.

A    So kind of -- these are like suspicious packages that

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 76 of 166 PageID
1367
KYLE DAVID - APRIL 22, 2025                                    76
Direct examination by Mr. Leath

I had noticed when we came along or when we looked down in the hole. These are like the cable lines to run the throttles for the engines. Usually in these buckets are like GPS or -- they're like waterproof, so like personal belongings or -- from the mariners, and then like rain jacket, and then you can see like some drinks and stuff.

Q    Thank you, sir.

We're going to go to the next photo, 28-G, and following the same process, sir, please, you know, just go ahead and walk us through this.

A    So that's myself in the orange preserver, you can see here. For the packages, we got permission to open the -- open the black, you know, bag to see what was in them, and then you can see there are just like these green packages with like Sony labeling.

Q    Sir, going to the next photo, 28-H -- have I got my alphabet right?

Same thing, sir. What are we looking at? How do you know?

A    So I reported back my findings for what I'd saw, and they asked me to cut it open to see what was in it, so this is -- this is my hand right here, here's the knife I used to cut open the package, and I basically just cut open a window to see what was -- what the contents were inside the package.

Q    Sir, I'm going to go ahead and pull up the next photo,

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 77 of 166 PageID
1368
KYLE DAVID - APRIL 22, 2025    77
Direct examination by Mr. Leath

28-I, and no shock, same question here.

A    So I radioed back to the cutter and reported my findings. It was a white powdery substance.  They instructed me to run NIK testing, which is Narcotic Identification Kit, it's basically like a flow chart we use to try to identify the substance that is inside the package.  That is me holding up a test from the 30th of November 2017 off the TWON vessel La Jolla, and then you can see I have my A.B.O. read me the directions and I just basically follow along to test the contents inside the package, and it came back for -- you basically break these glass ampules as 1, 2, 3 and then you agitate them and it will give a reaction based off of what is inside the package, so this was pink over blue, which was indication for cocaine.

Q    And, sir, you mentioned I believe TWON.  What is that phrase?

A    Oh.  TWON is treated without nationality.  So when we went alongside the vessel, the first thing that we try to do is establish who the master is, and then if there is nobody claimed to be the master and we report all that back and -- we basically treated it without nationality because there was no claim from any of the individuals on board.

Q    Sir, I'm going to go ahead and show you what I believe is our next photo, 28-J, and if you would once again walk us through.

A    So we always run two tests just to verify, so same process, I had my assistant boarding officer read me through the directions as I tested the white powdery substance, and you can basically see same exact thing with the 1, 2 and 3, and then right there you can kind of faintly see the pink over blue for the positive test of cocaine.

Q    And were you the boarding officer for this case?

A    I was.

Q    And we've covered a little bit of the boarding.  What occurs after the boarding with the contraband?

A    So once we have a positive indication that they are positive for drugs, we request a transfer of individuals back to the cutter, where then I will begin all the evidence processing on board.  There's a checklist that we basically follow to gather any electronics, take pictures of anything on board, and basically identify how many bales of the substance was on board, and we prepare that to transfer it all back to the cutter, where then I'll begin all the paperwork.

Q    And does the Coast Guard have a name for combining all that information for interdiction?

A    Yes, it's called a case package, and it's out of the Maritime Law Enforcement Manual, Appendix G.

Q    You got it down.

Now, is there any way the Coast Guard -- does it give any identification for tracking the contraband with individual

interdictions, is there any numbers or tracking system?

A    Yeah.  So anything -- there's a -- it gets assigned an FDIN, which is a Federal Drug Identification Number, anything over 10 kilos gets assigned a FDIN, so I basically relay all that information back, I get assigned an FDIN, and that's what's associated with my case.

Q    And do you recall, did you have more than 10 kilos in this case?

A    Yeah.

        MR. LEATH:  One moment to confer with counsel, Your Honor.

BY MR. LEATH:

Q    And I think I misled you.  I got three more photos for you.

A    Okay.

Q    I forgot.  My alphabet is getting weak.

        I'm going to go ahead and show you photo 28-A.  What are we looking at here, sir?

A    So that's a side profile of the engine outboards that were on board the vessel.

Q    And --

A    And it just shows you like the serial number, make and model.

Q    And did you just take a photo because you wanted to, or is this standard procedure?

A     Standard procedure.  It's part of the checklist that I have to follow for building a case package and it's part of the required documentation that I have to submit.

Q     Sir, let me go ahead and show you 28-B.

Same thing.  What are we looking at, sir?

A     That's another side profile of the engine, with the serial numbers --

Q     All right.

A     -- make and model.

Q     I'm going to go ahead and show you 28-C.

I presume I know the answer, but what are we looking at, sir?

A     Same thing, it's the make and model and serial number for the engine that was on board the LPV, low profile vessel.

Q     Now, in your training and experience, what happens with the contraband once you get it on board your Coast Guard cutter, where does it go from there?

A     So I began processing it all.  There's a lot of documentation that goes with it, but I have to assign procedure tags for everything, assign evidence bags or personal effect bags, and then they're all tracked via serial number, and then I have to document all that on an 1149 as well, which is a Coast Guard multiuse document for transferring property between cutters, but it basically establishes chain of custody, and then you also have chain of custody documents on the seizure

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 81 of 166 PageID
1372
KYLE DAVID - APRIL 22, 2025                                        81
Cross-examination by Ms. Castaneda

tags and evidence bags as well.

Q    And do you know from experience who the Coast Guard -- who they hand these drugs off to eventually?

A    It will just be a case representative.  I've done different dispositions through different agencies and/or areas, so it really just depends on who the case agent is.

MR. LEATH:  No further questions, Your Honor.

THE COURT:  Cross?

MS. CASTANEDA:  Yes.  Thank you.

Good afternoon.

**CROSS-EXAMINATION OF KYLE DAVID**

**BY MS. CASTANEDA:**

Q    You said that you've been in the Coast Guard for quite some time.  I think you said 13 years; is that correct?

A    Yes, ma'am.

Q    And were you an M.E. or are you still an M.E.?

A    I'm still an M.E.

Q    And what is that?

A    It's a Maritime Enforcement Specialist.

Q    So you specialize in boarding boats, right?

A    Yes.

Q    Okay.  And you said you did eight to nine counter-drug boardings?

A    Yes.

Q    Was that just one Coast Guard patrol?

A      No.

Q      That was more than one?

A      That was over the course of my time on board Coast Guard Cutter STEADFAST.

Q      And how many years was that?

A      I was on board for three years.

Q      Okay.  So how many patrols did you do where alleged contraband was found?

A      We average three patrols a year, I was there three years, so that's nine patrols, so I would say on average one boarding per patrol.

Q      Okay.  And how many boardings have you done since the one we were just discussing?

A      That was my last one on board Coast Guard Cutter STEADFAST, so that was the eighth to ninth one that I've done.

Q      Have you done any other type of boardings since then?

A      Yeah.  I do -- did some boardings like two weeks ago.

Q      Okay.  And are those law enforcement boardings or more recreational boating?

A      Those are recreational boating.

Q      Okay.  And when you do a Coast Guard boarding, do you have to do paperwork for them?

A      Yes.

Q      Okay.  And for the recreational boats, what form is used for that?

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 83 of 166 PageID
1374
KYLE DAVID - APRIL 22, 2025                              83
Cross-examination by Ms. Castaneda

A     We use a 4100.

Q     And is the nickname for boardings for rec boats actually called 4100 boardings?

A     Yes.

Q     Okay.  And is that because it's so important to complete that form when you do it?

A     I have to do the form and then I submit all of the paperwork into a program that we track all the vessels and if there's any violations or anything like that.

Q     Okay.  And that's signed and dated by you?

A     Yes.

Q     Okay.  And then submitted to somebody, right?

A     Yeah, submitted into our program, and then there's basically a hierarchy of people it goes to for observation.

Q     Okay.  Would that be called the chain of command?

A     Yes.

Q     Okay.  So you do the boarding, sign the documents, correct?

A     Yes.

Q     Submit it, somebody reviews it, correct?

A     Yes.

Q     And do they then sign it as well?

A     It just depends if it needs to get -- if there's an error or if there's a violation or something, then it will go to that chain of command, but if it's no vio then we're good to go as

far as what it -- what it is.

Q    Okay.  And you mentioned that you have to complete a -- I think it was Coast Guard 1149 form --

A    Yes.

Q    -- when you do a drug boarding.

A    1149 is a multiuse document for the Coast Guard that is used to transfer property or anything that you have to have a chain of custody established for.

Q    Was one used on this drug case?

A    Yes, I use them for all.

Q    And you signed and dated it?

A    Yes.

Q    Did you review that before you came here today?

A    No.

Q    Why not?

A    It wasn't in the stuff that was submitted to me.

Q    Do you know if it exists?

A    Every time I would do a case package it was established for the chain of custody and I would always submit 1149s. Pretty sure if I go back to the servicing unit all those documents are on file, so --

Q    Okay.  So the Government has those somewhere?

A    Yes.

Q    Okay.  But you didn't look at them today?

A    No.

KYLE DAVID - APRIL 22, 2025                              85
Cross-examination by Ms. Castaneda

Q    Okay.  And you mentioned something about an inventory tag, completing an inventory tag.

A    Yes.  Evidence tag.

Q    Okay.  Is that completed for anything the Coast Guard touches that it then brings on board a cutter?

A    Yes.

Q    Okay.  So that would include clothing?

A    That would be a personal effects bag that we would use, because clothing wouldn't be considered evidence.

Q    Okay.  What about electronics?

A    We would use an evidence bag for that.

Q    Okay.  And you said that was tracked via a serial number?

A    Yeah, although all the bags are each identifiable via serial number.

Q    Okay.  And would you agree that all those things are important for Government accountability?

A    Yes.

Q    Okay.  And you said you did one in this case --

A    Yes.

Q    -- but you didn't review it here today.

     And you mentioned that you did process contraband in this case, correct?

A    Yes.

Q    Have you ever -- well, so on this patrol, did you have more than one drug interdiction?

A    I believe I had one earlier in the patrol.

Q    Okay.  And did you guys bring on board contraband?

A    Yes.

Q    So were there two boats full of contraband together?

A    I had three servicing armories down below that I would have each of my cases locked under key with separate cases.

Q    Okay.  And is all the contraband stored in a secure space?

A    Yes.

Q    And who has access to that?

A    Anyone -- so when the -- when we have drugs on board, it's either myself or the Ex.O. would have access to that, but we would have to -- basically I'd have to go check out with the Executive Officer to let him know that I was going into the space to process evidence.

Q    Okay.  Is a form completed when you do that?

A    When you sign the key out, there's a SF-86 and a key control registry that gets signed out.

Q    Okay.  Do you know if you completed one in this case for this?

A    I have to fill that form out anytime I have possession of a key that is -- that I have -- like that's under like a lock and control space, I have to fill one out.

Q    Okay.  Is it fair to say you did?

A    Yes.

Q    Okay.  And then is it fair to say that anyone else that

entered that did the same thing?

A     Yes.

Q     Okay.  And that's for accountability, right?

A     Yes.

Q     Is that to make sure that whatever you all have seized and are storing stays in the same condition as when you seized it?

A     Yes.

Q     Okay.  And that's Coast Guard policy, right?

A     Yes.

Q     And you believe that you followed that here?

A     Yes.

Q     And you documented it?

A     Yes.

Q     But you're unable to read any of those documents?

A     Yes.

Q     And you mentioned that you believe that was more than 10 kilograms of cocaine on board, correct?

A     Yes.

Q     But that's not your job, right, to determine that it's actually cocaine, right?

A     I run the NIK testing and then it gets a positive and then I submit it as a case and then it gets turned over to another Government agency, and I'm unfamiliar with the process once it gets turned over.

Q     Okay.  So when you do a test, do you test every piece of

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 88 of 166 PageID
1379
KYLE DAVID - APRIL 22, 2025                                    88
Cross-examination by Ms. Castaneda

evidence that you found?

A    I just test one, it's -- and then I submit a representative sample, the representative sample is attached to the case, and that's 10 kilos of -- so I basically wrap that up, assign it an evidence tag, and then document it via 1149, and that transfers with my case package and all my documentation.

Q    And what happens to everything that's not counted in the 10 kilos?

A    Usually any bulk stuff usually goes to like a bulk holding platform which will then go for like disposition.

Q    What's bulk?

A    Bulk is anything over the 10 kilos.

Q    Okay.  And you said that was stored and then put where?

A    It would be transferred to another unit depending on cutter operations.  In my past we would transfer it to another servicing unit with more of a holding -- holding area.

Q    Okay.  And does that mean it goes from one cutter to another cutter?

A    Yes, and there's a documentation that follows along with it.

Q    Okay.  And you would have to sign and date that, right?

A    Yes, and anytime I brought bulk onto my boat, I would have to sign and date.

Q    So when you say brought onto your boat, that means you

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 89 of 166 PageID 1380
KYLE DAVID - APRIL 22, 2025                    89
Cross-examination by Ms. Castaneda

took contraband from someone else's boat onto your boat and you were then in charge of that contraband?

A     Yes, and we would establish chain of custody via the 1149 documentation.

Q     Okay.  And do you know how many times that happened on this patrol?

A     I couldn't tell you.

Q     Is it fair to say it's common practice to cross-deck contraband from one cutter to another?

A     It can be.  It just depends on operations of what's going on with the platform itself.

Q     Okay.  Fair to say if there's bad weather or something like that, that could affect where drugs are stored on a Coast Guard cutter, correct?

A     Well, all of them are stored in a like servicing -- usually like armory space or anything like that, so -- I couldn't tell you what other platforms did because I didn't serve -- I didn't serve on those.

Q     Did you go to another boat after the one that you were on for this?

A     I have not.

Q     You've just been land-based since?

A     Yeah, and then I've done deployments on like temporary duty trips to other cutters.

Q     Okay.  I'm going to show you what was previously marked

Government Exhibit 20-A, B and C.

A    Okay.

         MS. CASTANEDA:  May I have the ELMO again.

Q    Can you see that okay?

A    Yes.

Q    And can you read the serial number on there?

A    1003435.

Q    So that's not shaved or filed off, is it?

A    No.

Q    Okay.  I'm going to show you 28-B.  Can you read that one, please.

A    1003400.

Q    Is that serial number shaved off?

A    No.

Q    Okay.  All right.  This is 28-C, and please read that one.

A    1003434.

Q    And is that one shaved off?

A    No.

Q    Okay.  And you said you took these photographs?

A    Yes.

Q    Because you were the B.O.?

A    Yes.

Q    Okay.  Thank you.

         MS. CASTANEDA:  Thank you, Your Honor.

         THE COURT:  Any Redirect?

MR. LEATH:  No, Your Honor.

THE COURT:  Thank you, sir.  You may step down.

Call your next witness.

(Rick Greer enters proceedings.)

MR. LEATH:  Your Honor, we'd like to call Rick Greer for our next witness.

COURTROOM DEPUTY:  Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Rick, last name Greer, G-R-E-E-R.

COURTROOM DEPUTY:  Thank you.  Please take a seat in the witness box.

THE COURT:  Proceed.

MR. LEATH:  Thank you, Your Honor.

Good afternoon, Mr. Greer.

THE WITNESS:  Hello.

**DIRECT EXAMINATION OF RICK GREER**

**BY MR. LEATH:**

Q    Have you ever worked for the Department of the Drug Enforcement Administration?

A    Yes, sir, I have.

Q    I almost said Agency.

A    Yes.  Administration.

Q    And how long did you work for the DEA?

A    Almost 21 years.

Q    Can you briefly just give us an overview of your career with the DEA.

A    Yes.  Tampa office was my first office.  I was here for about four years, four or five years, and -- in Tampa, then I went to a maritime group called PanEx for about five or six years.  That is -- that was -- the time was not in the main Tampa office but close by.  I then went to Afghanistan for four and a half years, then I went to Pakistan for a year and a half, and I returned back to Tampa, where I was able to complete my career.

Q    And at PanEx what did you do, what were your various roles?

A    PanEx, I was one of the case agents, you know, focusing on transnational organizations, looking, investigating those organizations that were shipping cocaine, typically, any other drugs, from South America, Central America into Mexico and into the United States.

Q    And as part of your duties at PanEx did you ever participate in chain of custody or processing of drugs from Coast Guard interdictions?

A    Yes, sir.

Q    And approximately what years did you do that?

A    Wow.  I did that from 2005 to 2010 and then from two thousand and -- end of '16 up until '22, end of '22.

Q    And how many did you do for drug processing, how many cases were you involved in, just guessing?

A    How many cases?  Had to be several hundred, easily.

Q    And can you go ahead and just describe the process of how that would work.

A    Sure.  So typically what the agents would do is we would have like a packet that we put together.  Initially when there's an interdiction at sea we would be notified of this interdiction, and especially if we received prosecution for that, we would have some documentation, to include a number, an FDIN number, Federal Drug Identification Number, I believe, and that would be in our packet.  That would be the main number to -- when we got to the Coast Guard, we would meet the Coast Guard typically in San Diego or Miami, and they would have the drugs either on the ship or on the side of the boat unloaded already, stacked on pallets, and we would meet with somebody within -- a representative within the Coast Guard, and they would have them organized by that FDIN number, and we would have that FDIN number as well, so then we're matching up to know which interdiction, which case we're looking for.

Q    And for each of these cases was it uniform in how you did them, or were they all kind of on their -- on their own way?

Was there a system to it?

A    It was pretty uniform, yes.

Q    And why is that?

A    Just to keep it kind of standard, we knew what we were doing.  I did a lot of those cases myself.  There were only a few of us that took the leadership role in meeting with the Coast Guard and having the packets and then signing for the drugs.  You know, once we signed for it, we would then take it to the labs.

Q    And, sir, do you recall being involved in the drug processing for a Coast Guard interdiction that occurred in November 2017?  And I believe the processing occurred somewhere early 2018.

A    Yes.

Q    Do you remember that?

A    Yes.

Q    What was your role in that, from your memory?

A    As a witness for the agent that was signing for the drugs, and then witness as -- once the drugs are signed for from the Coast Guard, they would be taken on a truck, typically, and transported to the lab, and then either that day or maybe the following day the drugs would be processed, and that means typically -- you know, the drugs would typically come in a bale, maybe 20, 30 kilograms per bale, and we would take those out of the bales and put them into a box and then they would be

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 95 of 166 PageID
1386
RICK GREER - APRIL 22, 2025                    95
Direct examination by Mr. Leath

submitted into the lab for testing.

Q   And that's a little bit -- that's more than say a year ago, back in 2018.

A   Yes.

Q   And how do you remember that processing?

A   I did so many of item.

Q   Okay.

A   Yeah.

Q   And is there anything that makes you remember that date of picking up the drugs on the -- early 2018?

A   Nothing particular stood out with that one, no.

Q   And in your memory was there anything that was -- you know, that went awry in that processing or any issues with that processing?

A   No, sir.

Q   Do you think you would remember if there were?

A   Yes.

        MR. LEATH:  One moment to confer with counsel, Your Honor.

BY MR. LEATH:

Q   And, sir, for that processing in 2018, I just want to confirm that that was for a Coast Guard interdiction that occurred on November 30th, 2017, and the 28 -- you're processing for that.

A   Yeah, it would have been -- it wasn't seized on that day,

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 96 of 166 PageID
1387
RICK GREER - APRIL 22, 2025                    96
Cross-examination by Ms. Castaneda

it was just processed on the 25th, 26th, or something like that.

Q    Later on.

A    Yes.

Q    Was that standard, to process later on for a boarding that occurred?

A    Oh, absolutely.  Yeah.

Typically, the interdictions are done and it could take, average, 30 days, maybe 30, 45 days or so, before -- maybe two months before the drugs would actually make it into port.

Q    And do you match numbers from the Coast Guard to the DEA when you make those processings?

A    So it's the -- with the Federal -- the FDIN number, Federal Drug Identification Number, yes.

Q    And did those numbers match for this processing?

A    Yes.

MR. LEATH:  No further questions.

THE COURT:  Cross?

MS. CASTANEDA:  Good afternoon, Mr. Greer.

THE WITNESS:  Hi.

**CROSS-EXAMINATION OF RICK GREER**

**BY MS. CASTANEDA:**

Q    You mentioned filling out forms with FDIN numbers.  Are those required?

A     Yes.

Q     In every case?

A     Yes.

Q     And when the DEA receives information from the Coast Guard, is DEA required to take the Coast Guard documents and keep them with them, or how does that work?

A     Yes.  You'll get a receipt from the Coast Guard, 1149, I believe it is, and the 1149 is going to have the FDIN number on it, and then DEA will prepare a DEA-7 and put that FDIN number on that 7, but we'll have a report of that FDIN number for --

Q     Okay.  And then how does a DEA-6 come into play?

A     During this point it would be like an acquisition, so there would be an acquisitional report that would be written when the drugs were received.

Q     When they're received?

A     Yes.

Q     So DEA completes a DEA Form 6 when they receive drugs from the Coast Guard?

A     At some point thereafter, yes.  It may not be that exact same day --

Q     Okay.

A     -- but shortly after there will be a report memorializing that the drugs were received from the Coast Guard --

Q     Okay.

A    -- or whomever, when it was inter -- acquisitioned.

Q    Okay.  And are those required?

A    Acquisition reports?  Yes.

Q    DEA Form 6 is required?

A    Yes.

Q    Okay.  So DEA Form 6s and 7s are required in every case, correct?

A    Not every case.  If there is a drug acquisition, yes.

Q    Okay.  Every drug case, it would be fair to say that you were required to complete a DEA Form 6 and a DEA Form 7?

A    If drugs were seized.

Q    Okay.

A    Yes.  Sorry.  Yes.

        MS. CASTANEDA:  No further questions, Your Honor.

        THE COURT:  Any Redirect?

        MR. LEATH:  No, Your Honor.

        THE COURT:  Thank you, sir.

        THE WITNESS:  Thank you.

        THE COURT:  You may step down.

        Call your next witness.

        MR. LEATH:  Your Honor, the Government calls Hans Seidel-Quintero.

        (Hans Seidel-Quintero enters proceedings.)

        THE COURT:  Swear the witness, please.

        COURTROOM DEPUTY:  Please raise your right hand.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 99 of 166 PageID
HANS SEIDEL-QUINTERO 1390APRIL 22, 2025        99
Direct examination by Mr. Leath

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes, I swear it.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Hans Seidel-Quintero.  S-E-I-D-E-L.

COURTROOM DEPUTY:  Thank you.

THE COURT:  Proceed.

MR. LEATH:  Thank you, Your Honor.

Mr. Quintero, good afternoon.

THE WITNESS:  Good afternoon.

**DIRECT EXAMINATION OF HANS SEIDEL-QUINTERO**

**BY MR. LEATH:**

Q    Why are you wearing an orange suit?

A    Because I am a Federal inmate and I am serving a sentence for a crime that I committed.

Q    And what crime would that be?

A    Narco trafficking.  Well, specifically conspiracy.

Q    And did you plead guilty to a conspiracy?

A    Yes, sir.

Q    Sorry.  Did you plead guilty to conspiracy --

A    Yes, sir.

Q    -- to traffic cocaine?

And did you have a plea agreement with the

HANS SEIDEL-QUINTERO - APRIL 22, 2025          100
Direct examination by Mr. Leath

Government?

A     Yes, sir.

Q     And within that plea agreement is there a cooperation agreement?

A     At its time, yes.

Q     And are you required to tell the truth here today?

A     Yes, sir.  That's what I'm here for.

Q     Sir, where are you from originally?

A     From Tumaco, Colombia.

Q     And what did you do before you got into narco trafficking?

A     I am a degreed attorney.

Q     And what kind of work did you do as an attorney?

A     Well, when I practiced, I handled administrative matters and titles, things like that.

Q     Can you go ahead and just describe for us briefly how you went from being an attorney to getting involved in narco trafficking, just providing examples.

A     Well, to be exact, it was through a cousin of mine who at the time sought me out to help him with some title matters with the purchase of properties, and that's when I started to get involved, because I started to learn about the business.  I met a person who needed their work to be done for the logistics and the sending out of go-fasts, and then that's when I served as a middleman, a middleman for that person and my cousin.

Q     And what was your cousin's name?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 101 of 166 PageID
1392
HANS SEIDEL-QUINTERO    APRIL 22, 2025        101
Direct examination by Mr. Leath

A    Oscar Quintero.

Q    Can you go ahead and just lay out the story of the various roles you fulfilled as a narco trafficker, maybe starting from the beginning until when you were arrested.

A    Well, first of all, it was as a middleman.  Later I started to acquire knowledge as to the transportation work and drug trafficking, which was the logistics, organizing the motorboats, the purchase of the engines, coordinating the crews, the refuelings for the motorboats, and everything specific for the sending out of the motorboats and the semi-submersibles.

Q    And what specifically did you do with the -- with the motorboats?  What was your role?

A    I was the chief of the logistics of the transportation.

Q    And what type of logistics would you arrange?

A    The transportation with the sending of the motorboats to Central and North America.

Q    And what countries would you send the motorboats to?

A    Costa Rica, Guatemala and Mexico.

Q    And can you describe for the jury what would be on those boats.

A    Cocaine.

Q    And would there be any like fuel drums or extra items?

A    Could you repeat the question?

Q    Would there be anything else?  Would there be fuel or any

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 102 of 166 PageID
1393
HANS SEIDEL-QUINTERO — APRIL 22, 2025          102
Direct examination by Mr. Leath

other accessories on those boats?

A    Yes, sir.  Well, there was fuel, satellite phones, GPS navigators, gasoline, supplies, food for the days that would -- that the trip would entail, batteries, tools, any related item that a motorboat might need to get by those days, and if there's any type of breakdown, to be able to overcome it.

Q    And would you calculate how much fuel was needed, depending on the distance of the trip?

A    Yes, sir.

Q    And how would you do that?

A    Because we more or less had a route with the miles that the vessel was going to travel, and then when we do the math, it would be based on the capacity of the motors, how much -- many miles, how much fuel it would consume per mile, and then with that you would do the calculation.

Q    And would you buy the engines for these vessels?

A    Yes, sir.

Q    And where would you get those engines from?

A    Specifically at Agronautica with Los Papis.

Q    And do you see anybody who went by -- included in the Los Papis nickname in the courtroom here today?

A    Yes, sir.

Q    Can you go ahead and just describe for the record what he's wearing, where he's at.

A    He's there with a white shirt, I believe, or white

sweater.

MR. LEATH:  Let the record reflect that the witness has identified the defendant.

THE COURT:  Let the record so reflect.

MR. LEATH:  Thank you, Your Honor.

BY MR. LEATH:

Q    And how did you first meet the defendant?

A    I met him -- I have known him for -- a long time ago, but to be exact it was around the year 2014 where I met up with him specifically to do the title work for some properties that my cousin was selling.

Q    And for your cousin, what did you work with the defendant on?  Could you be specific on that?

A    At that time I was in charge of doing the title work for the properties that he was purchasing, all of the legal work for the properties that he was acquiring.

Q    And, sir, we're going to come back to the properties, but going back to the vessels, how would you get the vessels from the defendant?  Can you just walk us through that transaction.

A    Well, one would speak personally with him or with the brother, one would tell him what engines were being needed, what capacity, and then the number, plus any extra that would be needed, like toolboxes and rain gear and everything related that would be used for the trip of a motorboat.

Q    And so you would buy accessories from the defendant

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 104 of 166 PageID
1395
HANS SEIDEL-QUINTERO   APRIL 22, 2025        104
Direct examination by Mr. Leath

in addition to the engines; is that --

A    Yes, sir.

Q    Would those accessories include things like fuel hoses?

A    Yes, sir.

        MR. LEATH:  And I'm going to go ahead and put up
Government's Demonstrative Number 2, please.

        COURTROOM DEPUTY:  On the computer?

        MR. LEATH:  On the computer.

        Thank you, ma'am.  Sorry.

BY MR. LEATH:

Q    Sir, I'm putting up Government's Demonstrative Number 2.
Do you know what this is?

A    Yes, sir.

Q    What is it?

A    It's a map.  To be exact, it's like a tool you can use to
track the routes, to figure out the routes.

Q    And can you go ahead on your screen, sir, you can use your
finger, can you just put what routes you would use for your
smuggling vessels, and just describe for us as you do it.

A    Well, to be exact, we'd leave here from Tumaco, which is
in the border region with Ecuador.  When we'd go to Mexico, we
would go all the way back here, which is behind the Galapagos
Islands, it's called the desert, then we'd reach a certain area
of Mexico where the Mexican vessels would come out to around
400, 500 miles out to receive the drugs.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 105 of 166 PageID
1396
HANS SEIDEL-QUINTERO    APRIL 22, 2025    105
Direct examination by Mr. Leath

Q    And would you register those vessels?

A    No, sir.

Q    Why not?

A    Because they were for narco trafficking.  It was for something illegal.

Q    Would you use any other routes?

A    Well, for Costa Rica it was -- it was to a different area because it's closer to us in Colombia, so we would use a route that was over here that was closer, instead of going all the way around.

Q    And why did you call it -- the certain position the desert on the previous route?

A    Because the fishermen and anybody who travels at sea says that out over there, not even the birds fly out there.

Q    Now, how many of your vessels did you buy engines from the defendant for?

A    I believe at about 95 percent.

Q    And approximately how many vessels?

A    As far as engines, over 30 engines, and as far as vessels, it was two, I believe.

Q    And approximately how much cocaine did you traffic using the defendant's engines?

A    Over 10 tons.

        MR. LEATH:  Permission to approach the witness, Your Honor?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 106 of 166 PageID
1397
HANS SEIDEL-QUINTERO    APRIL 22, 2025        106
Direct examination by Mr. Leath

THE COURT:  You may.

BY MR. LEATH:

Q    So, Mr. Quintero, I've handed you what's been marked for identification as Government's Exhibit, I believe, 29-A.  Can you please go ahead and look at it and then look up at me when you're done reviewing it.

Sir, do you recognize this?

A    Yes, sir.

Q    How do you recognize it?

A    That's a purchase agreement that my cousin did with Juan Rios.

Q    And were you involved in this agreement?

A    Yes, once they finished this part, I handled the title work for the real estate that was being sold.

Q    And was that because you were an attorney?

A    Yes, sir.

Q    And is that photo a fair and accurate representation of that transaction?

A    Yes, sir.

Q    Do you see any alterations or edits?

A    No, not really.

MR. LEATH:  Your Honor, permission to admit Exhibit 29-A into evidence.

THE COURT:  It will be admitted.

MR. LEATH:  Thank you, Your Honor.  Permission to

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 107 of 166 PageID
HANS SEIDEL-QUINTERO 1398APRIL 22, 2025          107
Direct examination by Mr. Leath

publish?

THE COURT:  You may.

MR. LEATH:  I apologize.  Hooking up the computer.

BY MR. LEATH:

Q    All right.  Sir, I'm going to pull up Exhibit 29-A on the screen.  Can you go ahead and just walk the jury through what we're looking at.  What is this?

A    It's a purchase agreement that's signed prior to the title work for the real estate, where the business transaction itself is guaranteed, where the person that's selling commits to the person that's buying as to the business deal that's going to take place.

Q    And do you know the individuals that were involved in this?

A    Yes, sir.

Q    Who were they?

A    It was Juan Rios and Oscar Quintero.

Q    And I'm now going to show you Exhibit 29-B, which has previously been admitted into evidence.  For the record, I'm just going to read under the intended seller, Juan Gabriel Rios-Silva under intended seller, and under intended buyer Oscar Adriano Quintero-Rengifo.

And, sir, who is Oscar, once again?

A    My cousin.

Q    And what did he do for a living?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 108 of 166 PageID
1399
HANS SEIDEL-QUINTERO   APRIL 22, 2025       108
Direct examination by Mr. Leath

A    He was a narco trafficker.

Q    And did you work for him?

A    Yes, on occasions I worked for him.

Q    And for your experience, how many times have you met the defendant?

A    How many times have I seen him?

Q    Personally, met him personally.

A    Over 10, 20 times, thereabouts.

Q    And did you ever visit his business?

A    Yes.

Q    And where was his business?

A    One was in Tumaco, and to be exact on El Comercio Street, and the other one in Cali, and I don't remember the neighborhood exactly but I know it was in around the middle of town in Cali.

        MR. LEATH:  And go ahead and publish Government's Exhibit 1-A, which has been previously admitted.

        THE COURT:  You may.

Q    And, sir, do you recognize this photo?

A    Yes, sir.

Q    What is it?

A    It's the Agronautica store, which is in the City of Cali.

Q    And when you bought engines from the defendant, did you do it personally?

A    Yes, sir.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 109 of 166 PageID
HANS SEIDEL-QUINTERO  1400  APRIL 22, 2025       109
Direct examination by Mr. Leath

Q     Face-to-face?

A     Yes, sir.

Q     And for the cocaine that you smuggled on those engines, do you know where that cocaine was bound for?

A     Yes, it was going to Central and North America.

Q     And in your own words, why do you believe the drugs were going to North America?  And is it safe to say the United States?

A     Yes, because we all know that's the final destination for the drugs.

Q     And how do you know that?

A     Through people that would work with us that would receive them in Mexico.  Sometimes you would have to wait for payment because they said that they had to wait to get across the border.

Q     And, sir, did you ever tell the defendant what you were doing with the engines?

A     Yes, sir.

Q     Can you give us an example?

A     Well, sometimes we'd make mention, for example, if a motor had a breakdown or if we needed the hoses or the filters to be replaced, because the engines were going to go out on a trip and there was a lot of money at stake on those vessels, that's why on occasions we would speak to him or with his brother about that topic.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 110 of 166 PageID
HANS SEIDEL-QUINTERO    1401    APRIL 22, 2025    110
Direct examination by Mr. Leath

Q    And who is his brother?

A    Milton Rios-Silva.

Q    And were they known by any nicknames?

A    Yes, sir.

Q    What were they, or what was it?

A    Los Papis.

Q    And is that a common name in Colombia?

A    No.

Q    And people in Tumaco, did they know who Los Papis were?

A    Yes, sir.

Q    How?

A    Well, because everybody in Tumaco identifies them as the owner of those engine stores, and because how they treat others, because not everybody in Tumaco is known by that name, Los Papis.

Q    And why did you buy engines from -- for narco trafficking from the defendant?  Why did you choose him?

A    Because of the closeness and the friendship that I had with Juan, but most of all with Milton, and there was a possibility of obtaining six, seven, eight engines, which in Tumaco wasn't very common.  It wasn't common to be able to get them at any other place but with them, since they kept a number of engines.

Q    What type of person in Tumaco buys four or more engines at a time?

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 111 of 166 PageID
1402
HANS SEIDEL-QUINTERO   APRIL 22, 2025        111
Direct examination by Mr. Leath

A    People that are working with narco trafficking, because a fisherman in Tumaco doesn't have the resources even to get a 40-horsepower engine, if that, and Tumaco is not a tourist region where you could say there are vessels with four engines, three engines.

Q    Could a normal fisherman in Tumaco buy six engines at one time?

A    No, sir.

Q    Why not?

A    Because he's not going to make the money to be able to purchase those engines, they're expensive, and this is a person who makes in one day maybe 10, $20 by fishing.

Q    How many engines could a normal fisherman buy in a year in Tumaco?

A    One engine.

        THE COURT:  When you reach a convenient stopping place, we'll break for the afternoon.

        MR. LEATH:  Yes, Your Honor.  Now is an appropriate time.

        THE COURT:  All right.  Let's take a 15 minute break.

                *(Jury exits proceedings.)*

                        - - - - -

            (Recess at 2:30 p.m. until 2:45 p.m.)

                        - - - - -

        THE COURT:  How long do you have on Cross?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 112 of 166 PageID
1403
HANS SEIDEL-QUINTERO  APRIL 22, 2025        112
Direct examination by Mr. Leath

MS. CASTANEDA:  I'm sorry, Your Honor?

THE COURT:  How long do you have on Cross?

MS. CASTANEDA:  Max 15 minutes.

THE COURT:  How many?

MS. CASTANEDA:  Maximum 15 minutes.

THE COURT:  15 or 20?

MS. CASTANEDA:  Probably closer to 10, 10 to 15, Your Honor.

THE COURT:  10?

MS. CASTANEDA:  Yes.

THE COURT:  Okay.  I'll bring up the next witness then when she starts her cross-examination.  When she starts then you can bring him up and he can be waiting in the hallway.

*(Jury enters proceedings.)*

THE COURT:  You may proceed.

MR. LEATH:  Thank you, Your Honor.

BY MR. LEATH:

Q   So, Mr. Quintero, I'd just like to circle back, since we're back from the break.

When you would buy your engines from the defendant, how would you pay for them?

A   In cash always.

Q   And approximately how much for an engine?

A   I believe at that time, during 2016, they were 18 million Colombian pesos.

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 113 of 166 PageID
1404
HANS SEIDEL-QUINTERO APRIL 22, 2025       113
Direct examination by Mr. Leath

Q    And do you know approximately how much that is in United States dollars?

A    $6,000.

Q    And approximately how much would you make or how much money would be involved in one of the vessels that you sent with cocaine?

A    Over $1,500,000, with the cocaine.

Q    And once again, how much in U.S. dollars, approximately?

A    $1,500,000.

Q    In United States dollars?

A    Yes.

Q    When you bought the engines from the defendant, would you remove serial numbers?

A    No, sir.

Q    Why not?

A    Because those things are typically for a single use and they would often be sunk once they'd arrive to Mexico, Guatemala, Costa Rica, and since it was for something illegal.

Q    So did you make enough money to cover the loss of that vessel?

A    Yes, of course.

Q    Sir, did you ever have any interactions where you witnessed the defendant or his business in or around cocaine?

A    One single time, sir.

Q    Would you tell us that story.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 114 of 166 PageID 1405
HANS SEIDEL-QUINTERO    APRIL 22, 2025    114
Direct examination by Mr. Leath

A    It was one time that me and another gentleman, we were going to unload 180 kilos, and we entered it through Agronautica in Tumaco so that we would not have to, and there you take a motorboat and go out to the place where the motor -- where the go-fasts would leave from.

Q    So can you go ahead and just tell us that story in detail where you saw the cocaine at his business.

A    To be exact, a person sought me out because some drugs were being brought from Samaniego, Nariño, and the truck was coming in a -- the drugs were coming in a truck with a false -- with a false bottom, it had a stash compartment, and that person needed a parking location to be able to do the transfer of the drugs that was being brought and hidden.  Once we extracted it from there, he tells me that he needs to take it to Los Papis, so I accompanied him there on my motorcycle, and that's where he delivered it.  I don't know exactly to who, but he delivered it there at their business.

Q    So did you physically see cocaine going into the business personally?

A    Yes, sir.

Q    And how do you know it was cocaine?

A    Because I helped unload it and I knew what was contained in the packages.

        MR. LEATH:  One moment to confer with counsel, Your Honor.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 115 of 166 PageID
HANS SEIDEL-QUINTERO 1406APRIL 22, 2025        115
Cross-examination by Ms. Castaneda

BY MR. LEATH:

Q    And, sir, for that -- for that story, that situation that you just described, what time of day was it?

A    I believe it was 11:00 in the morning, if I'm not mistaken.

Q    And did you see -- did you -- you said you personally verified it was cocaine?

A    Yes, sir.

        MR. LEATH:  No further questions, Your Honor.

        THE COURT:  Cross?

        MS. CASTANEDA:  Good afternoon.

        THE WITNESS:  Good afternoon.

        **CROSS-EXAMINATION OF HANS SEIDEL-QUINTERO**

**BY MS. CASTANEDA:**

Q    You haven't been sentenced yet, right?

A    Yes, I've been sentenced.

Q    How many years did you get?

A    210 months.

Q    You're going to agree that's a long time, right?

A    Yes.

Q    And you don't know Mr. Rios, do you?

A    Of course I know him.

Q    But you heard he was going to trial, right?

A    Yes.  Everyone knows that.

Q    That's right.  And you're from Colombia, right?

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 116 of 166 PageID
HANS SEIDEL-QUINTERO  1407 APRIL 22, 2025      116
Cross-examination by Ms. Castaneda

A     Yes.

Q     And you're a drug trafficker?

A     Yes.

Q     And you bought engines?

A     Yes.

Q     And you know that he sells engines, right?

A     Yes.

Q     In the last couple of months have you shared a jail cell with any Colombian narco drug trafficker?

A     Yes.

Q     You have, right?  And they told you Mr. Rios was going to trial, right?

A     No, not the person that I was with.

Q     And your cousin that you talked about, is he here in Tampa?

A     I believe so.

Q     Did you see him today?

A     No.

Q     Did you see him yesterday?

A     No.

Q     Have you ever seen him here in a jail in the United States?

A     No.

Q     Was it he that told you that Mr. Rios was going to trial?

A     No.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 117 of 166 PageID
1408
HANS SEIDEL-QUINTERO   APRIL 22, 2025        117
Cross-examination by Ms. Castaneda

Q    What about on the way to the jail here today, when you were transported?

A    No.

Q    Were you with another Colombian?

A    No.

Q    You were transported here completely by yourself?

A    With another person, but I believe he's American.

Q    And when you're being held back in the cell, are you with Colombian drug traffickers back there?

A    No, I'm alone.

Q    Completely alone?

A    Yes.

Q    Have you ever used the phone while you've been in jail?

A    Yes.

Q    Have you ever used the e-mail?

A    No.

Q    You've never used e-mail here?

A    No.

Q    Before you were brought to the United States, were you hold in Picota?

A    Yes.

Q    And were you held there with other Colombian drug traffickers?

A    Yes.  Everyone there is a narco trafficker.

Q    And they're all from Colombia, right?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 118 of 166 PageID
HANS SEIDEL-QUINTERO 1409 APRIL 22, 2025         118
Cross-examination by Ms. Castaneda

A    The great majority.

Q    And you tried to cooperate before you were extradited, right?

A    Yes.

Q    And you know that if you provide information about people here in the United States, you get a reduction in your sentence, correct?

A    Yes.

Q    So you said you're a close friend to Mr. Rios.

A    Not close, but we're friends.

Q    You said that you bought engines from him because you have a close friendship.  Is that not correct?

A    Yes.

Q    So you have a close friendship or you don't?

A    Yes.

Q    How many years have you known him?

A    Over ten years.

Q    What's his mom's name?

A    I don't know.

Q    You don't know his mom, but you're a close friend?

A    I don't know her name.

Q    And you're from the area?

A    Yes.

Q    And you don't know the neighborhood exactly where engines were sold because you've never been there, have you?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 119 of 166 PageID
1410
HANS SEIDEL-QUINTERO APRIL 22, 2025          119
Cross-examination by Ms. Castaneda

A     Yes, of course I went.

Q     You said you bought these engines personally, correct?

A     Yes.

Q     But you're a narco trafficker.  You don't go pick up engines by yourself, do you?

A     Of course I did.

Q     You send your workers to go do that, right?

A     Sometimes.

Q     Okay.  So you didn't pick up every engine you've ever purchased for your drug activity, have you?

A     Personally, no.

Q     And you testified, quote, and everyone in Tumaco identifies him as the owner of the engine store.  Correct?

A     Yes.

Q     And that's the only reason you're sitting here right there today, right?

A     No.

Q     Because you coordinated with Colombian drug traffickers to say exactly what you needed to say today, right?

A     No.

Q     Because you've never even met the defendant.

        MR. LEATH:  Objection.  Your Honor, Counsel is speaking over the witness.

        THE COURT:  Overruled.

Q     You have never met the defendant on trial today, have you?

A    Yes, of course I know him.

Q    And you made up a story about running kilos of cocaine through his engine store because it sounds good, right?

A    No.

Q    Did it happen?

A    Yes.

Q    You're just trying to add frosting to this cocaine cake of a story that you're telling, aren't you?

A    No, I'm not making anything up.

Q    And he isn't the first person you've pretended to know, is he?

A    I don't understand the question.

Q    Mr. Rios is not the first Colombian person that you've ever pretended to know, is he?

A    No, I'm not pretending.

        MS. CASTANEDA:  No further questions, Your Honor.

        THE COURT:  Any Redirect?

        MR. LEATH:  Briefly, Your Honor.

        **REDIRECT EXAMINATION OF HANS SEIDEL-QUINTERO**

**BY MR. LEATH:**

Q    Mr. Quintero, have you talked to the defendant since you've been in the U.S. prison?

A    While here in Hernando County I was together with him.

Q    And did you ever have a conversation with him?

A    Yes.

Q    What was that conversation about?

MS. CASTANEDA:  Objection.  Hearsay.

THE COURT:  Overruled.

A    We would talk every day about different subjects.

Q    Did you ever talk about him going to trial?

A    Yes.  Of course.

Q    What did you -- what did you say about that?

A    That to not, to not go to trial.

Q    Why did you tell him not to go to trial?

A    Because he knows that there are many people that can testify against him about things that he has done.

MR. LEATH:  Your Honor, I'm going to publish an exhibit that's already been admitted, 29-A.

THE COURT:  All right.

Q    I'm going to zoom in as much as I can, but once again, this is the previous exhibit.  Is this the transaction -- this is a transaction you worked on.  Can you go ahead and read the name that I've zoomed in on.

A    Which of all the names that are there?

Q    Right at the top.

A    Juan Gabriel Rios-Silva.

Q    And who is that?

A    He's there.

Q    Who is the man in prison you had a conversation with about not going to trial?

HANS SEIDEL-QUINTERO APRIL 22, 2025        122
Redirect Examination by Mr. Leath

A    The one that's there.

MR. LEATH:  No further questions, Your Honor.

THE COURT:  All right.  Thank you.  You may step down.

Call your next witness.

MR. LEATH:  The United States calls Robin Castro Gomez.

THE COURT:  And approach the bench, please.

*(The following bench conference was held.)*

THE COURT:  You know when you ask questions, you've got to have a good faith belief that you're going to put on evidence to back up the questions.

MS. CASTANEDA:  Yes, Your Honor.

THE COURT:  Okay.

*(End of bench conference; proceedings resume in open court.)*

*(Robin Castro Gomez enters proceedings.)*

INTERPRETER:  Your Honor, there's an open piece of evidence here.  Should I --

MR. LEATH:  Permission to retrieve that, Your Honor.

THE COURT:  You may.

Swear the witness, please.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 123 of 166 PageID
1414
ROBIN CASTRO GOMEZ - APRIL 22, 2025                123
Direct examination by Mr. Leath

THE WITNESS:  Yes, Your Honor.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Castro Gomez, Robin.  C-A-S-T-R-O.

THE COURT:  Thank you.

Proceed.

MR. LEATH:  Thank you, Your Honor.

Mr. Castro Gomez, good afternoon.

THE WITNESS:  Good afternoon.

**DIRECT EXAMINATION OF ROBIN CASTRO GOMEZ**

**BY MR. LEATH:**

Q    Sir, why are you wearing an orange shirt?

A    Because I am in jail.

Q    And why are you in jail?

A    Because I am a narco trafficker.

Q    And did you plead guilty, more specifically, to conspiracy to traffic cocaine?

A    Yes.

Q    And did you plead guilty because are you guilty?

A    Yes.

Q    And did you plead guilty with a plea agreement with the United States?

A    No.

Q    Are you required to tell the truth here today?

A    Yes.

ROBIN CASTRO GOMEZ - APRIL 22, 2025                    124
Direct examination by Mr. Leath

Q    Sir, where are you from?

A    Colombia.

Q    And just give us a brief description of where you lived in Colombia.

A    In Colombia I lived in a town called San Juan in the Department of Nariño.

Q    And what did you do before you got into narco trafficking?

A    I worked in agriculture.

Q    And what kind of agriculture?

A    Planting several different -- how do I explain it?  Over there we -- we grow a lot of coconut, plantains, oranges, citrus.

Q    And can you go ahead and describe the various roles that you did in narco trafficking.

A    Well, once I began narco trafficking, I started with cultivating the plant, which that includes everything from the tilling to the harvesting, when the cocaine paste can be produced from.

Q    And then what did you do next?

A    Well, over time I met other people, and then I got into the transporting of drugs as such.

Q    And what type of transportation of drugs would you do?

A    Well, I started by traveling aboard the motorboats towards Central America.

Q    And then what did you do?

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 125 of 166 PageID
1416
ROBIN CASTRO GOMEZ - APRIL 22, 2025          125
Direct examination by Mr. Leath

A     Well, afterwards I went climbing until -- climbing up until I became a transporter.

Q     And what were your duties as a transporter?

A     Well, my duties were to make sure -- organizing everything for the boats so that the drugs would make it to Central America.

Q     And as part of your duties would you be involved in the purchase of engines for those vessels?

A     Could you repeat the question, please?

Q     As part of your duties with dispatching the vessels, would you be involved with purchasing the engines?

A     Yes, I would buy -- I would buy the engines.

Q     Could you describe how you would do that.

A     I'd buy the engines at a business which is called Agronautica.

Q     Do you see anyone in the courtroom here today who was involved in that business, Agronautica?

And, sir, what years would you buy the engines?

        MS. CASTANEDA:  Your Honor, can the record reflect that he did not identify anybody?

        THE COURT:  I can't hear you.

        MS. CASTANEDA:  Can the record reflect that the witness was unable to identify anybody after being asked?

        THE COURT:  Well, the record would already reflect that, since he hasn't identified anyone, but let the record

ROBIN CASTRO GOMEZ – APRIL 22, 2025                126
Direct examination by Mr. Leath

reflect he has not yet identified anyone.

MS. CASTANEDA:  Thank you.

BY MR. LEATH:

Q    So what years would you buy the engines?

A    Well, the thing, I haven't answered the question yet.  I'm analyzing the --

Q    That's okay.

What individuals would you buy engines from, sir?

A    From Juan Rios, the brother Milton Rios, and also Oscar Rios.

Q    And who would you buy engines from more, which brothers?

A    I'd buy from the Tumaco company, Agronautica.

Q    And who worked mainly in Tumaco that you worked with?

A    Juan Rios and Milton.

Q    And in what years would you buy engines?

A    I started buying the engines in the year 2015 until '18, more or less.

Q    And how many vessels did you dispatch?

A    I dispatched some 10, 12 vessels.

Q    And were any of those vessels interdicted?

A    Yes.

Q    How many?

A    Three.

Q    Sir, I'm going to go ahead and show a photo, a previously admitted exhibit.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 127 of 166 PageID
ROBIN CASTRO GOMEZ - APRIL 22, 2025       127
1418
Direct examination by Mr. Leath

THE COURT:  You may.

MR. LEATH:  Thank you, Your Honor.  29-D.

Q    And, sir, for those vessels, what type of drugs would you transport?

A    Cocaine.

Q    And approximately how much cocaine would you transport on those vessels?

A    Um, 3500, 1200 kilos of cocaine.

Q    And what type of vessels would you use?

A    I would use different vessels.

Q    And can you describe those for us.

A    There were some vessels that were 33-footers, others that were forty -- I don't know, 43, something like that, and others that we knew as the 900s, which were Ecuadorian vessels.

Q    And where would you send those vessels?

A    Costa Rica, Guatemala and Mexico.

MR. LEATH:  And, Your Honor, I'm going to show an exhibit that's been previously admitted, 28-D.

THE COURT:  You may.

MR. LEATH:  Thank you, sir.

BY MR. LEATH:

Q    Sir, do you recognize the vessel in this photo?

Let me zoom in.

A    Yes, sir.

Q    How do you recognize it?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 128 of 166 PageID 1419
ROBIN CASTRO GOMEZ - APRIL 22, 2025                128
Direct examination by Mr. Leath

A    Because of the manner, the manner of construction, I recognize it.

Q    And were you involved in the dispatch of this vessel?

A    Yes.

Q    And what were your duties?

A    There I played the role of a dispatcher, of the chief.

Q    And did this vessel -- did you dispatch it with cocaine?

A    Yes.

Q    And did you know what happened to this vessel before I showed you the photo?

A    Yes.

Q    And how did you know?

A    Because when that -- during that time, when that vessel was detained, we used to install these trackers on them, and the communications gear they had, so when they were detained, that allows them time to call the number that we give them for communicating, and that's how I found out that it had been detained.

Q    And, sir, earlier I asked you a question about identifying someone and you said you hadn't had the -- you haven't answered that question.  What did you mean by that?

A    Because I didn't answer that there was someone that -- I had not identified the person, but I can identify them.

Q    How can you identify them?

A    Well, he's seated, in white, and he's here across from me.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 129 of 166 PageID
1420
ROBIN CASTRO GOMEZ - APRIL 22, 2025    129
Direct examination by Mr. Leath

Q    And are you nervous for your testimony here today in court, sir?

A    Well, a little, yes.  I feel because of the -- the great number of people, I don't know.

Q    And, sir, for the record, did you buy engines from anyone that's here in the courtroom?

A    Yes.

Q    And who would that be?

A    Juan Rios.

Q    And can you identify him for the record, please.

A    Could you repeat, please?

Q    Could you identify what he's wearing for the record, please.

A    He's wearing a white sweater with black pants and clear glasses with black frames.

MR. LEATH:  Let the record reflect that the witness has identified the defendant.

THE COURT:  Let the record so reflect.

MR. LEATH:  One moment to confer with counsel, Your Honor?

THE COURT:  You may.

BY MR. LEATH:

Q    Sir, for the engines that you would buy for your smuggling vessels, would you remove the serial numbers from those engines?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 130 of 166 PageID
1421
ROBIN CASTRO GOMEZ - APRIL 22, 2025           130
Direct examination by Mr. Leath

A     No, I wouldn't remove them.  The motors would get to me without a serial.

Q     And would you ever have a serial number on those engines?

A     Repeat, please.

Q     Would there ever be a serial number on those engines? Would you check, or would you --

A     On a few occasions, yes.

MR. LEATH:  One moment, Your Honor.

I'm now going to show what's been previously admitted as Exhibit 28-A, Your Honor, publish that.

BY MR. LEATH:

Q     So, sir, you said on some occasions you would leave the serial numbers on; is that correct?

A     Yes.

Q     And why is that?

A     Because the serial number would be left there because I'd buy those engines and they would be purchased but not -- they wouldn't remain in anyone's name really.

MR. LEATH:  One moment, Your Honor.

BY MR. LEATH:

Q     And, sir, for those occasions you would leave the serial numbers on, does this photo represent one of those occasions?

A     Yes.

Q     And would your name be on those engines, or whose name?

A     It would be the name of some random person, because at

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 131 of 166 PageID
1422
ROBIN CASTRO GOMEZ - APRIL 22, 2025    131
Cross-examination by Ms. Castaneda

that time you'd buy it and at that time it would be Milton, and I'd ask him for an engine and he'd send them to me with no need to send him names of people or to sign anything, nor to sign for the engines, but on some you did have to sign for it.

Q   And why would your name not be on there?

A   Because, no, I didn't like buying them in my name, because I knew what the engines were for.

Q   And what were they for?

A   To work with narco trafficking.

MR. LEATH:  No further questions, Your Honor.

THE COURT:  You may proceed with Cross.

MS. CASTANEDA:  Good afternoon.

THE WITNESS:  Good afternoon.

**CROSS-EXAMINATION OF ROBIN CASTRO GOMEZ**

**BY MS. CASTANEDA:**

Q   You're from Colombia, right?

A   Yes.

Q   And you're a drug trafficker, right?

A   Yes.

Q   In the last couple of months have you shared a jail cell with anybody else from Colombia?

A   Could you repeat?

Q   In the last couple of months have you shared a jail cell with anyone from Colombia?

A   No.

ROBIN CASTRO GOMEZ - APRIL 22, 2025          132
Cross-examination by Ms. Castaneda

Q    Did you before you were extradited from Colombia to the United States?

A    Yes.

Q    Who?

A    My brother.

Q    What's your brother's name?

A    Alvaro Castro.

Q    Anybody else?

A    Oscar Quintero.

Q    Who is that?

A    Who is a compadre of mine from Colombia.

Q    Is he a narco trafficker as well?

A    Also a narco trafficker.

Q    You don't know Mr. Rios, do you?

A    Yes, I know him.

Q    You were prepared to testify today by another Colombian drug trafficker, weren't you?

A    No, sir.

Q    And you were told he's wearing white today, weren't you?

         MR. LEATH:  Objection, Your Honor.

         THE COURT:  Overruled.

Q    You said -- I'm sorry.  The answer was yes?

         THE COURT:  I'll overrule the objection.

A    I didn't -- could you repeat?

Q    You were told by somebody that Mr. Rios is wearing a white

shirt today, weren't you?

A    No, no one told me.  I'm seeing it.

Q    You said you put trackers on boats?

A    Yes.

Q    On the engines?

A    No, on the -- on the cargo.

Q    Who told you to do that?

A    What do you mean, who told me?  I did that for safety.
That was my responsibility.

Q    You put the trackers on every drug boat that you had?

A    Yes.

        MS. CASTANEDA:  No further questions, Your Honor.

        THE COURT:  Any Redirect?

        MR. LEATH:  Just briefly, Your Honor.  Thank you.

        **REDIRECT EXAMINATION OF ROBIN CASTRO GOMEZ**

**BY MR. LEATH:**

Q    Sir, now nervous are you to testify against the defendant
here today?

A    No, not anymore.  I'm normal.

Q    Not anymore?  You're comfortable?

A    Yeah, I feel comfortable now.

        MR. LEATH:  No further questions, Your Honor.

        THE COURT:  Thank you.  You may step down.

        Call your next witness.

        MR. LEATH:  Your Honor, the Government calls

Juan Moreno-Bonilla.

And, Your Honor, after this witness arrives, Mr. Bonilla, can we make preparations with the marshals to bring up the next witness after him?

THE COURT:  How long will you be with this one?

MR. LEATH:  I would say approximately 15 minutes, Your Honor.

THE COURT:  Before you swear the witness, Marshal, it is estimated this witness will take about 20 minutes.  Could you have the next witness ready to go, go ahead and bring him up?

U.S. MARSHAL:  Yes, sir.

THE COURT:  What's the name of the next witness?

MR. LEATH:  The next one would be Oscar Quintero.

*(Juan Moreno-Bonilla enters proceedings.)*

THE COURT:  Okay.  Swear the witness, please.

COURTROOM DEPUTY:  Yes, Your Honor.

Please raise your right hand.

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you shall give in these proceedings shall be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Could you please state your name and spell your last name for the record.

THE WITNESS:  Juan David Moreno-Bonilla.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 135 of 166 PageID
JUAN MORENO-BONILLA 1426PRIL 22, 2025        135
Direct examination by Mr. Leath

          J-U-A-N, D-A-V-I-D, M-O-R-E-N-O, B-O-N-I-L-L-A.

          COURTROOM DEPUTY:  Thank you.

          THE COURT:  You may have a seat.  Proceed.

          MR. LEATH:  Thank you, Your Honor.

          **DIRECT EXAMINATION OF JUAN MORENO-BONILLA**

**BY MR. LEATH:**

Q    So, sir, why are you wearing an orange shirt today?

A    Because I've come to testify and I'm in jail.

Q    And what are you in jail for?

A    For narco trafficking.

Q    And did you plead guilty to narco trafficking?

A    Affirmative.  Yes.

Q    Specifically, conspiracy to traffic cocaine?

A    Cocaine.  Cocaine, yes.

Q    And did you plead guilty because you were guilty?

A    I'm guilty.

Q    And did you have a plea agreement with the United States?

A    Have a plea agreement?

Q    When were you sentenced, sir, how long ago?

A    In October of 2015.

Q    And how long was your sentence?

A    15, 8 months.  15 years, 8 months.

Q    And do you understand you're required to tell the truth
today?

A    Affirmative.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 136 of 166 PageID
1427
JUAN MORENO-BONILLA - APRIL 22, 2025        136
Direct examination by Mr. Leath

Q    Sir, briefly, where are you from?

A    Buenaventura.

Q    And what did you do before you got into narco trafficking?

A    I would do the transportation of fish.

Q    And anything else?

A    And I was also in the Army.  I was in the Army.

Q    Which Army?

A    The Colombian Army.

Q    And will you please describe for us how you got involved in narco trafficking.

A    Oh, by way of some friends.

Q    And just go ahead and explain to us how that occurred.

A    Well, I had a lot of friends that were into drug trafficking, and I retired from the Army to get into the narco trafficking.

Q    And what roles did you serve as in narco trafficking? What different jobs did you do?

A    I was always a boatman.

Q    And can you go on and describe what a boatman means.

A    A boatman is when someone hires you to do a trip.

Q    What kind of trip?

A    With -- what kind of trip?  Like with cocaine, we'd leave from El Chocó to Panama.

Q    And what were -- what were your responsibilities for those trips?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 137 of 166 PageID
1428
JUAN MORENO-BONILLA - APRIL 22, 2025              137
Direct examination by Mr. Leath

A    My responsibilities were to get the merchandise to Panama.

Q    And what was that merchandise?

A    Cocaine.

Q    And did you ever buy any engines from these vessels?

A    No.  I was a traveler, then I went up.  Afterwards I became a dispatcher.

Q    Okay.  What was a dispatcher?  What did a dispatcher do?

A    When you organize a motorboat and you send it to Panama or Costa Rica or wherever the owner of the merchandise says.

Q    And would you gather different items needed for the vessel?

A    Affirmative.

Q    And would one of those items be engines?

A    Engines.

Q    And where would you get those engines?

A    The engines, I'd buy them there in Buenaventura from Mr. Juancho, El Papi.

Q    And do you see that individual in the courtroom here today?

A    Well, I'd have to look around to see.

Q    Go ahead and look around.

A    Yeah, there he is in white.

Q    And can you go ahead and just identify what he's wearing and where he's sitting.

A    He's seated there.

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 138 of 166 PageID
1429
JUAN MORENO-BONILLA - APRIL 22, 2025          138
Direct examination by Mr. Leath

MR. LEATH:  Let the record reflect he identified the defendant.

THE COURT:  Let the record so reflect.

BY MR. LEATH:

Q    And how many times have you met the defendant?

A    How many times I've seen him?

Q    Yes.  Have you seen him in person?

A    I've seen him in person several times.

Q    And did you personally purchase engines from him?

A    Yes.  Affirmative.

Q    Have you ever witnessed the defendant aware of why you were using those engines or the purpose behind those engines?

A    Of course.

Q    How?

A    Because when I would do business with him, I would tell him, and there happened to be these special engines and to bring me those, the 200s, 250s, and it just so happens that he told me that he would do the mounting of it, the accessories.

Q    Were you ever aware of the defendant investing in individual kilos of cocaine or loads of cocaine?

A    Oh, when I -- when I was -- when I did the first trip, when I didn't have the money to buy the engines, the owner told me to sell 50 kilos out of that, and out of that a friend purchased 40 and El Papi, Juancho, purchased 10.

Q    And so the individual who purchased 10 kilos of cocaine in

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 139 of 166 PageID
1430
JUAN MORENO-BONILLA - APRIL 22, 2025          139
Cross-examination by Ms. Castaneda

that trip is the defendant?

A    The defendant.

Q    And walk us through that transaction.  So once he purchases the cocaine, what happens next?

A    Because I didn't have money to purchase the engines with, so from that he gave me the engines and he gave me the balance, the money.  Once the trip was successful, I gave him his profit out of the 10 kilos.

Q    So you personally gave him his profit from the cocaine?

A    Affirmative.

Q    Was anyone else present at this meeting?

A    Yes, my partner was there, Barilla, my partner.

MR. LEATH:  One moment to confer with Counsel, Your Honor.

No further questions, Your Honor.

THE COURT:  Cross?

MS. CASTANEDA:  Thank you.

Good afternoon.

THE WITNESS:  Good afternoon.

**CROSS-EXAMINATION OF JUAN MORENO-BONILLA**

**BY MS. CASTANEDA:**

Q    You said that you bought engines from Mr. Rios in Buenaventura at his shop?

A    Not at the store.  We always negotiated with him in Cali and he would place them in Buenaventura for me.

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 140 of 166 PageID
1431
JUAN MORENO-BONILLA - APRIL 22, 2025          140
Cross-examination by Ms. Castaneda

Q    What street is his shop on?

A    That there is called Pueblo Nuevo.

Q    Which store are you talking about?

A    The stores like that, by name, I didn't know them, but I did know where they were at.

Q    You don't know the name of the store?

A    No, because I never dealt with him there at the store.

Q    You're from Colombia, right?

A    Yes, Colombia.

Q    And you're a drug trafficker, right?

A    Yes.

Q    And the last couple of months have you shared a jail cell with any other Colombian drug traffickers?

A    Of course.

Q    Who?

A    Currently?

Q    Yes, currently.

A    There's some guys who are boatmen.

Q    And what about before?

A    You mean in prison or over here where I'm at, at County?

Q    Let's start with in Colombia at Picota.

A    Oh, in La Picota.  In la Picota I was with other Colombians, but I didn't know them.

Q    None of them are drug traffickers?

A    No, because I was with -- well, there were narco

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 141 of 166 PageID
1432
JUAN MORENO-BONILLA - APRIL 22, 2025          141
Cross-examination by Ms. Castaneda

traffickers, but I didn't share a cell with one.

Q    Did you share a patio with any of them?

A    Yeah, because they have different cases like for being paramilitaries or being guerillas, that, and their extradition fell through over there.

Q    How would you know that if you didn't share a cell with them?

A    I did share cells with them.  There were three of us in a cell.

Q    Who were they?

A    One of them was from Turbo, I called him El Brujo.

Q    And the other two?

A    No, there were three of us, El Brujo, and the other one was an old man who was a brother of a commander from the guerilla.

Q    And what about here in the United States, what Colombian drug traffickers have you shared cells with?

A    Like "cell" cell you say?  Let me remember.
        Well, at Coleman Low, there I was always with my co-defendant, we shared a cell.

Q    What's his name?

A    Caicedo-Valencia.

Q    And what about before you were sent to Coleman, what about in county jail?

A    At Pinellas?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 142 of 166 PageID
1433
JUAN MORENO-BONILLA - APRIL 22, 2025                    142
Cross-examination by Ms. Castaneda

Q    Yes.

A    I also shared a cell with him there.

Q    Who else?

A    Who else?  Who else?  There are people from different regions, from Satinga, from Tumaco.

Q    Did you talk to them?

A    Of course, we talk.

Q    What about Hernando?

A    I was never at Hernando.

Q    What about Citrus?

A    Citrus, good.  I was there.

Q    Were you housed there before?

A    Well, when I -- when I was sentenced, I arrived at Citrus, I did a month there, then from there they sent me back to Pinellas, and then from there to prison.

Q    Which Colombian drug traffickers were you housed with at Citrus?

A    No, there I was with some boatmen as well.  They were boat guys, Ecuadorians.

Q    Who were you transported with today?

A    Who was I transported with?  Well, I came there with a Mexican who is here for reentry.

Q    What about yesterday?

A    Yesterday?

Q    Were you transported here yesterday?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 143 of 166 PageID
1434
JUAN MORENO-BONILLA - APRIL 22, 2025    143
Cross-examination by Ms. Castaneda

A    No.

Q    Were you told that the defendant is wearing white?

A    No.

Q    You don't know Mr. Rios, do you?

A    Mr. Who?

Q    You don't know Mr. Rios, do you?

A    I know Mr. Rios.

Q    Who prepared you to testify against him today?

A    Who prepared me to testify today?  Oh, the agents and the Government.

Q    Which Colombian narco trafficker did?

        MR. LEATH:  Objection, Your Honor.  Lack of foundation.

        THE COURT:  Overruled.

A    No.  No.  No.  No.  No.  No.  No.  Traffickers, no.

Q    Have you ever tried to buy information about drug trafficking activities for your benefit?

A    If I've tried to purchase activities?

Q    Have you ever tried to buy information about drug trafficking to reduce your sentence?

A    Like what type of information like that?

Q    Any information.

A    No.  When I was -- I always tried to get busts, I had a lot of friends out there that wanted to help me, but the opportunity never came about.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 144 of 166 PageID
1435
JUAN MORENO-BONILLA - APRIL 22, 2025        144
Cross-examination by Ms. Castaneda

Q    So you never paid anybody for that information?

A    No.  No.  Never.

            MS. CASTANEDA:  Thank you, Your Honor.

            THE COURT:  Any Redirect?

            MR. LEATH:  No, Your Honor.

            THE COURT:  Thank you, sir.  You may step down.

            Call your next witness.

            MR. LEATH:  The United States calls Oscar
Quintero-Rengifo.

            *(Oscar Quintero-Rengifo enters proceedings.)*

            THE COURT:  Swear the witness, please.

            COURTROOM DEPUTY:  Please rise and raise your right
hand.

            Do you solemnly swear or affirm, under penalty of
perjury, that the testimony you shall give in these proceedings
shall be the truth, the whole truth and nothing but the truth?

            THE DEFENDANT:  Yes.

            COURTROOM DEPUTY:  Could you please state your name
and spell your last name for the record.

            THE DEFENDANT:  Quintero, Oscar.  Quintero-Rengifo,
Oscar.

            COURTROOM DEPUTY:  Could you spell it, please.

            THE COURT:  Spell your last name.

            THE DEFENDANT: Q-U-I-R -- no.  R -- no.  I'm sorry.

            THE COURT:  All right.  You may have a seat.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 145 of 166 PageID
1436
OSCAR QUINTERO-RENGIFO    APRIL 22, 2025         145
Direct examination by Mr. Baeza

MR. BAEZA:  Okay.  Good afternoon, sir.

THE WITNESS:  Good afternoon.

**DIRECT EXAMINATION OF OSCAR QUINTERO-RENGIFO**

**BY MR. BAEZA:**

Q    Why are you in an orange jumpsuit today?

A    Because I am a Federal inmate.

Q    In your own words, tell the jury what you did.

A    I trafficked with drugs.

Q    Did you plead guilty?

A    Yes, sir.

Q    Did you plead guilty because you are guilty?

A    Yes, sir.

Q    Were you sentenced already?

A    Yes, sir.

Q    What was your sentence?

A    250 months.

Q    Were you -- did you have a nickname in the Colombian media?

A    Yes.

Q    What was it?

A    Guatala and El Principe de los Sumergibles.

Q    Does that translate to the Prince of Semi-Submersibles?

INTERPRETER:  Your Honor, the interpreter is answering yes to the Government's question.

MR. BAEZA:  Oh.  Thank you.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 146 of 166 PageID
1437
OSCAR QUINTERO-RENGIFO    APRIL 22, 2025    146
Direct examination by Mr. Baeza

BY MR. BAEZA:

Q    Is there anyone in this courtroom who worked with the Prince of Semi-Submersibles?

A    Working directly?  No.

Q    Was there someone who helped with the purchase of property?

A    Yes.

Q    Was there someone who helped -- excuse me, withdrawn.

Was there someone who offered to help launder your drug money?

A    Yes.

Q    Is that the same person?

A    Yes, sir.

Q    Who is that person?

I need an audible answer, sir.

A    Juan Rio.

Q    Did you know him by any nicknames?

A    As Papi.

Q    Can you describe him by an article of clothing and where he's sitting?

A    A white sweater.  He has glasses.

MR. BAEZA:  Let the record reflect the witness has identified the defendant.

THE COURT:  Let the record so reflect.

BY MR. BAEZA:

Q    How long have you known Mr. Rios-Silva?

A    I can't recall well, but many years.

Q    All right.  Can you give an estimate on how long you've known him?

A    Ten, 12 years.

Q    All right.  How did you meet him?

A    By way of some gentlemen that were called the Narvaezes, and I started working with them and they would buy engines and things for the management of the motorboats, to do the drug transports.

Q    How many drug trips were you involved in while working with the Narvaezes?

A    Many.  Around 15, 12, 13.

Q    What did you start out as in this organization?

A    A -- what do you call it, like a gofer, a gofer.

Q    Okay.

A    An errand boy.

Q    And then over the years did you move up to having your own organization?

A    Yes, sir.

Q    And approximately when did you begin starting to send semi-submersibles?

A    In 2016, 2015, 2016.

Q    And how many semi-submersibles were you involved in

Case 8:21-cr-00286-JSM-NHA     Document 270     Filed 05/23/25     Page 148 of 166 PageID
1439
OSCAR QUINTERO-RENGIFO     APRIL 22, 2025     148
Direct examination by Mr. Baeza

sending?

A     About 13, 14.

Q     About how many kilos on each one?

A     Between 5 and 7 tons, 8 tons.

Q     What was the destination?

A     Central America, Guatemala, Mexico.

Q     What organizations were receiving the cocaine that you were involved in sending?

A     I know there was a man from Guatemala, a mayor, I don't remember, and in Mexico, the Sinaloa cartel.

Q     Do you recall the name Eric Zuniga?

A     Yes, sir.

Q     Who is Eric Zuniga?

A     He was the one in charge of receiving the shipments that would arrive at Guatemala.

Q     And with respect to the Sinaloa cartel, who did you work with?

A     I don't know, because that there, there was a Colombian that had the contacts over there with them.

Q     Who was the Colombian?

A     Hugo Verdugo.

Q     You described 13 to 14 semi-submersibles sending between 5 and 7 tons of cocaine each time.  Is it your testimony today though that you didn't personally purchase engines from the defendant for those ventures?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 149 of 166 PageID
1440
OSCAR QUINTERO-RENGIFO     APRIL 22, 2025          149
Direct examination by Mr. Baeza

A      I purchased a couple.

Q      How many?

A      Two.

Q      Did you purchase them directly or through an intermediary?

A      Directly.

Q      Were those vessels ever dispatched?

A      Yes.

Q      Did you ever purchase motors from the defendant for a vessel that was not dispatched?

A      No.

Q      Where are you from, sir?

A      From Colombia.

Q      Whereabouts?

A      Tumaco.

Q      Did you know the name of the defendant's business?

A      Yes.

Q      What was it?

A      Agronautica.

Q      Regarding the construction of semi-submersibles, where was that conducted?

A      In a village named San Juan on the coast.

Q      Was this an area controlled by the FARC?

A      Yes, sir.

Q      What is the FARC?

A      A group, they call themselves to be a revolutionaries in

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 150 of 166 PageID
1441
OSCAR QUINTERO-RENGIFO   APRIL 22, 2025         150
Direct examination by Mr. Baeza

Colombia, an armed group.

Q   Do you recall the dates on the semi-submersibles you purchased -- or, withdrawn.

Do you recall the dates of the semi-submersibles for which you purchased engines from the defendant and for which the trip was successful?

A   The date?  Approximately about 2018.

Q   Whenabouts?

INTERPRETER:  Repeat please, Counsel?

Q   About when in 2019?

A   In 2018 I bought a couple of engines directly, but I stored those engines and the job was able to be done in 2019.

Q   All right.  So you bought them in 2018 but did not dispatch until 2019?

A   Yes, sir.

Q   Who got you started in the semi-submersible business?

A   Well, I used to work previously with go-fasts, and the gentleman I mentioned earlier that I used to work for, one day he asked me if I could get a submersible for him.

Q   Who was that person?

A   Hugo Verdugo.

Q   Mr. Verdugo asks you to go get him what on his behalf?

A   Submersibles.

Q   And when he says get a semi-submersible, what did you understand that to be?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 151 of 166 PageID
1442
OSCAR QUINTERO-RENGIFO  APRIL 22, 2025     151
Direct examination by Mr. Baeza

A    Well, that's like a submersible to transport large amounts of drugs.

Q    Okay.  So what did you take that direction from Verdugo to do?

A    Find someone that would build them.

Q    All right.  And what else?

A    To be able to organize it, to dispatch it, and since I didn't know, I didn't understand, I didn't have a lot of knowledge about that, I asked Juan Rios if he had someone that could either sell me or build that submersible for me, and he set a date for me to meet Rodrigo Piñeda, and then that's when I began to have knowledge.

Q    In or around what year was that?

A    In 2016, like I said.

Q    How much money were you making from these submersibles?

A    Approximately a million.

Q    Is that a million Colombian pesos or American dollars?

A    Dollars.

Q    That's for each trip?

A    Yes, sir.

Q    So your personal take-home was $1 million?

A    Yeah.  Well, out of that I also had to share with another partner that I had.

Q    Okay.  So you make $1 million.  How much -- how much of it do you have to share, how much do you get to keep?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 152 of 166 PageID 1443
OSCAR QUINTERO-RENGIFO    APRIL 22, 2025         152
Direct examination by Mr. Baeza

A    Half.

Q    Okay.  So about a half a million dollars was yours; is that accurate?

A    Yes, sir.

Q    Cash, bank accounts, crypto?

A    Cash.

Q    Why cash?

A    Because you can't move that through banks.

Q    Did the defendant ever transport drug money on your behalf?

A    Yes.

Q    To the best of your recollection, how many times?

A    About three, four times.

Q    How much money did he transport for you each time, to the best of your recollection?

A    About 300, $400,000.

Q    And once again, you said dollars, do you mean American dollars?

A    No, because I do the conversion, it was Colombian money.

Q    It was Colombian money, but what is your -- what is your estimate of the American dollars involved?

A    300 to $400,000.

Q    Where did that money come from?

A    That money would be given to me by Mr. Verdugo to pay the guerilla tax.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 153 of 166 PageID
1444
OSCAR QUINTERO-RENGIFO    APRIL 22, 2025    153
Direct examination by Mr. Baeza

Q    Well, where did Mr. Verdugo's money come from?

A    From narco trafficking.

Q    So you asked Mr. Rios-Silva to transport drug money at least three times, between 300 and $400,000, to pay the tax to the FARC guerillas.  Am I accurate so far?

A    Yes, sir.

Q    What, if any, share of that did Mr. Rios-Silva get to keep?

A    They would charge 1 percent or one-and-a-half.

Q    So about 3 to three-and-a-half thousand dollars?

A    Yes, sir.

Q    Who else worked with the defendant in the operation of their engine business?

A    His brother.

Q    What was his brother's name?

A    Milton Rios.

Q    What if any businesses did the defendant want you to -- ask you to invest in with your drug money?

A    The first one was for concerts.

Q    Can you describe in detail your recollection of the concerts that Mr. Rios-Silva asked you to invest in.

A    There was a concert where they were going to bring Mark Anthony and I don't remember who.  There were other artists.

Q    Okay.  What was the purpose of investing in the concert?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 154 of 166 PageID
1445
OSCAR QUINTERO-RENGIFO   APRIL 22, 2025    154
Direct examination by Mr. Baeza

Describe to the best of your recollection what that purpose was.

A    To be able to try and have a profit and for it to be legal.

Q    All right.  When you say try to have a profit and have it be legal, what do you mean by that?

A    That since the money that I had in cash I could not, how do you say it, report it, so by way of these events you could clean it up or legalize it.

Q    Did you agree to do that?

A    Yes.

Q    Are you aware of other narco traffickers who agreed to do that as well?

A    No.

Q    How much did you invest at the behest of Mr. Rios-Silva in this concert?

A    About 300, 400 million pesos.

Q    How many dollars is that?

A    About 100,000.

Q    How much money did you make from this?

A    I really don't remember.  It was -- that was kind of like pocket change.  He didn't pay it any mind.

Q    $100,000 is pocket change?

A    Well, that's how we'd say over there.

Q    All right.  Before we get to businesses, I want to ask you

OSCAR QUINTERO-RENGIFO    APRIL 22, 2025      155
Direct examination by Mr. Baeza

something about your background.

Do you currently take any medication?

A    No.

Q    Did you previously take medication for anxiety or depression?

A    A long time ago.  About five, six, seven years ago.

Q    Despite that, you're thinking clearly today?

A    Yes, sir.

Q    Just to confirm.

What other businesses were you involved in with the defendant?

A    I purchased properties.

Q    All right.  Let's talk about -- let's talk about properties.

MR. BAEZA:  Can we put on the ELMO, please.

Q    All right.  I'm showing you what's already been admitted into evidence as Government's Exhibit 29-A.  Do you recognize this document, sir?

A    Yes, sir.

Q    What is it, sir?

A    It's a purchase agreement for a property.

Q    Who was the seller?

A    Juan Rios.

MR. BAEZA:  I apologize.  I've been zooming in and zooming out and moving the paper around.  I apologize to

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 156 of 166 PageID
1447
OSCAR QUINTERO-RENGIFO   APRIL 22, 2025         156
Direct examination by Mr. Baeza

everybody in the room who may have gotten dizzy from me.

BY MR. BAEZA:

Q    Who was the purchaser?

A    The purchaser was -- well, I don't remember well, but I signed, I signed the purchase agreement.

Q    You were asked to spell your name earlier and you had some trouble.  Do you also have trouble reading?

A    No.

Q    Okay.  Do you recognize your signature there, sir?

A    Yes, sir.

Q    How much -- what property were you purchasing from Mr. Rios-Silva?

A    A plot of land.

Q    How much did you pay for this plot of land from Mr. Rios-Silva?

A    About 145 million pesos.

Q    How many dollars is that, to the best of your knowledge?

A    About 35,000.

Q    How did you pay?  What was the method of payment?

A    Cash.

Q    Why cash?

A    Because, well, as I said, the money that I had was money that I could not have at the bank.

Q    You previously said that you -- that this was put in the name of another person.

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 157 of 166 PageID
1448
OSCAR QUINTERO-RENGIFO    APRIL 22, 2025    157
Direct examination by Mr. Baeza

A    Yes.

Q    Why did you put this property in the name of another person?

A    Because I was committing crimes and I could not have something in my name.

Q    What was the source of the money that you used to buy this property?

A    Where did it come from?

Q    Yes, sir.

A    Narco trafficking.

Q    What, if anything, did you ever communicate to Mr. Rios-Silva about you being a narco trafficker?

A    Yes.

Q    No.  What, if anything, did you say to Mr. Rios-Silva about you being a narco trafficker?

A    Well, he knows me, where I'm from, and how I obtain things.

Q    What do you mean, he knows how you obtain things?

A    Because I would mention certain things to him about what I was going to do.

Q    Like what?

A    Well, that I was trafficking drugs.

Q    To the best of your recollection, what would you say to Mr. Rios-Silva to communicate that you were trafficking drugs?

A    Well, that I was working, that -- that things had changed

for me, because I had come from -- like I said, I had been an errand boy and, well, I sought him out because I knew he had knowledge, that he could help me to make investments.

Q    When you were extradited to the United States, did you ever see the defendant at the Citrus County Jail?

A    Yes, sir.

Q    Do you recall ever being -- having your cell searched and a phone was located?

A    Yes, sir.

Q    How did you obtain that phone?

A    By way of an inmate that was there, he introduced me to -- I don't remember well, but it was by way of another inmate, I believe.

Q    Who was the inmate?

A    Juan Rios.

Q    Tell us about how the defendant helped you get a phone while in jail.

A    Well, when I arrived, he had a tiny phone, and he told me, well, that there was someone that could obtain one for me, like the one they took from --

          THE COURT:  Approach the bench.

          MR. BAEZA:  Yes, Your Honor.

           *(The following bench conference was held.)*

          THE COURT:  What does this have to do with this case?

          MR. BAEZA:  It's just impeachment material because he

Case 8:21-cr-00286-JSM-NHA   Document 270   Filed 05/23/25   Page 159 of 166 PageID
1450
OSCAR QUINTERO-RENGIFO   APRIL 22, 2025        159
Direct examination by Mr. Baeza

had a contraband phone.

THE COURT:  So you're trying to use some bad act that he committed in jail to impeach him in advance or something?

MR. BAEZA:  Make the exception for the accusation, Your Honor, just addressing the fact that he had a contraband phone but he also got it from the defendant.

We can just leave it at this if you want.

THE COURT:  I vote for that.

*(End of bench conference; proceedings resume in open court.)*

MR. BAEZA:  I only have a few minutes left, Mr. Quintero, so I'm going to move to the final set of questions I have for you.

BY MR. BAEZA:

Q   You've mentioned businesses that the defendant asked you to invest in.  We've talked about concerts.  We've talked about the land transaction.  What, if any, other businesses?

A   One to obtain gold, gold, bauxite, something like that. I don't remember.

Q   Who -- withdrawn.

Did you accept the defendant's invitation to invest in gold?

A   No, sir.

Q   The cocaine you were involved in trafficking, in your own words, why do you believe that it was ultimately intended for the United States?

A    Because we all know that it ends up here, where they pay the most for it.

MR. LEATH:  No further questions.

THE COURT:  You may proceed with Cross.

MS. CASTANEDA:  Thank you.

INTERPRETER:  Your Honor, may the interpreter inquire for a possible correction?

THE COURT:  Yes.

INTERPRETER:  Your Honor, previously the interpreter stated it was a plot of land.  It was more for a structure, a building.

THE COURT:  That was purchased?

INTERPRETER:  Yes.

THE COURT:  How long do you have on Cross?

MS. CASTANEDA:  Five minutes, Your Honor.

THE COURT:  Proceed.

MS. CASTANEDA:  May I use the ELMO?  Thank you.

I'm referencing the same Government Exhibit 29-A.

Good afternoon.

THE WITNESS:  Good afternoon.

**CROSS-EXAMINATION OF OSCAR QUINTERO-RENGIFO**

**BY MS. CASTANEDA:**

Q    You said you signed for this document?

A    Yes.

Q    But you don't know what it's for, do you?

A    For the purchase of a property.

Q    But you're just going off the basis of what you can read, right?

A    No.

Q    So this is for land or a house?

A    It's like a house.  It's a locale, like an office.

Q    So is it for somebody to live in or to work in?

A    That was to rent it to them themselves, because they had the real estate company there.

Q    Are you cousins with Hans Seidel Quintero?

A    Yes.

Q    And he told you about Mr. Rios, didn't he?

A    No.

Q    You knew on your own?

A    Yes.

Q    You're from Colombia, right?

A    Yes.

Q    And you're a drug trafficker, right?

A    Yes.

Q    Were you in Picota jail before you were extradited?

A    Yes.

Q    Did you share a jail cell with any other Colombian narco traffickers before you were extradited?

A    Yes.

Q    Who?

Case 8:21-cr-00286-JSM-NHA    Document 270    Filed 05/23/25    Page 162 of 166 PageID
1453
OSCAR QUINTERO-RENGIFO    APRIL 22, 2025    162
Cross-examination by Ms. Castaneda

A    There were so many, because we were -- there were six of us each time, so there were many.

Q    Just do your best to recall, please.

A    Well, I was with my boss, with Hugo Verdugo, with -- who else can I mention?  There's many.  Aprias.
        The thing is that since they're nicknames --

Q    What about when you got to the United States, were you in Pinellas first?

A    Yes.

Q    Who were you housed with there from Colombia?

A    I arrived from Colombia with Robin Castro, and Juan Rios was, and there was another Colombian whose name I can't recall that was there also.

Q    And what about at Citrus?  Did you ever go to Citrus County Jail?

A    Yes.

Q    And who were you housed with there from Colombia?

A    Alonzo Piñeda was there.  Juan Rios.  There was another Juan, Garcia.  Jesse.  I don't remember the other names.

Q    And what about Hernando County?  Were you ever at Hernando County jail?

A    I was there just for one night and they took -- they brought me out the next day.

Q    Do you remember being housed with any Colombian narco traffickers there?

OSCAR QUINTERO-RENGIFO APRIL 22, 2025          163
Cross-examination by Ms. Castaneda

A    No.

Q    And where are you housed permanently right now?

A    At Pinellas.

Q    And have you been at Pinellas since you came to the United States?

A    I've been in different areas.

Q    Did you go to any Federal prison?

A    Yes.

Q    Were you housed with Colombian narco traffickers there?

A    Yes.

Q    And who do you recall being housed with there?

A    There's just so many.  There's a Mr. Yuca.  There's a Guajira.  There's just -- there's too many.

Q    Which Colombian narco trafficker prepared you to testify today?

A    No, no one's prepared me.

Q    You didn't talk to your cousin?

A    No.

Q    Have you ever purchased information about drug trafficking to reduce your sentence?

A    No.

Q    Sometimes that's called a positivo.  Did you ever try to buy information about a positivo?

A    No.

        MS. CASTANEDA:  Thank you, Your Honor.

THE COURT:  Any Redirect?

MR. LEATH:  No, Your Honor.

THE COURT:  You may step down.

We'll be in recess until 9:30 tomorrow morning.

*(Jury exits proceedings.)*

THE COURT:  How are we doing time-wise?

MR. BAEZA:  Your Honor, we are officially ahead of schedule.

THE COURT:  Okay.  That means we're going to finish by Thursday?

MR. BAEZA:  Potentially.  Potentially we could rest by Thursday, Your Honor.

THE COURT:  Okay.  You're getting me excited.

MR. BAEZA:  I can tell.

THE COURT:  How much time does the defense have now, do you think?

MS. CASTANEDA:  I would say we need a day, Your Honor, but I will be as quick as possible, but I would say a full day.

THE COURT:  Okay.  And have you agreed on jury instructions?

MS. CASTANEDA:  I haven't talked to the United States about it, but we can talk now.

THE COURT:  Okay.  How about if you talk about the jury instructions and the verdict form and then let me know

tomorrow morning if you've agreed on those.

MS. CASTANEDA:  Yes, Your Honor.

THE COURT:  See you tomorrow morning.

- - - - -

(Proceedings adjourned at 4:30 p.m.)

- - - - -

C E R T I F I C A T E

This is to certify that the foregoing transcript of proceedings taken in a jury trial in the United States District Court is a true and accurate transcript of the proceedings taken by me in machine shorthand and transcribed by computer under my supervision, this the 14th day of May, 2024.


/S/ DAVID J. COLLIER


DAVID J. COLLIER

OFFICIAL COURT REPORTER